JUDGE GUZMAN
MAGISTRATE JUDGE SCHENKIER

07 C 6916

# EXHIBIT A

IN THE
CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

THOMAS ARMSTRONG, LISA FARR,         )
DAVID BALLARD, MIKE BLAUHORN,    )
ROY BOX, CAROL BOX, SHAWN BRAYSHAW, )
CHELAN BRAYSHAW, CLIFF CAUKELL,    )      2007L012766
JOE CHEVALDAVE, OLGA CHEVALDAVE,    )      CALENDAR/ROOM T
NICHOLAS CIFARELLI, DAVID DUCHARME, )      NONE 00:00
CHRISTINE NICHOL, MARIA ILONA ELSMORE, )     Fraud
JIM FITCHETT, LEN FREETH,          )      Jury Demand
MARYSE GALLYSSANT, KURT GASSER,    )
WAYNE GEROW, THERESA GEROW,     )      Complaint
DAVID GLOVER, KERRIE GLOVER,      )
JOANNE GUSTAFSON, KAY ARMSTRONG   )      Damages In
BEVERLY HASCARL, LEE HEICHERT,     )      Excess of $50,000
DEBBIE HICKS, CHAD HICKS, DARRIN HICKS, )
PETER HIEBERT, DIANE HOWARD,      )
BRUNO HUBER, ANDREAS HUETTIG,     )
GARTH HUNTER, GEORGE IVERSON,     )
SUSAN DAVIES, JOANNE JORDAN,      )
LEONARD KAPLAN, BIPPY MCMASTER,    )
SHIRLEY KOSIANCIC, HILARY BITTEN,    )
URSULA KRIEGER, BOBBY KOVAR,      )
ELVIRA LANG, PHILIP LARSTONE,      )
JEFFERY LIOCE, ANTONIO LIOCE,      )
GUISSEPINA LIOCE, GUNTER LEYER,     )
MARIANNE LEYER, GERDI MAUCHER,    )
JAMES MELLEN, DOROTHY MELLEN,    )
GEORGE MELLEN, WERNER MENGLER,   )
MARILYN MENGLER, TYLER MENGLER,   )
ANITA MICHIELS, HENRY MOREY,      )
JAMES MORRIS, BELINDA NUNN,      )
BRIAN NURSEY, DIANA NURSEY,      )
OMEGADENT SERVICES, LTD.,        )
GENE PARKER, CAROLYN PARKER,     )
YVES PELLETIER, MICHELLE PELLETIER,  )
MARK PERRY, ULRIKE PERSCH,       )
SYBILLE PROCHASKA, RONALD PROVAN,  )
KATHY PROVAN, DAN ROBBINS,      )
DENNIS ROGERS, BARRY RYRIE,      )
BRUCE RYRIE, LYNETTE RYRIE,      )
NORM SANDERSON, JR., TROY SALADANA, )
DICK SCHULTZ, JOAN SCHWARTZENBERGER, )
MIKE SEATON, KAREN SEATON,      )

FILED
2007 NOV -9 PM 4:09
DOROTHY BROWN
CLERK OF CIRCUIT COURT
LAW DIVISION

NELSON SLOBODA, CRAIG SOWINSKI,                    )
INDRA STRUEBBE, SEAN TOBIN,                        )
ASAMI SUDO, BETH TROTTER,                          )
TWAMLEY HOLDINGS, ALLAN CECCON,                    )
MICHAEL VAN DEUSEN,                                )
PATRICIA VAN DEUSEN, ALLEN WALKER,                 )
THERESA WALKER, FRED WEDGEWOOD,                    )
DAVID WELCH, SHELLEY WELCH,                        )
MICHELLE WHITCOMB, SANDRA WHITCOMB,                )
MATHIAS WIESMANN, SAMUEL WIESMANN,                 )
LANA WOCKNITZ, ELAINE WOODS,                       )
JAMES YORK, THOMAS ZARP,                           )
HENRIETTE ZARP, ELIZABETH BERGER,                  )
BRADLEY ROBERTS, GIOVANNA CUNSOLO                  )
AUDREY KANYO, KELMAN KANYO,                        )
TIMOTHY PETER McCRORY, HAMISH FRASER,              )
JOHN VANDEN HEUVEL, JEFFERY POPHAM,                )
BUSINESS PARADIGM PROPERTIES, LTD.,                )
GERMAIN-GEISLER FAMILY TRUST by                    )
DIANNE GERMAIN as its Trustee,                     )
HANS JOSEF SCHONEBERGER, and                       )
BARBARA POENSGEN,                                  )
                                                   )
        Plaintiffs,                                )
                                                   )
        v.                                         )
                                                   )
Interactive Brokers, LLC,                          )
                                                   )
        Defendant.                                 )

Table Of Contents

I.     Nature of Case
       ..................................................................................................1

II.    Plaintiffs
       ..................................................................................................2

III.   Defendant
       ...............................................................................................13

IV.    Venue
       ...............................................................................................14

V.     Facts
       ...............................................................................................14

       a.    Steele Opened A Commodity Futures Trading Account
             At Interactive Stating That He Had A Liquid Net Worth
             Of Only $175,000, That He Was Self-Employed As A
             Commodity Futures Trader, That All Of The Money
             That Would Be Deposited Into His Account Would Belong
             To Him, And That He Would Be Trading Only For Himself
             ...............................................................................................14

       b.    Steele Formed Separate Partnerships With Shannon And
             Fulkco
             ...............................................................................................15

       c.    Interactive Accepted Wire Transfers From Third Parties
             Totaling $7.7 Million That It Credited To Steele's Account
             ...............................................................................................17

       d.    Interactive Issued Checks Made Payable To Steele Person-
             ally Or Wire Transferred Approximately $3.1 Million To His
             Personal Bank Account
             ...............................................................................................18

       e.    Interactive Executed Speculative Futures Trades For
             Steele That Were Worth Many Millions Of Dollars
             That Resulted In Losses Of About $4.3 Million
             ...............................................................................................18

       f.    Interactive Knew The Money In Steele's Account Did
             Not Belong To Him
             ...............................................................................................18

g.   Interactive Urged Steele To Limit The Number Of
     Deposits That Would Be Made Into His Account
     Because His Regular Activity For Making Deposits Was
     Raising Flags, Particularly When Withdrawals
     Were Made On The Same Day
     ..........................................................................................24

h.   Interactive Recklessly Allowed Steele To Make En-
     ormous Trades That Resulted In Losses Of About
     $2,000,000 Over A Period Of Only Two Days
     ..........................................................................................25

i.   Interactive Breached The Duties It Owed To The Public,
     Including The Plaintiffs, To Exercise Reasonable Care
     To Avoid Injuring Them While Conducting Its Business,
     And To Train And Supervise Its Employees Properly
     ..........................................................................................25

j.   Interactive Was Forced Finally To Report Steele's
     Illegal Activities To The Authorities In May 2005
     ..........................................................................................35

k.   The CFTC Filed An Injunctive Action Against Steele
     ..........................................................................................36

l.   The Plaintiffs' Out-Of-Pocket Losses And Other
     Damages
     ..........................................................................................37

VI.  Plaintiffs' Causes of Action
     ..........................................................................................39

     COUNT ONE

     Intentionally And Knowingly Aiding and Abetting
     Steele's Fraudulent Scheme And Breaches Of
     Fiduciary Duties
     ..........................................................................................39

COUNT TWO

Aiding And Abetting Steele's Fraudulent Scheme
And Breaches Of Fiduciary Duties By Intentionally,
Knowingly, And Consciously Ignoring Obvious,
Glaring "Red Flags" Relating To Steele's Criminal
Conduct
.................................................................................40

COUNT THREE

Intentionally And Knowingly Acting In Concert With Steele
.................................................................................41

COUNT FOUR

Acting In Concert With Steele By Intentionally, Knowingly,
And Consciously Ignoring Obvious, Glaring "Red Flags"
Relating To Steele's Criminal Conduct
.................................................................................41

COUNT FIVE

Willful And Wanton Misconduct
.................................................................................42

COUNT SIX

Negligence, Gross Negligence, And Reckless Misconduct
.................................................................................42

COUNT SEVEN

Negligent, Grossly Negligent, And Reckless Failure
To Train And Supervise Its Employees Properly
.................................................................................43

COUNT EIGHT

Unjust Enrichment Warranting The Imposition of a Cons-
tructive Trust On The Commissions Interactive Deducted
From Steele's Account
.................................................................................44

VII.    Prayer for Relief
.................................................................................44

<u>COMPLAINT</u>

I.    <u>Nature of Case</u>

1.    This action stems from a fraudulent scheme Kevin J. Steele ("Steele"), a Canadian citizen, perpetrated upon more than <u>200</u> individuals and entities, including the Plaintiffs, who suffered losses totaling approximately <u>$7,000,000</u> (U.S.).

2.    The Provincial Court of Nakusp for the Province of British Columbia, Canada (the "Provincial Court") convicted Steele of criminal fraud and sentenced him to six (6) years in prison.

3.    The U.S. Commodity Futures Trading Commission ("CFTC") and National Futures Association ("NFA") brought disciplinary actions against Defendant, Interactive Brokers, LLC ("Interactive"), for the role it played in allowing Steele to operate a commodity pool as an unregistered commodity pool operator.

4.    Initially, Steele told Interactive that he had a <u>liquid net worth of only $175,000</u>, and that <u>the money deposited into his account would be his and his alone, and that he would be trading speculative commodity futures contracts only for himself.</u>

5.    Interactive, however, learned shortly thereafter that Steele's representations were false, but it, nonetheless: (a) accepted wire transfers and checks from third parties totaling more than <u>$7,700,000</u>, which it credited to Steele's account knowing that the funds did not belong to him; (b) issued checks made payable to him personally and wire transferred funds to his personal bank account totaling more than <u>$3,100,000,</u> knowing that these funds did not belong to him; and (c) entered orders for the purchase and sale of highly speculative commodity futures contracts worth many millions of doll-

ars with funds that it knew did not belong to him, which resulted in losses totaling more than $4,300,000.

6.     Interactive has even admitted that it urged Steele to limit the number of deposits that would be made into his account, and to make only one $250,000 withdrawal each month because his "regular" activity was raising "flags", particularly when withdrawals were made on the same day deposits were made.

7.     The Plaintiffs are bringing this action against Interactive for: (a) intentionally and knowingly aiding and abetting Steele's fraudulent scheme and breaches of fiduciary duties (Count One); (b) aiding and abetting Steele's fraudulent scheme and breaches of fiduciary duties by intentionally, knowingly, and consciously ignoring obvious, glaring "red flags" relating to Steele's criminal conduct (Count Two); (c) intentionally and knowingly acting in concert with Steele (Count Three); (d) acting in concert with Steele by intentionally, knowingly, and consciously ignoring obvious, glaring "red flags" relating to Steele's criminal conduct (Count Four); (e) willful and wanton misconduct (Count Five); (f) negligence, gross negligence, and reckless misconduct (Count Six); (g) negligent, grossly negligent, and reckless failure to train and supervise its employees properly (Count Seven); and (h) unjust enrichment warranting the imposition of a constructive trust on the commissions Interactive deducted from Steele's account (Count Eight).

II.     Plaintiffs

8.     The Plaintiffs include:

(1)     Plaintiff, Thomas Armstrong, is a resident of Winlaw, British Columbia, Canada.

(2)    Plaintiff, Lisa Farr, is a resident of Winlaw, British Columbia, Canada.

(3)    Plaintiff, David Ballard, is a resident of New Denver, British Columbia, Canada.

(4)    Plaintiff, Mike Blauhorn, is a resident of Nakusp, British Columbia, Canada.

(5)    Plaintiff, Roy Box, is a resident of Lake Havasu, Arizona, United States.

(6)    Plaintiff, Carol Box, is a resident of Lake Havasu, Arizona, United States. She is Plaintiff Roy Box's spouse, with whom she maintained a joint account.

(7)    Plaintiff, Shawn Brayshaw, is a resident of Victoria, British Columbia, Canada.

(8)    Plaintiff, Chelan Brayshaw, is a resident of Victoria, British Columbia, Canada. She is Plaintiff, Shawn Brayshaw's spouse, with whom she maintained a joint account.

(9)    Plaintiff, Cliff Caukell, is a resident of New Hazelton, British Columbia, Canada.

(10)    Plaintiff, Joe Chevaldave, is a resident of Kelowna, British Columbia, Canada.

(11)    Plaintiff, Olga Chevaldave, is a resident of Kelowna, British Columbia, Canada. She is Plaintiff, Joe Chevaldave's spouse, with whom she maintained a joint account.

(12)    Plaintiff, Nicholas Cifarelli is a resident of Silverton, British Columbia, Canada.

(13)    Plaintiff, David Ducharme, is a resident of Winlaw, British Columbia,

Canada.

(14)     Plaintiff, Christine Nichol, is a resident of Winlaw, British Columbia,
Canada.  She maintained a joint account with Plaintiff, David Ducharme.

(15)     Plaintiff, Maria Ilona Elsmore, is a resident of New Denver, British
Columbia, Canada.

(16)     Plaintiff, Jim Fitchett, is a resident of New Denver, British
Columbia, Canada.

(17)     Plaintiff, Len Freeth, is a resident of Castlegar, British Columbia, Canada.

(18)     Plaintiff, Kay Armstrong, is a resident of Castlegar, British Columbia,
Canada.  She maintained a joint account with Plaintiff, Len Freeth.

(19)     Plaintiff, Maryse Gallyssant, is a resident of Silverton, British Columbia,
Canada.

(20)     Plaintiff, Kurt Gasser, is a resident of Kassel, Germany.

(21)     Plaintiff, Wayne Gerow, is a resident of Silverton, British Columbia,
Canada.

(22)     Plaintiff, Theresa Gerow, is a resident of Silverton, British Columbia,
Canada.

(23)     Plaintiff, David Glover, is a resident of Coquitlam, British Columbia,
Canada.

(24)     Plaintiff, Kerrie Glover is a resident of Coquitlam, British Columbia,
Canada.  She is Plaintiff, David Glover's spouse, with whom she maintained a
joint account.

(25)     Plaintiff, Joanne Gustafson, is a resident of Silverton, British Columbia,

Canada.

(26)    Plaintiff, Terrence Gustafson, is a resident of Silverton, British Columbia, Canada. He is Plaintiff, Joanne Gustafson's spouse, with whom he maintained a joint account.

(27)    Plaintiff, Beverly Hascarl, is a resident of McBride, British Columbia, Canada.

(28)    Plaintiff, Lee Heichert, is a resident of New Denver, British Columbia, Canada.

(29)    Plaintiff, Debbie Hicks, is a resident of New Denver, British Columbia, Canada.

(30)    Plaintiff, Chad Hicks, is a resident of New Denver, British Columbia, Canada.

(31)    Plaintiff, Darrin Hicks, is a resident of New Denver, British Columbia, Canada.

(32)    Plaintiff, Peter Hiebert, is a resident of Victoria, British Columbia, Canada.

(33)    Plaintiff, Diane Howard, is a resident of Victoria, British Columbia, Canada.

(34)    Plaintiff, Bruno Huber, is a resident of Granthams Landing, British Columbia, Canada.

(35)    Plaintiff, Andreas Huettig, is a resident of Winnipeg, Manitoba, Canada.

(36)    Plaintiff, Garth Hunter, is a resident of Silverton, British Columbia, Canada.

(37)    Plaintiff, George Iverson is a resident of Silverton, British Columbia, Canada.

(38)    Plaintiff, Susan Davies, is a resident of Silverton, British Columbia, Canada.  She maintained a joint account with Plaintiff, George Iverson.

(39)    Plaintiff, Joanne Jordan, is a resident of New Denver, British Columbia, Canada.

(40)    Plaintiff, Leonard Kaplan, is a resident of Nelson, British Columbia, Canada.

(41)    Plaintiff, Bippy McMaster, is a resident of Nelson, British Columbia, Canada.  She maintained a joint account with Plaintiff, Leonard Kaplan.

(42)    Plaintiff, Shirley Kosiancic, is a resident of Nakusp, British Columbia, Canada.

(43)    Plaintiff, Hilary Bitten, is a resident of Nakusp, British Columbia, Canada.  She maintained a joint account with Plaintiff, Shirley Kosiancic.

(44)    Plaintiff, Ursula Krieger, is a resident of Hohenpeipenberg, Germany.

(45)    Plaintiff, Bobby Kovar, is a resident of Victoria, British Columbia, Canada.

(46)    Plaintiff, Elvira Lang, is a resident of Kassel, Germany.

(47)    Plaintiff, Philip Larstone, is a resident of Winlaw, British Columbia, Canada.

(48)    Plaintiff, Jeffery Lioce, is a resident of Trail, British Columbia, Canada.

(49)    Plaintiff, Antonio Lioce, is a resident of Trail, British Columbia, Canada.

(50)    Plaintiff, Guissepina Lioce, is a resident of Trail, British Columbia,

Canada.  She maintained two joint accounts; one with Plaintiff, Jeffery Lioce and one with Plaintiff, Antonio Lioce.

(51)    Plaintiff, Gunter Leyer, is a resident of Kassel, Germany.

(52)    Plaintiff, Marianne Leyer, is a resident of Kassel, Germany.  She is Plaintiff, Gunter Leyer's spouse, with whom she maintained a joint account.

(53)    Plaintiff, Gerdi Maucher, is a resident of Silverton, British Columbia, Canada.

(54)    Plaintiff, James Mellen, is a resident of Penticton, British Columbia, Canada.

(55)    Plaintiff, Dorothy Mellen, is a resident of Penticton, British Columbia, Canada.  She is Plaintiff James Mellen's spouse, with whom she maintained a joint account.

(56)    Plaintiff, George Mellen, is a resident of Silverton, British Columbia, Canada.

(57)    Plaintiff, Werner Mengler, is a resident of Silverton, British Columbia, Canada.

(58)    Plaintiff, Marilyn Mengler is a resident of Silverton, British Columbia, Canada.  She is Plaintiff, Werner Mengler's spouse, with whom she maintained a joint account.

(59)    Plaintiff, Tyler Mengler, is a resident of Silverton, British Columbia, Canada.

(60)    Plaintiff, Anita Michiels, is a resident of New Denver, British Columbia, Canada.

(61)    Plaintiff, Henry Morey, is a resident of Slocan, British Columbia, Canada.

(62)    Plaintiff, James Morris, is a resident of Kaslo, British Columbia, Canada.

(63)    Plaintiff, Belinda Nunn, is a resident of Nelson, British Columbia, Canada.

(64)    Plaintiff, Brian Nursey, is a resident of Victoria, British Columbia, Canada.

(65)    Plaintiff, Diana Nursey, is a resident of Victoria, British Columbia, Canada. She is Plaintiff, Brian Nursey's spouse, with whom she maintained a joint account.

(66)    Plaintiff, Omegadent Services, Ltd is a corporation which was organized under the laws of British Columbia, Canada.

(67)    Plaintiff, Gene Parker, is a resident of New Denver, British Columbia, Canada.

(68)    Plaintiff, Carolyn Parker, is a resident of New Denver, British Columbia, Canada.  She is Plaintiff, Gene Parker's spouse, with whom she maintained a joint account.

(69)    Plaintiff, Yves Pelletier, is a resident of Victoria, British Columbia, Canada.

(70)    Plaintiff, Michelle Pelletier, is a resident of Victoria, British Columbia, Canada.  She is Plaintiff, Yves Pelletier's spouse, with whom she maintained a joint account.

(71)    Plaintiff, Mark Perry, is a resident of Silverton, British Columbia, Canada.

(72)    Plaintiff, Ulrike Persch, is a resident of Kassel, Germany.

(73)    Plaintiff, Sybille Prochaska, is a resident of Victoria, British Columbia,

Canada.

(74)    Plaintiff, Ronald Provan, is a resident of Silverton, British Columbia,

Canada.

(75)    Plaintiff, Kathy Provan, is a resident of Silverton, British Columbia,

Canada.  She is Plaintiff, Ronald Provan's spouse, with whom she maintained a

joint account.

(76)    Plaintiff, Dan Robbins, is a resident of Victoria, British Columbia,

Canada.

(77)    Plaintiff, Dennis Rogers, is a resident of Victoria, British Columbia,

Canada.

(78)    Plaintiff, Barry Ryrie, is a resident of Barrhead, Alberta, Canada.

(79)    Plaintiff, Bruce Ryrie, is a resident of Innisfail, Alberta, Canada.

(80)    Plaintiff, Lynette Ryrie, is a resident of Castlegar, British Columbia,

Canada.

(81)    Plaintiff, Norm Sanderson, Jr. is a resident of Castlegar, British Columbia,

Canada.  He is Plaintiff Lynette Ryrie's spouse, with whom he maintained a joint

account.

(82)    Plaintiff, Troy Saladana, is a resident of Victoria, British Columbia,

Canada.

(83)    Plaintiff, Dick Schultz, is a resident of Nelson, British Columbia, Canada.

(84)    Plaintiff, Joan Schwartzenberger, is a resident of Victoria, British

Columbia, Canada.

(85)    Plaintiff, Mike Seaton, is a resident of Creston, British Columbia, Canada.

(86)    Plaintiff, Karen Seaton, is a resident of Creston, British Columbia, Canada.  She is Plaintiff, Mike Seaton's spouse, with whom she maintained a joint account.

(87)    Plaintiff, Nelson Slaboda, is a resident of Winfield, British Columbia, Canada.

(88)    Plaintiff, Craig Sowinski, is a resident of Victoria, British Columbia, Canada.

(89)    Plaintiff, Indra Struebbe, is a resident of Altenau-Saulgrub, Germany.

(90)    Plaintiff, Sean Tobin, is a resident of Halifax, Nova Scotia, Canada.

(91)    Plaintiff, Asami Sudo, is a resident of Halifax, Nova Scotia, Canada.  She is Plaintiff, Sean Tobin's spouse, with whom she maintained a joint account.

(92)    Plaintiff, Beth Trotter, is a resident of Victoria, British Columbia, Canada.

(93)    Plaintiff, Twamley Holdings, is a corporation which was organized under the laws of British Columbia, Canada.

(94)    Plaintiff, Michael Van Deusen, is a resident of Seward, Alaska, United States.

(95)    Plaintiff, Patricia Van Deusen, is a resident of Seward, Alaska, United States.  She is Plaintiff, Michael Van Deusen's spouse, with whom she maintained a joint account.

(96)    Plaintiff, Allen Walker, is a resident of Nelson, British Columbia, Canada.

(97)    Plaintiff, Theresa Walker, is a resident of Nelson, British Columbia, Canada.  She is Plaintiff, Allen Walker's spouse, with whom she maintained a joint account.

(98)    Plaintiff, Fred Wedgewood, is a resident of Sidney, British Columbia, Canada.

(99)    Plaintiff, David Welch, is a resident of Silverton, British Columbia, Canada.

(100)   Plaintiff, Shelley Welch, is a resident of Victoria, British Columbia, Canada.  She is Plaintiff, David Welch's spouse, with whom she maintained a joint account.

(101)   Plaintiff, Michelle Whitcomb, is a resident of Lumby, British Columbia, Canada.

(102)   Plaintiff, Sandra Whitcomb, is a resident of Vernon, British Columbia, Canada.

(103)   Plaintiff, Mathias Wiesmann, is a resident of Wallerau, Switzerland.

(104)   Plaintiff, Samuel Wiesmann, is a resident of Wallerau, Switzerland.  He maintained a joint account with Plaintiff, Mathias Wiesmann.

(105)   Plaintiff, Lana Wocknitz, is a resident of New Denver, British Columbia, Canada.

(106)   Plaintiff, Elaine Woods, is a resident of Castlegar, British Columbia, Canada.

(107)   Plaintiff, James York, is a resident of Castlegar, British Columbia, Canada.

(108)   Plaintiff, Thomas Zarp, is a resident of Lake Havasu City, Arizona, United States.

(109)   Plaintiff, Henriette Zarp, is a resident of Lake Havasu City, Arizona, United States. She is Plaintiff, Thomas Zarp's spouse, with whom she maintained a joint account.

(110)   Plaintiff, Elizabeth Berger, is a resident of Powell River, British Columbia, Canada.

(111)   Plaintiff, Allan R. Ceccon, is a resident of Castlegar, British Columbia, Canada.

(112)   Plaintiff, Bradley Roberts, is a resident of Edmonton, Alberta, Canada,

(113)   Plaintiff, Giovanna Cunsolo, is a resident of Edmonton, Alberta, Canada. She maintained a joint account with Plaintiff, Bradley Roberts.

(114)   Plaintiff, Audrey Kanyo, is a resident of Beaverlodge, Alberta, Canada.

(115)   Plaintiff, Kelman Kanyo, is a resident of Beaverlodge, Alberta, Canada. He maintained a joint account with Plaintiff, Audrey Kanyo.

(116)   Plaintiff, Hamish Fraser, is a resident of Galifaldi Highlands, British Columbia, Canada.

(117)   Plaintiff, Timothy Peter McCrory, is a resident of Silverton, British Columbia, Canada.

(118)   Plaintiff, John Vanden Heuvel, is a resident of Nelson, British Columbia, Canada.

(119)   Plaintiff, Jeffery Popham, formerly a resident of Victoria, British Columbia, Canada, who is now residing in Carqueiranne, France.

(120)   Plaintiff, Business Paradigm Properties, Ltd, is a corporation which was organized under the laws of British Columbia, Canada.

(121)  Plaintiff, Dianne Germain, as Trustee for the Germain-Geisler Family Trust, formerly known as the Dianne Germain Family Trust.

(122)  Plaintiff, Hans Josef Schoneberger, is a resident of Lahntal-Gobfelden, Germany.

(123)  Plaintiff, Barbara Poensgen, is a resident of Lahntal-Gobfelden, Germany. She maintained a joint account with Plaintiff, Hans Josef Schoneberger.

III.  Defendant

9.     Defendant, Interactive, is a limited liability company that was organized and exists under Connecticut law.  At all times pertinent hereto, Interactive acted as a brokerage firm for the purchase and sale of commodity futures contracts and securities.

10.    At all times pertinent hereto, Interactive was: (a) licensed to do business in the state of Illinois; (b) registered as a Futures Commission Merchant with the CFTC and as a Broker-Dealer with the Securities and Exchange Commission; and (c) a Member of the NFA, National Association of Securities Dealers, Inc. ("NASD"), NASD Amex Regulation, and various exchanges, including the New York Stock Exchange ("NYSE"), Chicago Board of Trade ("CBOT"), CBOE Futures Exchange, LLC ("CBOE Futures"), Boston Stock Exchange ("BSE"), National Stock Exchange ("NSE"), Philadelphia Stock Exchange ("PSE"), NASDAQ, Chicago Stock Exchange ("CSE"), American Stock Exchange ("AMEX"), National Stock Exchange ("NSE"), and International Securities Exchange ("ISE").

11.    The acts and omissions alleged herein were committed by Interactive employees during the course of and within the scope of their employment with Interactive.

Interactive is liable for their tortious acts and omissions as alleged herein under the doctrine of *respondeat superior*.

IV.    Venue

12.    Interactive maintains a registered office in Cook County, Illinois where its principal place of business is located.

13.    All or a substantial portion of Interactive's acts and omissions alleged herein took place in Cook County, Illinois.

14.    Venue is properly laid in the Circuit Court of Cook County, Illinois under sections 2-101 and 102 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101 and 102.

V.    Facts

    a.    Steele Opened A Commodity Futures Trading Account At Interactive Stating That He Had A <u>Liquid</u> <u>Net</u> <u>Worth</u> <u>Of</u> <u>Only</u> <u>$175,000,</u> That He Was <u>Self</u>-<u>Employed</u> <u>As</u> <u>A</u> <u>Commodity</u> <u>Futures</u> <u>Trader,</u> That <u>All</u> <u>Of</u> <u>The</u> <u>Money</u> <u>That</u> <u>Would</u> <u>Be</u> <u>Deposited</u> <u>Into</u> <u>His</u> <u>Account</u> <u>Would</u> <u>Belong</u> <u>To</u> <u>Him,</u> <u>And</u> <u>That</u> <u>He</u> <u>Would</u> <u>Be</u> <u>Trading</u> <u>Only</u> <u>For</u> <u>Himself</u>

15.    Steele opened an individual trading account at Interactive (No. U82666) on or about December 16, 2002. (Steele opened two additional accounts at Interactive (Nos. U99311 and U10127), but all or almost of the activities that are the subject of this case were conducted through Account No. U82666. Account U10127 was never funded. All references made herein to "Steele's account" include all three accounts.)

16.    Steele submitted account opening forms to Interactive on or about December 16, 2002, which stated, among other things, that he had a "<u>liquid</u> <u>net</u> <u>worth</u>" <u>of</u> <u>only</u> <u>$175,000</u> (U.S.), and that he was <u>self</u>-<u>employed</u> <u>as</u> <u>a</u> <u>trader</u>.

17.     Steele also told Interactive that that the money that would be deposited in his account would be his and his alone, and that he would be trading futures contracts for himself only, but, beginning in February 2003, or about two months later, when Steele began perpetrating his fraudulent scheme, until May 2005, when it finally collapsed, Interactive: (a) accepted wire transfers and checks from third parties totaling more than $7,700,000, which it credited to Steele's account knowing that the funds did not belong to him; (b) issued checks made payable to him personally and wire transferred funds to his personal bank account at Bank of America totaling more than $3,100,000, knowing that the funds did not belong to him; and (c) entered orders for the purchase and sale of highly speculative commodity futures contracts worth many millions of dollars with funds that it knew did not belong to him, which resulted in losses totaling more than $4,300,000.

b.     Steele Formed Separate Partnerships With Shannon And Fulkco

18.     In 2002 or early 2003, Steele formed a partnership with David Shannon ("Shannon") where Shannon agreed to solicit investors to invest in Steele's commodity pool and perform various administrative duties for the pool, and Steele agreed to make trades for the pool's investors.

19.     Shannon solicited approximately 10 individuals who made investments in the commodity pool in 2003 and 2004.

20.     In 2003, Steele also formed a separate partnership with David Fulkco ("Fulkco"), where Fulkco agreed to solicit investors, perform various administrative func-tions for the commodity pool, and Steele agreed to make trades for the pool's investors.

21.    The Steele-Fulkco partnership continued from 2003 through May 2005, when Steele's fraudulent scheme collapsed.

22.    Fulkco, and his father, Wally Fulkco, solicited more than 200 individuals, including the Plaintiffs, who made investments in Steele's commodity pool in 2003, 2004, and 2005.

23.    Fulkco formed a company named Abriel Asset Management in or about early 2004 to solicit investors, wire transfer their funds to Interactive, and perform other administrative tasks for the commodity pool.

24.    Shannon and Fulkco were located in Victoria, British Columbia, while they were soliciting investors for Steele's commodity pool.

25.    For a portion of the time Steele was perpetrating his fraudulent scheme, he was located in Victoria, British Columbia, and, at other times, he was located in Vancouver, British Columbia.

26.    Steele, Shannon, Fulkco, or his father Wally Fulkco showed the Plaintiffs and other investors false account statements with Interactive's logo that Steele had fabricated, which showed substantial returns that were false, or they made similar false representations to them.

27.    Actually, Steele was losing millions of dollars trading futures contracts at Interactive throughout the entire time his account was opened at Interactive.

28.    Relying on the false representations that Steele, Shannon, Fulkco, or his father Wally Fulkco made about Steele's commodity pool, the Plaintiffs and many others invested substantial sums in Steele's pool.

    c.    Interactive Accepted Wire Transfers From Third Parties Totaling $7.7 Million Dollars That It Credited To Steele's Account

29.    In certain instances, Steele, Fulkco, or his father Wally Fulkco told the Plaintiffs or other investors to issue checks to Abriel Asset Management or wire transfer their funds to Abriel Asset Management, which they did. Abriel Asset Management then wire transferred their money to Interactive.

30.    In other instances, Steele, Shannon, Fulkco, or his father Wally Fulkco told the Plaintiffs or other investors to wire transfer their funds directly to Interactive to be credited to Steele's account, which they did.

31.    In various instances, Steele, Shannon, Fulkco, or his father Wally Fulkco told the Plaintiffs or other investors to issue checks to Custom House Currency Exchange ("CHCE") and give them to Steele, which they did.

32.    Steele then brought the checks to CHCE, and asked CHCE to wire transfer the funds to Interactive, which it did.

33.    None of the money that Interactive credited to Steele's Interactive account belonged to him.

34.    None of the wire transfers indicated that Steele was transferring his own money to Interactive; indeed, none of the wire transfers was made in Steele's name.

35.    During the period of February 2003 through May 2005, Interactive received at least 135 wire transfers from third parties totaling about $7,700,000 (U.S.), which Interactive credited to Steele's account.

36.    Eighty (80) of the 135 wire transfers came from Abriel Asset Management, 12 came from CHCE, and 43 came from 18 individual investors in foreign

countries, including, at least, Canada, Germany, and Switzerland as well as the United States.

37.    On various days, Interactive received multiple deposits from third parties that it credited to Steele's account.

    d.    Interactive Issued Checks Made Payable To Steele Personally or Wire Transferred Approximately $3.1 Million To His Personal Bank Account

38.    During February 2003 through May 2005, a period of approximately 26 months, Interactive processed approximately 200 withdrawals from Steele's account by issuing checks made payable to him personally or by wire transferring funds to his personal bank account at Bank of America, which totaled approximately $3,100,000 (U.S.).

39.    One-half of Steele's withdrawals were for sums less than $30,000, while others were for hundreds of thousands of dollars.

40.    Some of Steele's withdrawals were made on the same day deposits were made into his account.

    e.    Interactive Executed Speculative Futures Trades For Steele That Were Worth Many Millions Of Dollars, Which Resulted In Losses Of About $4.3 Million

41.    During the period of February 2003 through May 2005, Interactive executed numerous speculative futures trades for Steele worth many millions of dollars, which resulted in losses totaling more than $4,300,000 (U.S.), including commissions totaling $649,308 (U.S.) that Interactive deducted from Steele's account.

    f.    Interactive Knew The Money In Steele's Account Did Not Belong To Him

42.    During the first 13 months that Steele was perpetrating his fraudulent scheme (February 2003–March 2004), Interactive received deposits from third parties totaling about $580,000 (U.S.), which Interactive credited to Steele's account.

43.    During the same period, Steele incurred losses of approximately $240,000 (U.S.) from trades Interactive executed for him, and Interactive issued checks made payable to him personally or wire transferred money to his personal bank account totaling about $150,000 (U.S.).

44.    Interactive knew that the amount of these deposits, withdrawals, and trading losses were out of line for a full-time trader who had a liquid net worth of only $175,000 (U.S.).

45.    Interactive asked Steele where he was getting the money he was using to trade futures contracts.

46.    Steele told Interactive that he was a full-time trader, who was merely trying to earn a living trading futures contracts, and that he was only withdrawing money "to pay for his living expenses".

47.    Steele's response failed to answer Interactive's question about where he was getting the money he was using to trade futures contracts.

48.    Interactive consciously disregarded Steele's non-responsive answer, without even asking him why third parties had deposited so much money into his account or why he had not issued any checks personally or wire transferred any funds to Interactive in his own name.

49.    Despite Steele's failure to explain where he was getting the money that was deposited into his account, over the next 13 months (April 2004-May 2005), Interactive: (a) accepted wire transfers from third parties totaling more than $7,400,000 (U.S.), which Interactive credited to Steele's account knowing that the funds did not belong to him; (b) processed numerous wire transfers to his personal bank account at

Bank of America and issued checks that it made payable to him personally, which totaled about $3,000,000 (U.S.) knowing that the funds did not belong to him; and (c) executed numerous speculative futures trades for him that were worth many millions of dollars, which resulted in steady losses totaling more than $4,000,000 (U.S.), including more than $600,000 in commissions that Interactive deducted from his account, knowing that the funds did not belong to him.

50.    At no time while Steele's account was opened at Interactive, did Interactive even ask Steele whether he had liquidated any non-liquid assets to make deposits into his account at Interactive.

51.    Interactive knew that the money Steele was withdrawing from his account was far greater than anything he needed to "pay for his living expenses", but Interactive knowingly, intentionally, and consciously ignored Steele's obvious lies.

52.    Interactive did not want to know any of the details about Steele's fraudulent scheme, because if it made any reasonable inquiries about what he was doing, his criminal activities would have been laid bare for the rest of the world to see, and Interactive would have lost any opportunity to claim, albeit falsely, that it knew nothing about Steele's fraudulent scheme.

53.    Moreover, Interactive would have lost the opportunity to continue paying itself hundreds of thousands of dollars in commissions from Steele's account.

54.    Despite the obvious, glaring "red flags" surrounding Steele's account, Interactive continued helping Steele to carry out his fraudulent scheme.

55.     In September 2004, Interactive asked Steele disingenuously about where he was getting money to trade futures contracts -- knowing full well that the funds in his account did not belong to him.

56.     Steele responded by stating once again that he was a "full-time day trader", and that he was merely withdrawing money from his account "to pay for his living expenses".

57.     Interactive knew that Steele's representations could not be true, but it, nonetheless, intentionally, knowingly, and consciously continued to give Steele substantial assistance to carry out his fraudulent scheme.

58.     Clearly, the magnitude and patterns of the deposits, withdrawals, and trading losses in Steele's account, and the patently false explanations he gave Interactive, made clear to Interactive that the funds in his account did not belong to him.

59.     Steele also sent Interactive an email at about the same time, which said that the money in his account came from "revenue property and real estate he had in various countries", and that "his liquid net worth had increased from $175,000 to $300,000".

60.     Steele's email said nothing about "trying to earn a living" as a "full-time day trader."

61.     Interactive knew that the inconsistencies in Steele's explanations did not add-up.

62.     Interactive's credit managers and other employees also knew that Steele could not have been engaging in a new, robust real estate business in foreign countries while working as a "full-time day trader" over this 13-month period.

63.    Interactive's credit managers and other employees also knew that Steele could not have been making the large margin deposits he was making for his futures trades with a liquid net worth of only $300,000 -- unless he was using money that did not belong to him.

64.    Interactive did not even ask Steele why he had said that he only had a liquid net worth of $300,000, when he claimed that he had so much "income" flowing freely into and out of his account from the foreign real estate transactions that he was using to trade futures contracts.

65.    Interactive did not even ask Steele why Abriel Asset Management, CHCE, and 18 individuals and other entities had wire transferred so much money to Interactive on so many occasions, or why none of the deposits had been made by Steele in his own name.

66.    Interactive also knew that companies with names ending in "Asset Management", like Abriel Asset Management, typically invest money for clients, but Interactive failed to even ask Steele why so much money was coming from Abriel Asset Management or what his relationship to Abriel Asset Management was; nor did Interactive do anything else to determine what the nature of Abriel Asset Management's business was.

67.    At no time did Interactive even try to contact any of the 18 individuals, CHCE, or Abriel Asset Management to inquire: (a) whether Steele was managing investments for them or other third parties; (b) whether the millions of dollars they were wire transferring to Interactive belonged to them; (c) whether their deposits related in any way to legitimate real estate transactions in foreign countries; (d) whether they knew that

Steele had directed Interactive to issue checks made payable to him personally and wire transfer funds totaling many millions of dollars to his personal bank account at Bank of America; or (e) whether they knew he was losing many millions of dollars trading futures contracts in his account at Interactive.

68.    Interactive's employees did not even ask Steele whether he would mind if they called any of the 18 individuals, CHCE, or Abriel Asset Management to inquire about these matters.

69.    At no time did Interactive contact Bank of America to ask whether the bank had any information, along with its own, that would indicate whether the enormous sums that Interactive received from third parties in at least three foreign countries and the United States, which Interactive had wire transferred to the Bank of America later, belonged to the third parties -- as opposed to Steele.

70.    Interactive did not want another financial institution to do an investigation that could expose Steele's criminal activities and deprive it of the opportunity to continue deducting more and more commissions from Steele's account and interfere with its ability to claim later, albeit falsely, that it had no idea that Steele was defrauding so many people around the world.

71.    Interactive also knew that no rational person would commingle enormous sums of money to trade futures contracts with other large sums of money to engage in foreign real estate transactions because any rational person would know that he could earn a great deal of interest from a bank with the funds he would be using from-time-to-time to engage in foreign real estate transactions.

72.    Interactive also knew that Steele's representations made about receiving income from so many real estate transactions were patently false because he would have to report his profits and losses from futures trading separately from the income he said he was receiving from foreign real estate transactions on his tax returns, and that commingling his profits and losses from both businesses would create substantial and unnecessary difficulties when preparing his tax returns.

73.    Interactive's employees are very sophisticated about financial matters; to be sure, their sole business involves financial matters.

74.    Once again, Interactive knew that numerous third parties had deposited money into Steele's account that did not belong to him, and that he was acting as commodity pool operator to misappropriate millions of dollars from numerous persons around the world.

75.    In short, Interactive knowingly, intentionally and consciously "looked the other way" so it could continue deducting hundreds of thousands of dollars in commissions from Steele's account.

g.    Interactive Urged Steele To Limit The Number Of Deposits Made In His Account Because His Regular Activity For Making Deposits Was Raising Flags, Particularly When Withdrawals Were Made On The Same Day

76.    Interactive had a conversation with one or more of Interactive's employees in April 2005, which shows that Interactive knew that Steele was defrauding third parties.

77.    Interactive told Steele that he had to "consolidate [the] deposits and withdrawals because…the regular activity is what is drawing flags … especially when the withdrawals are coupled with deposits on the same day…it raises the question…"

78.    Interactive also told Steele that it "would prefer to see a withdrawal once a month for $250,000."

79.    Interactive wanted Steele to make only one $250,000 withdrawal each month to conceal the fraud he was perpetrating on third parties.

80.    Clearly, Interactive knew that a trader who had a liquid net worth of only $175,000 or even $300,000 could not withdraw $250,000 each month from his account -- unless the money belong to third parties.

81.    Interactive also knew that Steele did not need $250,000 per month to pay for his living expenses, but it continued to help him defraud numerous investors, including the Plaintiffs.

h.    Interactive Recklessly Allowed Steele To Make Enormous Trades That Resulted In Losses Of About $2,000,000 Over A Period Of Only Two Days

82.    In May 2005 Interactive recklessly allowed Steele to make trades in his account that resulted in approximately $2,000,000 in losses over a period of only two days, knowing full well that he was using money to trade futures contracts that did not belong to him

i.    Interactive Breached The Duties It Owed To The Public, Including The Plaintiffs, To Exercise Reasonable Care To Avoid Injuring Them While Conducting Its Business, And To Train And Supervise Its Employees Properly

83.    Interactive owed the public, including the Plaintiffs, a duty to exercise reasonable care to avoid injuring them while conducting its business.

84.    The injuries the Plaintiffs suffered were readily foreseeable, particularly in light of the numerous, glaring "red flags" surrounding Steele's account.

85.    The burden on Interactive to perform simple tasks to avoid injuring them was minimal, like contacting Abriel Asset Management, CHCE, or the 18 individuals who made 43 wire transfers to Interactive to inquire about Steele's suspicious activities.

86.    Interactive breached the duties it owed the public, including the Plaintiffs, by knowingly, intentionally, and consciously: (a) crediting Steele's account with deposits totaling millions of dollars that it knew were not his; (b) executing trades for Steele for the purchase and sale of risky futures contracts worth many millions of dollars with funds that it knew did not belong to him, which resulted in millions of dollars in losses; and (c) issuing checks made payable to him personally and processing wire transfers to his personal bank account for millions of dollars that it knew did not belong to him.

87.    No responsible Broker-Dealer or Futures Commission Merchant, following generally accepted customs, standards, and practices in the securities or commodities industries, would have allowed Steele to use its personnel to commit his fraudulent scheme or given him the substantial assistance that Interactive gave him.

88.    Interactive's acts and omissions were negligent, grossly negligent, and reckless, if not intentional, and constitute repeated and flagrant breaches of the duties it owed members of the public, including the Plaintiffs, to exercise reasonable care to avoid injuring them while conducting its business.

89.    Interactive also owed the public, including the Plaintiffs, a duty to train and supervise its employees properly.

90.    Even if the Court were to assume, for purposes of argument only, that, despite the numerous, glaring "red flags" surrounding Steele's account, Interactive did not fully understand that Steele was defrauding third parties, Interactive failed to train and

supervise its employees in a reasonable manner to monitor its customers' accounts for patently obvious illegal activities like those alleged herein.

91.    Interactive's failure to train and supervise its employees in a reasonable manner was particularly evident in this case because Interactive's employees observed extremely suspicious circumstances (to say the least) surrounding Steele's account day-in-and-day-out, but it continued, nonetheless, to assist him in the perpetration of his fraudulent scheme.

92.    No responsible Broker-Dealer or Futures Commission Merchant, following generally accepted customs, standards, and practices in the securities or commodities industries, would have failed to train and supervise its employees like Interactive did; nor would they have given Steele the substantial assistance that Interactive gave him in this case.

93.    Interactive's failure to exercise due care to train and supervise its employees properly constitutes a breach of the duties it owed the public, including the Plaintiffs.

94.    The customs, practices and standards in the securities and commodities industries for training and supervising employees of Broker-Dealers and Futures Commission Merchants to detect illegal money laundering were heightened on October 26, 2001, or more than one year before Steele commenced his fraudulent scheme, when Congress amended section 5318(h) of the Bank Secrecy Act, with section 352 of the USA Patriot Act, 31 U.S.C. §5318(h)(1), which requires all financial institutions, including Interactive, to establish reasonable anti-money laundering programs, including, at a minimum, the adoption of internal policies, procedures, and controls to detect illegal

money laundering, to designate a compliance officer to ensure compliance with such policies, procedures, and controls, to implement an ongoing employee training program, and to use an independent auditing function to test their programs.

95.    Money laundering occurs when money obtained illegally is deposited into an account at one financial institution (like Interactive) is transferred later to another financial institution (like Bank of America), to hide or disguise proceeds from illegal activities -- which occurred repeatedly in this case.

96.    While Steele was perpetrating his fraudulent scheme at Interactive, the CFTC, NFA, NASD, NASD-AMEX, NYSE, CBOT, CBOE Futures, BSE, NSE, PSE, NASDAQ, CSE, AMEX, NSE, and ISE had various rules and policies in force which require their Members to train and supervise their employees properly to monitor their customers' accounts for illegal money laundering activities.

97.    To be sure, the NASD, NFA, NYSE, CBOT, CBOE Futures, CBOE, AMEX, BSE, PSE, CSE, ISE, NASDAQ, and NSE had identical rules that require their Members, including Interactive, to adopt and implement reasonable policies and procedures to detect illegal money laundering while Steele was defrauding the Plaintiffs. *See* NYSE Rule 445 (adopted April 22, 2002), NFA Rule 2-9(c) (adopted April 23, 2002), NASD Rule 3011 (adopted April 24, 2002), CBOT Rule 423.05 (adopted June 1, 2003), CBOE Futures Rule 605 (adopted August 25, 2005), AMEX Rule 432 (adopted July 25, 2002), ISE Rule 420 (adopted July 9, 2004), NSE Rule 5.6 (adopted August 14, 2002), PSE Rule 757 (adopted June 10, 2002), BSE Rule 42 (adopted October 10, 2003), NASDAQ 3011 (adopted September 3, 2003), and Section 12 of the CSE Rules and Regulations (adopted December 4, 2003).

98.     Each of these self-regulatory organizations and exchanges was also a Member of a "Joint Audit Committee", while Steele was defrauding the Plaintiffs.

99.     On October 29, 2002, the Joint Audit Committee sent a "Regulatory Update" to the Chief Financial Offers and Chief Compliance Officers of the Futures Commission Merchants, which were Members of said self-regulatory organizations and exchanges, including Interactive.

100.     This "Regulatory Update" reminded all of these Chief Financial Offers and Chief Compliance Officers that the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001 (a/k/a the USA Patriot Act) was signed into law on October 26, 2001, and that all Futures Commission Merchants fell within its purview.

101.     This "Regulatory Update" also indicated that the NFA had amended its Compliance Rule 2-9 (Rule 2-9(c)) and issued an interpretative notice detailing "…specific policies, procedures and internal controls that all firms must have in a written anti-money laundering program, which must encompass:

- Customer Identification and Verification

- Detection and Reporting of Suspicious Activity

- Hiring of Qualified Staff

- Recordkeeping

- Designation of a Compliance Officer

- Employee Training

- Independent Audit Function

102.     The foregoing rules, interpretative notices, "Regulatory Update", and other pronouncements of the foregoing self-regulatory organizations and exchanges reflect

generally accepted customs, practices and standards in the securities and commodities industries that pre-dated and continued throughout the period Steele was defrauding the Plaintiffs at Interactive.

103.    In short, the entire securities and commodities industries were implementing anti-money laundering programs for more than one year before Steele began defrauding the Plaintiffs.

104.    One of the generally accepted customs, practices and standards followed in the securities and commodities industries during this period included the use of computer programs to monitor customer accounts to determine whether any suspicious circumstances exist, like the numerous, glaring "red flags" surrounding Steele's account, including deposits made by third parties into a customer's account and requests made by the customer later to wire transfer funds from his account to another financial institution to be credited to an account whose owner is different than the person(s) who made the deposits into the customer's account.

105.    Before Steele began defrauding the Plaintiffs and thereafter, the foregoing self-regulatory organizations and exchanges sent their Members, including Interactive, additional notices, directives, and other pronouncements concerning their responsibility to look for, among other things, large numbers of unusual wire transfers or patterns of wire transfers that foreigners were making into and out of a customer's account for large sums of money, particularly when the wire transfers were made on the same day withdrawals were made, and when a customer has failed to provide the firm with a reasonable explanation for his suspicious activities -- which occurred repeatedly in this case.

106.    Interactive consciously and recklessly ignored the foregoing statutes, rules, notices, and directives while all responsible Broker-Dealers and Futures Commission Merchants were following them.

107.    To be sure, Interactive's acts and omissions were negligent, grossly negligent, and reckless.

108.    If Interactive had adopted and implemented reasonable policies and procedures to detect illegal money laundering it would have exposed Steele's criminal scheme to the entire world, and it would have been forced to stop giving him assistance to carry it out.

109.    Interactive's failure to act in conformity with the foregoing statutes, rules, notices, directives, and other pronouncements provides additional, independent evidence of its negligent, grossly negligent, and reckless failure to exercise due care to avoid injuring the Plaintiffs in this case.

110.    Interactive also violated its duties to report Steele's illegal money laundering practices and its own violations of various rules to the appropriate authorities.

111.    Section 352(h)(2) of the USA Patriot Act, 31 U.S.C. §5318(h)(2), authorized the U.S. Treasury Department to adopt regulations requiring all financial institutions to report suspicious money laundering activities to the Financial Crimes Enforcement Network ("FinCEN")

112.    Section 356(a) of the USA Patriot Act, 31 U.S.C. §5318(g)(1), directed the Treasury Department to adopt regulations by July 1, 2002, requiring all Broker-Dealers, like Interactive, to file Suspicious Activity Reports ("SARs") with the FinCEN

whenever they have a reasonable basis, as in this case, for believing that illegal money laundering activities are taking place at their firms.

113.    Section 356(b) of the USA Patriot Act, 31 U.S.C. §5318(g)(2), also authorized the Treasury Department to adopt the same kind of regulations for Futures Commissions Merchants, like Interactive.

114.    On July 1, 2002, or about <u>eight</u> <u>months</u> before Steele began his criminal conduct, the U.S. Treasury Department issued final regulations stating that all Broker-Dealers, like Interactive, must file SARs with FinCEN, <u>whenever</u> <u>they</u> <u>know,</u> <u>suspect,</u> <u>or</u> <u>have</u> <u>reason</u> <u>to</u> <u>suspect</u> <u>that</u> <u>a</u> <u>transaction</u> <u>or</u> <u>pattern</u> <u>of</u> <u>transactions</u> <u>constitutes</u> <u>illegal</u> <u>money</u> <u>laundering</u>.  The regulations state in pertinent that:

> "(2) <u>A transaction requires reporting under the terms of this</u> <u>section if it is conducted or attempted by, at, or through a</u> <u>broker-dealer, if it involves or aggregates funds or other</u> <u>assets of at least $5,000, and the broker-dealer knows, sus-</u> <u>pects, or has reason to suspect that the transaction (or a pat-</u> <u>tern of transactions of which the transaction is a part)</u>:
>
> "(i) <u>Involves funds derived from illegal activity or is inten-</u> <u>ded or conducted in order to hide or disguise funds or assets</u> <u>derived from illegal activity (including, without limitation,</u> <u>the ownership, nature, source, location, or control of such</u> <u>funds or assets) as part of a plan to violate or evade any fed-</u> <u>eral law or regulation or to avoid any transaction reporting</u> <u>requirement under federal law or regulation</u>;
>
> "(ii) <u>Is designed, whether through structuring or other</u> <u>means, to evade any requirements of this part or of any oth-</u> <u>er regulations promulgated under the Bank Secrecy Act</u>;
>
> "(iii) <u>Has no business or apparent lawful purpose or is not</u> <u>the sort in which the particular customer would normally be</u> <u>expected to engage, and the broker-dealer knows of no rea-</u> <u>sonable explanation for the transaction after examining the</u> <u>available facts, including the background and possible pur-</u> <u>pose of the transaction; or</u>

"(iv) <u>Involves use of the broker-dealer to facilitate criminal activity.</u>" (emphasis added) 31 CFR Part 103.19(a)(2)(i-iv).

115.    Clearly, Steele's criminal activities constitute criminal mail and wire fraud under U.S. law, 18 U.S.C. §§1341 and 1343, and criminal violations of the Bank Secrecy Act, 18 U.S.C. §§1956-57.

116.    On May 18, 2004, the U.S. Treasury Department adopted final regulations that also required Futures Commission Merchants, like Interactive, to file SARs with FinCEN whenever they know, suspect, or have reason to suspect that a transaction or a pattern of transactions constitutes illegal money laundering. 31 CFR Part 103.17. (These regulations are identical to the regulations the Treasury Department adopted for Broker-Dealers in CFR Part 103.19.)

117.    These regulations also state that Broker-Dealers and Futures Commission Merchants are not relieved of their duty to file a SAR with FinCEN when they have reported suspicious money laundering activities to any other governmental agency.

118.    During 2002, the NASD, NYSE, CBOT, CBOE, AMEX, BSE, PSE, CSE, ISE, NASDAQ, and NSE required all of their, including Interactive, that they had to file a SAR with FinCEN when they discover suspicious activities in their customers' accounts; the NFA did the same in 2004.

119.    At no time did Interactive file a SAR with FinCEN -- despite the extremely suspicious circumstances (to say the least) surrounding Steele's account.

120.    Interactive's failure to file a SAR with FinCEN further demonstrates its negligent, grossly negligent, and reckless failure to follow the customs, standards, and

practices in the securities and commodities industries while Steele was defrauding the Plaintiffs.

121.    NASD Rule 3070 also requires its Members, including Interactive, to report to the NASD any conduct, including its own conduct, that: "…violated any provision of any securities law or regulation, any rule or standards of conduct of any governmental organization, self-regulatory organization, or financial business or professional organization, or engaged in any conduct that the member knows or should have known is inconsistent with just and equitable principles of trade."

122.    At no time during the 26 months Steele was perpetrating his fraudulent scheme as an unregistered Commodity Pool Operator, in violation of section 4(m) of the Commodity Exchange Act, as amended ("CE Act"), 7 U.S.C. §6(m), or at any time thereafter, did Interactive report Steele's criminal conduct or their violations of the Bank Secrecy Act, *supra*, as amended by the USA Patriot Act, *supra*, the regulations of the Treasury Department, *supra*, NFA Compliance Rule 2-9(c), NASD Rules 3011, NYSE Rule 445, or CBOT Rule 423.05 to the NASD, CBOE Futures Rule 605, AMEX Rule 432, ISE Rule 420, NSE Rule 5.6, PSE Rule 757, BSE Rule 42, NASDAQ 3011, and Section 12 of the CSE Rules and Regulations to the NASD.

123.    Nor did Interactive report to the NASD its own violations of the CFTC's Reg. §166.3, or its violations of NYSE Rule 342, NFA Rule 2-9, NASD Rules 3010, CBOE Futures Rule 609, NSE Rule 5.7, PSE Rule 748, NASDAQ Rule 3010, AMEX Rule 922, BSE Rule 42.5, ISE Rule 1600(b), and CSE Rule 11 which require registrants and Member Firms, like Interactive, to gather accurate information about their customers and supervise their employees in a reasonable manner.

124.    If Interactive had reported Steele's and their own misconduct to the FinCEN, CFTC, NASD, NFA, NYSE, CBOT, CBOE Futures, CBOE, AMEX, BSE, PSE, CSE, ISE, NASDAQ, or NSE in a timely manner, one governmental body or another would have filed a lawsuit to enjoin Steele from any further violations of the law and to freeze all of the funds that Steele had in his Interactive and Bank of America accounts, which is demonstrated by the lawsuit the CFTC filed in the U.S. District Court against Steele only three days after it learned about his criminal activities, and prevented all or almost all of the losses the Plaintiffs sustained in this case.

125.    Interactive's brazen violations of the foregoing statutes, rules, notices, and directives provides additional, independent evidence of its negligent, grossly negligent, and reckless failure to exercise due care to avoid injuring the Plaintiffs in this case.

126.    If Interactive had not assisted Steele in the commission of his fraudulent scheme, the Plaintiffs would not have suffered the enormous damages they suffered in his case.

j.      Interactive Was Finally Forced To Report Steele's Illegal Activities To The Authorities in May, 2005

127.    On or about May 15, 2005, one of Steele's investors, Alan De Chezet, called Interactive to ask a question about his account.

128.    Interactive did not have an account for De Chezet on its books and records.

129.    On May 23, 2005, or eight days after it received this telephone call, Interactive finally reported Steele's criminal conduct to the CFTC -- without filing a SAR with FinCEN or its own violations of the foregoing statutes and rules to the NASD.

130.    If Interactive had failed to report what happened to the authorities, at this point, it would have only made matters worse for itself, and it would have deprived itself of any opportunity to deny, albeit falsely, that it did not have any knowledge about what Steele was doing.

131.    At no time before May 23, 2005 did any of the Plaintiffs know that Steele was defrauding them, or that Interactive was giving him substantial assistance.

k.    The CFTC Filed An Injunctive Action Against Steele

132.    On May 26, 2005, the CFTC filed an action against Steele in the U.S. District Court for the Northern District of Illinois seeking a temporary restraining order, a preliminary and permanent injunction, an order freezing the funds in his Interactive and Bank of America accounts, a civil monetary penalty, and an order directing him to make restitution to the Plaintiffs and his other investors.

133.    On the same day, May 26, 2005, the District Court entered a temporary restraining order and froze approximately $242,000 (U.S.), in Steele's Interactive and Bank of America accounts.

134.    On June 13, 2005, the District Court entered a preliminary injunction against Steele.

135.    When the Royal Canadian Mounted Police ("RCMP") arrested Steele in June 2005, he turned approximately $75,000 over to it, and the RCMP, in turn, entrusted this money to the Provincial Court to be distributed to the Plaintiffs and Steele's other investors.

136.    On November 22, 2005, the District Court entered a permanent injunction against Steele that enjoined him from committing any further violations of the Comm-

odity Exchange Act, as amended, directing Interactive and Bank of America to turn the $242,000 (U.S.) over to the Provincial Court to be distributed to Steele's investors, a civil monetary penalty in the amount of $6,200,000 (U.S.), and an order directing Steele to pay the Plaintiffs and his other investors $7,409,194.75 (U.S.) as restitution for their losses.

<ol type="1">
<li>The Plaintiffs' Out-Of-Pocket Losses And Other Damages</li>
</ol>

137.    The Provincial Court distributed portions of said $242,000 (U.S.) in Steele's accounts at Interactive and Bank of America and the $75,000 (U.S.) that Steele turned-over to the RCMP to the Plaintiffs and Steele's other investors.

138.    Faced with Interactive's serious violations of its rules, the NFA's Business Conduct Committee brought a disciplinary action against Interactive alleging, *inter alia*, that it failed to exercise due diligence in connection with Steele's account, which Interactive settled by agreeing to pay a fine in the amount of $125,000 (U.S.) and $325,000 (U.S.) into a restitution fund for investors who would be willing to release Interactive from any claims they might have against it.

139.    The Plaintiffs will not receive any portion of this $325,000 (U.S.) because they have not, and will not release Interactive from the claims they have made herein for such paltry sums.

140.    The CFTC also instituted an administrative action against Interactive where Interactive agreed to pay another $175,000 (U.S.) into a restitution fund for all of Steele's investors.

141.    The CFTC's order does not require an investor to sign a release to receive a distribution from the $175,000 restitution fund.

142.    The Provincial Court also agreed to distribute the $175,000 to Steele's investors, but, as of today's date, the Provincial Court has not made any distributions to the Plaintiffs or anyone else.

143.    The portions of the $242,000 (U.S.) and $75,000 (U.S.) the Plaintiffs have received and the portions of the $175,000 (U.S.) they expect to receive from the Provincial Court represent a tiny fraction of their losses.

144.    All of the Plaintiffs, except five, were residents of Canada, Germany, and Switzerland (the "Foreign Plaintiffs") when they made their investments in Steele's commodity pool.

145.    The remaining Plaintiffs resided in the United States when they made their investments.

146.    During 2003-2005, the Foreign Plaintiffs used Canadian Dollars, Euros, or Swiss Francs to make their investments in Steele's commodity pool.

147.    If the Court decides to enter a judgment against Interactive in favor of the Foreign Plaintiffs in U.S. Dollars, the amount of their judgments must account for the differences in the exchange rates that were in effect when they made their investments and the exchange rates that will be in effect when the Court enters its judgments.

148.    Without regard to the differences in exchange rates, all of the Plaintiffs have suffered out-of-pocket losses totaling approximately $4,000,000 (U.S.).

149.    The Foreign Plaintiffs would not be made whole if the Court's judgment did not account for such differences in the exchange rates in effect at these times if the U.S. dollar remains weaker than it was when the Foreign Plaintiffs made their investments.

150.    In addition, Interactive must pay all of the Plaintiffs interest at a rate the Court deems just and equitable to compensate them for the opportunities they lost to make alternative investments.

151.    The Plaintiffs would not be made whole without an award of interest or other measure of their opportunity losses to compensate them for the damages they sustained as a result of Interactive's tortious conduct.

152.    After appropriate adjustments are made for the differences in exchange rates for the Foreign Plaintiffs and interest is added to all of the Plaintiffs' out-of-pocket losses, the Plaintiffs' damages, as of today's date, are approximately $6,000,000.

153.    The CFTC's administrative order characterizes the $175,000 that Interactive must pay into a restitution fund as "commissions", which Interactive withdrew from Steele's account.

154.    Interactive is still wrongfully retaining at least $474,308 in commissions it paid itself from Steele's account.

VI.    Plaintiffs' Causes of Action

COUNT ONE

Intentionally And Knowingly Aiding And Abetting
Steele's Fraudulent Scheme And Breaches Of Fiduciary Duties

1-154.   The Plaintiffs re-allege paragraphs 1-154, above, and incorporate same herein by reference.

155.    Steele was at all times relevant hereto acting as the Plaintiffs' agent, which gave rise to fiduciary duties that he owed them of loyalty, candor, honesty, and to use their assets solely for their benefit.

156.    In addition, the Plaintiffs reposed trust and confidence in Steele by giving him discretion to invest their assets.

157.    By accepting that trust and confidence, Steele placed himself in a position that was superior to Plaintiffs', which gave rise to the same fiduciary duties he owed them as their agent.

158.    By defrauding the Plaintiffs, Steele knowingly, willfully, and intentionally breached the fiduciary duties he owed them.

159.    Interactive was regularly aware of its role in Steele's tortious conduct.

160.    Interactive intentionally and knowingly aided and abetted Steele's fraudulent scheme and his breaches of the fiduciary duties he owed the Plaintiffs.

161.    Interactive's acts and omissions were the proximate cause of the Plaintiffs' damages.

162.    Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of its employees alleged herein.

## COUNT TWO

Aiding And Abetting Steele's Fraudulent Scheme And Breaches
Of Fiduciary Duties By Intentionally, Knowingly, And Consciously
Ignoring Obvious, Glaring "Red Flags" Relating To Steele's Criminal Conduct

1-162.    The Plaintiffs re-allege paragraphs 1-162 of Count One, above, and incorporate same herein by reference.

163.    Interactive aided and abetted Steele's fraudulent scheme and breaches of fiduciary duties by intentionally, knowingly, and consciously ignoring obvious, glaring "red flags" surrounding Steele's account.

164.    Interactive's acts and omissions were the proximate cause of the Plaintiffs' damages.

165.    Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of its employees alleged herein.

<u>COUNT THREE</u>

<u>Intentionally And Knowingly Acting In Concert With Steele</u>

1-165.    The Plaintiffs re-allege paragraphs 1-165 of Count Two, above, and incorporate same herein by reference.

166.    Interactive intentionally and knowingly acted in concert with Steele.

167.    In addition, its own acts and omissions, when considered separately, constitute repeated breaches of the duties it owed the Plaintiffs.

168.    Interactive's acts and omissions were the proximate cause of the Plaintiffs' damages.

169.    Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of its employees alleged herein.

<u>COUNT FOUR</u>

Acting In Concert With Steele By Intentionally,
Knowingly, And Consciously Ignoring Obvious,
<u>Glaring "Red Flags" Relating To Steele's Criminal Conduct</u>

1-169.    The Plaintiffs re-allege paragraphs 1-169 of Count Three, above, and incorporate same herein by reference.

170.    Interactive intentionally, knowingly, and consciously ignored obvious, glaring "red flags" surrounding Steele's account.

171.   In addition, Interactive's own acts and omissions when considered separately, constitute repeated breaches of the duties it owed the Plaintiffs.

172.   Interactive's acts and omissions were the proximate cause of the Plaintiffs' damages.

173.   Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of its employees.

COUNT FIVE

Willful and Wanton Misconduct

1-173.   The Plaintiffs re-allege paragraphs 1-173 of Count Four, above, and incorporate same herein by reference.

174.   Interactive's acts and omissions were willful and wanton and were committed with utter indifference to and in conscious and reckless disregard for the Plaintiffs' welfare.

175.   Interactive's willful and wanton misconduct was the proximate cause of the Plaintiffs' damages.

176.   Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of its employees alleged herein.

COUNT SIX

Negligence, Gross Negligence, And Reckless Misconduct

1-176.   The Plaintiffs re-allege paragraphs 1-176 of Count Five, above, and incorporate same herein by reference.

177.   The injuries the Plaintiffs sustained were readily foreseeable.

178.    Interactive failed to exercise reasonable care to avoid injuring members of the public, including the Plaintiffs, while conducting its business.

179.    Interactive's acts and omissions were negligent, grossly negligent, and reckless, if not intentional, and constitute repeated and flagrant breaches of the duties it owed members of the public, including the Plaintiffs, to exercise reasonable care to avoid injuring them while conducting its business.

180.    Interactive's acts and omissions were the proximate cause of the Plaintiffs' damages.

181.    Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of its employees alleged herein.

COUNT SEVEN

Negligent, Grossly Negligent, And Reckless Failure<br>To Train And Supervise Its Employees Properly

1-181.    The Plaintiffs re-allege paragraphs 1-181 of Count Six, above, and incorporate same herein by reference.

182.    Interactive repeatedly breached its duty to train and supervise its employees in a reasonable manner throughout 2003-2005 while Steele was perpetrating his fraudulent scheme upon the Plaintiffs and many others.

183.    Interactive's negligent, grossly negligent, and reckless failure to train and supervise its employees in a reasonable manner was the proximate cause of the Plaintiffs' damages.

184.    Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of Interactive's employees.

<u>COUNT EIGHT</u>

Unjust Enrichment Warranting The Imposition Of A Constructive
<u>Trust On The Commissions Interactive Deducted From Steele's Account</u>

1-184. The Plaintiffs re-allege paragraphs 1-184 of Count Seven, above, and in-corporate same herein by reference.

185.    Interactive systematically paid itself commissions from Steele's account totaling $649,308 for the trades it executed for him with the Plaintiffs' and other invest-ors' money.

186.    The CFTC ordered Interactive to pay $175,000 of the commissions it deducted from Steele's account to the Plaintiffs and his other investors, leaving, at least, $474,308 in commissions, it is retaining wrongfully.

187.    Interactive is not permitted to benefit from its wrongful conduct by retain-ing the commissions it paid itself from Steele's account to the detriment of the Plaintiffs.

188.    Interactive's retention of these commissions would violate fundamental principles of justice, equity, and good conscience.

189.    The Plaintiffs have a greater right to these commissions than any right Interactive might have.

190.    Interactive would be unjustly enriched if it were allowed to retain these commissions.

191.    The Court should impose a constructive trust upon said commissions for the benefit of the Plaintiffs.

VII.    <u>Prayer for Relief</u>

WHEREFORE, the Plaintiffs hereby request that the Court enter: (a) money judgments against Interactive in the amounts of their losses (with adjustments for the

differences in the exchange rates where necessary); (b) with interest at a rate the Court

deems just and equitable; (c) the imposition of a constructive trust on, at least, $474.308

in commissions Interactive deducted from Steele's account; (d) punitive damages in an

amount to be determined at trial; (e) reasonable attorney's fees and expenses; (f) the costs

of this action; and (g) any other relief the Court deems just and equitable.

Respectfully submitted,
Plaintiffs,

By: _____

Their attorney

Peter J. Berman
Peter J. Berman, Ltd.
332 S. Michigan Avenue, Suite 1000
Chicago, IL 60604-4398
312.408.1114
No. 13414
Attorney for Plaintiffs