THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THOMAS ARMSTRONG, LISA FARR,            )
DAVID BALLARD, MIKE BLAUHORN,           )
ROY BOX, CAROL BOX, SHAWN BRAYSHAW,     )
CHELAN BRAYSHAW, CLIFF CAUKELL,         )
JOE CHEVALDAVE, OLGA CHEVALDAVE,        )
NICHOLAS CIFARELLI, DAVID DUCHARME,     )      No. 07-C-6916
CHRISTINE NICHOL, MARIA ILONA ELSMORE,  )
JIM FITCHETT, LEN FREETH,               )      Jury Demand
MARYSE GALLYSSANT, KURT GASSER,         )
WAYNE GEROW, THERESA GEROW,             )      Amended Complaint
DAVID GLOVER, KERRIE GLOVER,            )
JOANNE GUSTAFSON, KAY ARMSTRONG         )
BEVERLY HASCARL, LEE HEICHERT,          )
DEBBIE HICKS, CHAD HICKS, DARRIN HICKS, )
PETER HIEBERT, DIANE HOWARD,            )
BRUNO HUBER, ANDREAS HUETTIG,           )
GARTH HUNTER, GEORGE IVERSON,           )
SUSAN DAVIES, JOANNE JORDAN,            )
LEONARD KAPLAN, BIPPY MCMASTER,         )
SHIRLEY KOSIANCIC, HILARY BITTEN,       )
URSULA KRIEGER, BOBBY KOVAR,            )
ELVIRA LANG, PHILIP LARSTONE,           )
JEFFERY LIOCE, ANTONIO LIOCE,           )
GUISSEPINA LIOCE, GUNTER LEYER,         )
MARIANNE LEYER, GERDI MAUCHER,          )
JAMES MELLEN, DOROTHY MELLEN,           )
GEORGE MELLEN, WERNER MENGLER,          )
MARILYN MENGLER, TYLER MENGLER,         )
ANITA MICHIELS, HENRY MOREY,            )
JAMES MORRIS, BELINDA NUNN, ARTHUR NUNN, )
BRIAN NURSEY, DIANA NURSEY,             )
OMEGADENT SERVICES, LTD.,               )
GENE PARKER, CAROLYN PARKER,            )
YVES PELLETIER, MICHELLE PELLETIER,     )
MARK PERRY, BRYN PERRY,                 )
CAITLIN PERRY, AVE PERRY, ULRIKE PERSCH, )
SYBILLE PROCHASKA, RONALD PROVAN,       )
KATHY PROVAN, DAN ROBBINS,              )
DENNIS ROGERS, BARRY RYRIE,             )
BRUCE RYRIE, LYNETTE RYRIE,             )
NORM SANDERSON, JR., TROY SALADANA,     )
DICK SCHULTZ, JOAN SCHWARTZENBERGER,    )

MIKE SEATON, KAREN SEATON,                    )
NELSON SLOBODA, CRAIG SOWINSKI,               )
INDRA STRUEBBE, SEAN TOBIN,                    )
ASAMI SUDO, BETH TROTTER,                      )
TWAMLEY HOLDINGS, ALLAN CECCON,               )
MICHAEL VAN DEUSEN,                            )
PATRICIA VAN DEUSEN, ALLEN WALKER,            )
THERESA WALKER, FRED WEDGEWOOD,               )
DAVID WELCH, SHELLEY WELCH,                    )
MICHELLE WHITCOMB, SANDRA WHITCOMB,           )
MATHIAS WIESMANN, SAMUEL WIESMANN,            )
LANA WOCKNITZ, ELAINE WOODS,                   )
JAMES YORK, THOMAS ZARP,                       )
HENRIETTE ZARP, ELIZABETH BERGER,             )
BRADLEY ROBERTS, GIOVANNA CUNSOLO             )
AUDREY KANYO, KELMAN KANYO,                    )
TIMOTHY PETER McCRORY, HAMISH FRASER,         )
JOHN VANDEN HEUVEL, JEFFERY POPHAM,           )
BUSINESS PARADIGM PROPERTIES, LTD.,           )
GERMAIN-GEISLER FAMILY TRUST by               )
DIANNE GERMAIN as its Trustee,                )
HANS JOSEF SCHONEBERGER, and                  )
BARBARA POENSGEN,                             )
                                              )
        Plaintiffs,                           )
                                              )
              v.                              )
                                              )
Interactive Brokers, LLC,                     )
                                              )
        Defendant.                            )

Table Of Contents

I.    Nature of Case
      .................................................................................................1

II.   Plaintiffs
      .......................................…...................................................2

III.  Defendant
      ..........................................................................................13

IV.   Jurisdiction and Venue
      ....................................…....................................................14

V.    Facts
      ..........................................................................................15

      a.    Circumstances Relating To Steele's Fraudulent Scheme And
            Breaches Of The Fiduciary Duties He Committed
            .......................................................................................15

      b.    Steele Opened A Commodity Futures Trading Account
            At Interactive Stating That He Had A Liquid Net Worth
            Of Only $175,000, That He Was Self-Employed As A
            Commodity Futures Trader, That All Of The Money
            That Would Be Deposited Into His Account Would Belong
            To Him, And That He Would Be Trading Only For Himself
            .......................................................................................84

      c.    Interactive Accepted Wire Transfers From Third Parties
            Totaling $7.7 Million That It Credited To Steele's Account
            ..............................................................….....................85

      d.    Interactive Issued Checks Made Payable To Steele Personally
            Or Wire Transferred Approximately $3.1 Million To His
            Personal Bank Account
            .......................................................................................86

      e.    Interactive Executed Speculative Futures Trades For
            Steele That Were Worth Many Millions Of Dollars
            That Resulted In Losses Of About $4.3 Million
            .......................................................................................86

      f.    Interactive Knew The Money In Steele's Account Did
            Not Belong To Him
            .................................................….....................................87

g.    Interactive Urged Steele To Limit The Number Of Deposits Made In His Account Because His Regular Activity For Making Deposits Was Raising Flags, Particularly When Withdrawals Were Made On The Same Day .................................................................92

h.    Interactive Recklessly Allowed Steele To Make Enormous Trades That Resulted In Losses Of About $2,000,000 Over A Period Of Only Two Days .................................................................93

i.    Interactive Was Forced Finally To Report Steele's Illegal Activities To The Authorities In May 2005 .................................................................93

j.    The CFTC Filed An Injunctive Action Against Steele .................................................................94

k.    The Plaintiffs' Out-Of-Pocket Losses And Other Damages .................................................................95

VI.    Plaintiffs' Causes of Action .................................................................98

COUNT ONE

Intentionally And Knowingly Aiding and Abetting Steele's Fraudulent Scheme And Breaches Of Fiduciary Duties .................................................................98

COUNT TWO

Aiding And Abetting Steele's Fraudulent Scheme And Breaches Of Fiduciary Duties By Intentionally, Knowingly, And Consciously Ignoring Obvious, Glaring "Red Flags" Relating To His Criminal Conduct .................................................................99

COUNT THREE

Intentionally And Knowingly Aiding and Abetting Steele's
Conversion of Plaintiffs' Assets
..................................................................................................99

COUNT FOUR

Aiding and Abetting Steele's Conversion of Plaintiffs' Assets By
Intentionally, Knowingly, and Consciously Ignoring Obvious, Glaring
"Red Flags"
..................................................................................................100

COUNT FIVE

Unjust Enrichment Warranting The Imposition of a Cons-
tructive Trust On The Commissions Interactive Deducted
From Steele's Account
..................................................................................................101

VII.    Prayer for Relief
..................................................................................................102

AMENDED COMPLAINT

I.    Nature of Case

1.    This action stems from a fraudulent scheme that Kevin J. Steele ("Steele"), a Canadian citizen, perpetrated upon more than 200 individuals and entities, including the Plaintiffs, who suffered out-of-pocket losses totaling approximately $7,000,000 (U.S.).

2.    The Provincial Court of Nakusp for the Province of British Columbia, Canada (the "Provincial Court") convicted Steele of criminal fraud and sentenced him to six (6) years in prison.

3.    The U.S. Commodity Futures Trading Commission ("CFTC") and National Futures Association ("NFA") brought disciplinary actions against Defendant, Interactive Brokers, LLC ("Interactive"), for the role it played in allowing Steele to operate a commodity pool as an unregistered commodity pool operator.

4.    When Steele opened an account at Interactive he stated that he had a liquid net worth of only $175,000, and that the money deposited into his account would be his and his alone, and that he would be trading speculative commodity futures contracts only for himself.

5.    Interactive, however, learned shortly thereafter that Steele's representations were false, but it, nonetheless: (a) accepted wire transfers and checks from third parties totaling more than $7,700,000, which it credited to Steele's account knowing that the funds did not belong to him; (b) issued checks made payable to him personally and wire transferred funds to his personal bank account totaling more than $3,100,000, knowing that these funds did not belong to him; and (c) entered orders for the purchase

and sale of highly speculative commodity futures contracts worth many millions of dollars with funds that it knew did not belong to him, which resulted in losses totaling more than $4,300,000.

6.     Interactive knew that Steele was defrauding third parties.

7.     Interactive has even admitted that it urged Steele to limit the number of deposits that would be made into his account, and to make only one $250,000 withdrawal each month because his "regular" activity was   flags, particularly when with-drawals were made on the same day deposits were made.

8.     The Plaintiffs are bringing this action against Interactive for: (a) intentionally and knowingly aiding and abetting Steele's fraudulent scheme and breaches of fiduciary duties (Count One); (b) aiding and abetting Steele's fraudulent scheme and breaches of fiduciary duties by intentionally, knowingly, and consciously ignoring obvious, glaring "red flags" relating to Steele's criminal conduct (Count Two); (c) intentionally and knowingly aiding and abetting Steele's conversion of Plaintiffs' assets (Count Three); (d) aiding and abetting Steele's conversion of Plaintiffs' assets by intentionally, knowingly, and consciously ignoring obvious, glaring "red flags" (Count Four); (e) unjust enrichment warranting the imposition of a constructive trust on the commissions Interactive deducted from Steele's account (Count Five).   The Court dismissed Counts Six and Seven of the Plaintiffs' original Complaint with prejudice. The Plaintiffs hereby re-alleges and incorporates Counts Six and Seven of their original Complaint herein for the sole purpose of preserving their right to appeal the dismissal of Counts Six and Seven with prejudice.

II.     Plaintiffs

9.      The Plaintiffs include:

(1)      Plaintiff, Thomas Armstrong, is a resident of Winlaw, British Columbia, Canada.

(2)      Plaintiff, Lisa Farr, is a resident of Winlaw, British Columbia, Canada.

(3)      Plaintiff, David Ballard, is a resident of New Denver, British Columbia, Canada.

(4)      Plaintiff, Mike Blauhorn, is a resident of Nakusp, British Columbia, Canada.

(5)      Plaintiff, Roy Box, is a resident of Lake Havasu, Arizona, United States.

(6)      Plaintiff, Carol Box, is a resident of Lake Havasu, Arizona, United States. She is Plaintiff Roy Box's spouse, with whom she maintained a joint account.

(7)      Plaintiff, Shawn Brayshaw, is a resident of Victoria, British Columbia, Canada.

(8)      Plaintiff, Chelan Brayshaw, is a resident of Victoria, British Columbia, Canada.  She is Plaintiff, Shawn Brayshaw's spouse, with whom she maintained a joint account.

(9)      Plaintiff, Cliff Caukell, is a resident of New Hazelton, British Columbia, Canada.

(10)     Plaintiff, Joe Chevaldave, is a resident of Kelowna, British Columbia, Canada.

(11)    Plaintiff, Olga Chevaldave, is a resident of Kelowna, British Columbia, Canada. She is Plaintiff, Joe Chevaldave's spouse, with whom she maintained a joint account.

(12)    Plaintiff, Nicholas Cifarelli is a resident of Silverton, British Columbia, Canada.

(13)    Plaintiff, David Ducharme, is a resident of Winlaw, British Columbia, Canada.

(14)    Plaintiff, Christine Nichol, is a resident of Winlaw, British Columbia, Canada. She maintained a joint account with Plaintiff, David Ducharme.

(15)    Plaintiff, Maria Ilona Elsmore, is a resident of New Denver, British Columbia, Canada.

(16)    Plaintiff, Jim Fitchett, is a resident of New Denver, British Columbia, Canada.

(17)    Plaintiff, Len Freeth, is a resident of Castlegar, British Columbia, Canada.

(18)    Plaintiff, Kay Armstrong, is a resident of Castlegar, British Columbia, Canada. She maintained a joint account with Plaintiff, Len Freeth.

(19)    Plaintiff, Maryse Gallyssant, is a resident of Silverton, British Columbia, Canada.

(20)    Plaintiff, Kurt Gasser, is a resident of Kassel, Germany.

(21)    Plaintiff, Wayne Gerow, is a resident of Silverton, British Columbia, Canada.

(22)    Plaintiff, Theresa Gerow, is a resident of Silverton, British Columbia, Canada.

(23)   Plaintiff, David Glover, is a resident of Coquitlam, British Columbia, Canada.

(24)   Plaintiff, Kerrie Glover is a resident of Coquitlam, British Columbia, Canada.  She is Plaintiff, David Glover's spouse, with whom she maintained a joint account.

(25)   Plaintiff, Joanne Gustafson, is a resident of Silverton, British Columbia, Canada.

(26)   Plaintiff, Beverly Hascarl, is a resident of McBride, British Columbia, Canada.

(27)   Plaintiff, Lee Heichert, is a resident of New Denver, British Columbia, Canada.

(28)   Plaintiff, Debbie Hicks, is a resident of New Denver, British Columbia, Canada.

(29)   Plaintiff, Chad Hicks, is a resident of New Denver, British Columbia, Canada.

(30)   Plaintiff, Darrin Hicks, is a resident of New Denver, British Columbia, Canada.

(31)   Plaintiff, Peter Hiebert, is a resident of Victoria, British Columbia, Canada.

(32)   Plaintiff, Diane Howard, is a resident of Victoria, British Columbia, Canada.

(33)   Plaintiff, Bruno Huber, is a resident of Granthams Landing, British Columbia, Canada.

(34)    Plaintiff, Andreas Huettig, is a resident of Winnipeg, Manitoba, Canada.

(35)    Plaintiff, Garth Hunter, is a resident of Silverton, British Columbia,

Canada.

(36)    Plaintiff, George Iverson is a resident of Silverton, British Columbia,

Canada.

(37)    Plaintiff, Susan Davies, is a resident of Silverton, British Columbia,

Canada.  She maintained a joint account with Plaintiff, George Iverson.

(38)    Plaintiff, Joanne Jordan, is a resident of New Denver, British Columbia,

Canada.

(39)    Plaintiff, Leonard Kaplan, is a resident of Nelson, British Columbia,

Canada.

(40)    Plaintiff, Bippy McMaster, is a resident of Nelson, British Columbia,

Canada.  She maintained a joint account with Plaintiff, Leonard Kaplan.

(41)    Plaintiff, Shirley Kosiancic, is a resident of Nakusp, British Columbia,

Canada.

(42)    Plaintiff, Hilary Bitten, is a resident of Nakusp, British Columbia,

Canada.  She maintained a joint account with Plaintiff, Shirley Kosiancic.

(43)    Plaintiff, Ursula Krieger, is a resident of Hohenpeipenberg, Germany.

(44)    Plaintiff, Bobby Kovar, is a resident of Victoria, British Columbia,

Canada.

(45)    Plaintiff, Elvira Lang, is a resident of Kassel, Germany.

(46)    Plaintiff, Philip Larstone, is a resident of Winlaw, British Columbia,

Canada.

(47)    Plaintiff, Jeffery Lioce, is a resident of Trail, British Columbia, Canada.

(48)    Plaintiff, Antonio Lioce, is a resident of Trail, British Columbia, Canada.

(49)    Plaintiff, Guissepina Lioce, is a resident of Trail, British Columbia,
Canada.  She maintained two joint accounts; one with Plaintiff, Jeffery Lioce and
one with Plaintiff, Antonio Lioce.

(50)    Plaintiff, Gunter Leyer, is a resident of Kassel, Germany.

(51)    Plaintiff, Marianne Leyer, is a resident of Kassel, Germany.  She is
Plaintiff, Gunter Leyer's spouse, with whom she maintained a joint account.

(52)    Plaintiff, Gerdi Maucher, is a resident of Silverton, British Columbia,
Canada.

(53)    Plaintiff, James Mellen, is a resident of Penticton, British Columbia,
Canada.

(54)    Plaintiff, Dorothy Mellen, is a resident of Penticton, British Columbia,
Canada.  She is Plaintiff James Mellen's spouse, with whom she maintained a
joint account.

(55)    Plaintiff, George Mellen, is a resident of Silverton, British Columbia,
Canada.

(56)    Plaintiff, Mary Mellen, is George Mellen's spouse, with whom she
maintained a joint account.

(57)    Plaintiff, Werner Mengler, is a resident of Silverton, British Columbia,
Canada.

(58)    Plaintiff, Marilyn Mengler is a resident of Silverton, British Columbia, Canada. She is Plaintiff, Werner Mengler's spouse, with whom she maintained a joint account.

(59)    Plaintiff, Tyler Mengler, is a resident of Silverton, British Columbia, Canada.

(60)    Plaintiff, Anita Michiels, is a resident of New Denver, British Columbia, Canada.

(61)    Plaintiff, Henry Morey, is a resident of Slocan, British Columbia, Canada.

(62)    Plaintiff, James Morris, is a resident of Kaslo, British Columbia, Canada.

(63)    Plaintiff, Shirley Morris, is the spouse of James Morris, with whom she had a joint account.

(64)    Plaintiff, Belinda Nunn, is a resident of Nelson, British Columbia, Canada.

(65)    Plaintiff, Arthur Nunn, is the spouse of Belinda Nunn, with whom he had a joint account.

(66)    Plaintiff, Brian Nursey, is a resident of Victoria, British Columbia, Canada.

(67)    Plaintiff, Diana Nursey, is a resident of Victoria, British Columbia, Canada. She is Plaintiff, Brian Nursey's spouse, with whom she maintained a joint account.

(68)    Plaintiff, Omegadent Services, Ltd is a corporation which was organized under the laws of British Columbia, Canada.

(69)    Plaintiff, Gene Parker, is a resident of New Denver, British Columbia, Canada.

(70)    Plaintiff, Carolyn Parker, is a resident of New Denver, British Columbia, Canada. She is Plaintiff, Gene Parker's spouse, with whom she maintained a joint account.

(71)    Plaintiff, Yves Pelletier, is a resident of Victoria, British Columbia, Canada.

(72)    Plaintiff, Michelle Pelletier, is a resident of Victoria, British Columbia, Canada. She is Plaintiff, Yves Pelletier's spouse, with whom she maintained a joint account.

(73)    Plaintiff, Mark Perry, is a resident of Silverton, British Columbia, Canada.

(74)    Plaintiff, Caitlin Perry, is a resident of Silverton, British Columbia, Canada.

(75)    Plaintiff, Bryn Perry, is a resident of Silverton, British Columbia, Canada.

(76)    Plaintiff, Ave Perry, is a resident of Silverton, British Columbia, Canada.

(77)    Plaintiff, Ulrike Persch, is a resident of Kassel, Germany.

(78)    Plaintiff, Sybille Prochaska, is a resident of Victoria, British Columbia, Canada.

(79)    Plaintiff, Ronald Provan, is a resident of Silverton, British Columbia, Canada.

(80)    Plaintiff, Kathy Provan, is a resident of Silverton, British Columbia, Canada. She is Plaintiff, Ronald Provan's spouse, with whom she maintained a joint account.

(81)    Plaintiff, Dan Robbins, is a resident of Victoria, British Columbia, Canada.

(82)   Plaintiff, Dennis Rogers, is a resident of Victoria, British Columbia, Canada.

(83)   Plaintiff, Barry Ryrie, is a resident of Barrhead, Alberta, Canada.

(84)   Plaintiff, Bruce Ryrie, is a resident of Innisfail, Alberta, Canada.

(85)   Plaintiff, Lynette Ryrie, is a resident of Castlegar, British Columbia, Canada.

(86)   Plaintiff, Norm Sanderson, Jr. is a resident of Castlegar, British Columbia, Canada.  He is Plaintiff Lynette Ryrie's spouse, with whom he maintained a joint  account.

(87)   Plaintiff, Troy Saladana, is a resident of Victoria, British Columbia, Canada.

(88)   Plaintiff, Dick Schultz, is a resident of Nelson, British Columbia, Canada.

(89)   Plaintiff, Joan Schwartzenberger, is a resident of Victoria, British Columbia, Canada.

(90)   Plaintiff, Mike Seaton, is a resident of Creston, British Columbia, Canada.

(91)   Plaintiff, Karen Seaton, is a resident of Creston, British Columbia, Canada.  She is Plaintiff, Mike Seaton's spouse, with whom she maintained a joint account.

(92)   Plaintiff, Nelson Slaboda, is a resident of Winfield, British Columbia, Canada.

(93)   Plaintiff, Craig Sowinski, is a resident of Victoria, British Columbia, Canada.

(94)   Plaintiff, Indra Struebbe, is a resident of Altenau-Saulgrub, Germany.

(95)    Plaintiff, Sean Tobin, is a resident of Halifax, Nova Scotia, Canada.

(96)    Plaintiff, Asami Sudo, is a resident of Halifax, Nova Scotia, Canada.  She
        is Plaintiff, Sean Tobin's spouse, with whom she maintained a joint
        account.

(97)    Plaintiff, Beth Trotter, is a resident of Victoria, British Columbia, Canada.

(98)    Plaintiff, Twamley Holdings, is a corporation which was organized under
        the laws of British Columbia, Canada.

(99)    Plaintiff, Michael Van Deusen, is a resident of Seward, Alaska, United
        States.

(100)   Plaintiff, Patricia Van Deusen, is a resident of Seward, Alaska, United
        States.  She is Plaintiff, Michael Van Deusen's spouse, with whom she
        maintained a joint account.

(101)   Plaintiff, Allen Walker, is a resident of Nelson, British Columbia, Canada.

(102)   Plaintiff, Theresa Walker, is a resident of Nelson, British Columbia,
        Canada.  She is Plaintiff, Allen Walker's spouse, with whom she
        maintained a joint account.

(103)   Plaintiff, Fred Wedgewood, is a resident of Sidney, British Columbia,
        Canada.

(104)   Plaintiff, David Welch, is a resident of Silverton, British Columbia,
        Canada.

(105)   Plaintiff, Shelley Welch, is a resident of Victoria, British Columbia,
        Canada.  She is Plaintiff, David Welch's spouse, with whom she
        maintained a joint account.

(106)  Plaintiff, Michelle Whitcomb, is a resident of Lumby, British Columbia, Canada.

(107)  Plaintiff, Sandra Whitcomb, is a resident of Vernon, British Columbia, Canada.

(108)  Plaintiff, Mathias Wiesmann, is a resident of Wallerau, Switzerland.

(109)  Plaintiff, Samuel Wiesmann, is a resident of Wallerau, Switzerland. He maintained a joint account with Plaintiff, Mathias Wiesmann.

(110)  Plaintiff, Lana Wocknitz, is a resident of New Denver, British Columbia, Canada.

(111)  Plaintiff, Elaine Woods, is a resident of Castlegar, British Columbia, Canada.

(112)  Plaintiff, James York, is a resident of Castlegar, British Columbia, Canada.

(113)  Plaintiff, Thomas Zarp, is a resident of Lake Havasu City, Arizona, United States.

(114)  Plaintiff, Henriette Zarp, is a resident of Lake Havasu City, Arizona, United States. She is Plaintiff, Thomas Zarp's spouse, with whom she maintained a joint account.

(115)  Plaintiff, Elizabeth Berger, is a resident of Powell River, British Columbia, Canada.

(116)  Plaintiff, Allan R. Ceccon, is a resident of Castlegar, British Columbia, Canada.

(117)  Plaintiff, Bradley Roberts, is a resident of Edmonton, Alberta, Canada,

(118)  Plaintiff, Giovanna Cunsolo, is a resident of Edmonton, Alberta, Canada. She maintained a joint account with Plaintiff, Bradley Roberts.

(119)  Plaintiff, Audrey Kanyo, is a resident of Beaverlodge, Alberta, Canada.

(120)  Plaintiff, Kelman Kanyo, is a resident of Beaverlodge, Alberta, Canada. He maintained a joint account with Plaintiff, Audrey Kanyo.

(121)  Plaintiff, Hamish Fraser, is a resident of Galifaldi Highlands, British Columbia, Canada.

(122)  Plaintiff, Timothy Peter McCrory, is a resident of Silverton, British Columbia, Canada.

(123)  Plaintiff, John Vanden Heuvel, is a resident of Nelson, British Columbia, Canada.

(124)  Plaintiff, Jeffery Popham, formerly a resident of Victoria, British Columbia, Canada, who is now residing in Carqueiranne, France.

(125)  Plaintiff, Business Paradigm Properties, Ltd, is a corporation which was organized under the laws of British Columbia, Canada.

(126)  Plaintiff, Dianne Germain, as Trustee for the Germain-Geisler Family Trust, formerly known as the Dianne Germain Family Trust.

(127)  Plaintiff, Hans Josef Schoneberger, is a resident of Lahntal-Gobfelden, Germany.

(128)  Plaintiff, Barbara Poensgen, is a resident of Lahntal-Gobfelden, Germany. She maintained a joint account with Plaintiff, Hans Josef Schoneberger.

III.   Defendant

10.    Defendant, Interactive, is a limited liability company that was organized and exists under Connecticut law.  At all times pertinent hereto, Interactive acted as a brokerage firm for the purchase and sale of commodity futures contracts and securities.

11.    At all times pertinent hereto, Interactive was: (a) licensed to do business in the state of Illinois; (b) registered as a Futures Commission Merchant with the CFTC and as a Broker-Dealer with the Securities and Exchange Commission; and (c) a Member of the NFA, National Association of Securities Dealers, Inc. (n/k/a Financial Industry Regulatory Authority), NASD Amex Regulation, and various exchanges, including the New York Stock Exchange, Chicago Board of Trade, CBOE Futures Exchange, LLC, Boston Stock Exchange, National Stock Exchange, Philadelphia Stock Exchange, NASDAQ, Chicago Stock Exchange, American Stock Exchange, National Stock Exchange, and International Securities Exchange.

12.    The acts and omissions alleged herein were committed by Interactive employees during the course of and within the scope of their employment with Interactive. Interactive is liable for their tortious acts and omissions as alleged herein under the doctrine of *respondeat superior*.

IV.   Jurisdiction and Venue

13.    The Plaintiffs and Interactive are citizens of different states or subjects of foreign states.

14.     This case was filed originally in the Circuit Court of Cook County, Illinois.  On December 7, 2007, Interactive removed this case to the U.S. District Court for the Northern District of Illinois.

15.     The amount in controversy is approximately $6,400,000.00.

16.     This Court has jurisdiction over this matter under 28 U.S.C. §1332 (a)(2) and (c) (1).

17.     Interactive is the only Defendant in this case.  A substantial part of the events and omissions giving rise to the Plaintiffs' claims occurred in the Northern District of Illinois and the property that is subject of this case was situated in the Northern District of Illinois.

V.     Facts

        a.     Circumstances Relating To Steele's Fraudulent Scheme And The Breaches Of The Fiduciary Duties He Committed

18.     In 2002 or early 2003, Steele formed a partnership with David Shannon ("Shannon") where Shannon agreed to solicit investors for Steele's pool and Steele agreed to do the trading for the pool.  Steele and Shannon agreed to share the profits from this enterprise.

19.     Shannon solicited approximately 10 individuals who made investments in Steele's pool in 2003 and 2004.

20.     In 2003, Steele formed a separate partnership with David Fulkco ("D. Fulkco") and Wally Fulkco ("W. Fulkco") (referred to collectively as the "Fulkcos") where the Fulkcos agreed to solicit investors for Steele's pool and perform various administrative functions for the pool, and Steele agreed to do the trading for the pool.

Steele and the Fulkcos agreed to share the profits from this enterprise. (All references made herein to "Steele's pool", include the pool in which Shannon and the Fulkcos solicited the Plaintiffs and other investors to make investments.)

21.    The Fulkcos formed a company named Abriel Asset Management to solicit investors for Steele's pool, wire transfer investors' funds to Interactive, receive wire transfers from Interactive, issue statements to the investors, and perform other administrative tasks for the pool.

22.    This partnership continued until May 2005, when Steele's fraudulent scheme was uncovered.

23.    The Fulkcos solicited more than 200 individuals who made investments in Steele's pool.

24.    Most, if not all, of the funds that were wire transferred to Interactive were made in the name of someone other than Steele (including the Plaintiffs' funds).

25.    Interactive credited all of the investors' funds to an account that Interactive opened in Steele's individual name.

26.    During the course of Steele's fraudulent scheme, he intentionally, knowingly, and willfully provided Shannon and the Fulkcos with false information about the results of the trading he was doing for his commodity pool.

27.    Shannon and D. Fulkco were located in Victoria, British Columbia, while they were soliciting investors for Steele's commodity pool.

28.    For a portion of the time Steele was perpetrating his fraudulent scheme, he was located in Victoria, British Columbia, and, at other times, he was located in Vancouver, British Columbia.

29.    Steele was losing millions of dollars trading futures contracts at Interactive throughout the entire time his account was opened at Interactive.

30.    Instead of advising the Fulkcos and Shannon that he was incurring enormous losses throughout the time he was perpetrating his fraudulent scheme, Steele advised them that he was earning enormous profits each month.

31.    Steele also intentionally, knowingly, and willfully failed to advise Shannon and the Fulkcos, that he had Interactive issue checks to him personally and wire transfer large sums of the investors' money to his personal account at Bank of America.

32.    The Fulkcos and Shannon also made investments in Steele's pool.

33.    The Fulkcos gave the false information that Steele gave them about the results of his trading to a bookkeeping service known as Paperworks and had Paperworks prepare false account statements for each investor on Interactive letterhead (the "Phony Statements").

34.    The Fulkcos sent these Phony Statements to the people who invested in Steele's pool, which lulled them into believing that their investments were progressing well and that Interactive was holding their money in an account that Steele had opened for the commodity pool.

35.    The Fulkcos showed their own Phony Statements and other investors' Phony Statements to potential investors to solicit them to make investments in Steele's pool.

36.    The Fulkcos also told their investors to show their Phony Statements to their friends and family members, and tell that if they were interested in making an investment in Steele's pool, they should contact them.

37.   Many of the Plaintiffs and the other people whom the Fulkcos solicited to invest in Steele's pool resided in the New Denver, Silverton, and Nakusp, B.C.

38.   New Denver and Silverton, B.C. are only three (3) miles apart, and Nakusp, B.C. is only about 30 miles from Silverton and New Denver, B.C., where W. Fulkco lived for many years and raised his son, D. Fulkco.

39.   Almost all of the remaining Plaintiffs and the other investors and potential investors whom the Fulkcos or Shannon solicited to invest in Steele's pool resided in Victoria, B.C., and most of them are members of their families or friends who resided in the New Denver-Silverton-Nakusp, B.C. community or who had resided there.

40.   The Fulkcos and Steele knew that the New Denver-Silverton-Nakusp, B.C., community was a tight-knit community, which had a population totaling no more than about 800 people, and that the residents or former residents of this community reposed great trust and confidence in them and each other.

41.   The Fulkcos and Steele knew that the people they were soliciting to invest in Steele's pool in the New Denver-Silverton-Nakusp, B.C., community were, in fact, showing their Phony Statements to their friends and family members, and telling them that, if they were interested in learning more about Steele's pool, they should call them.

42.   Without knowing that Steele would be converting their money, the Plaintiffs and many other investors authorized Steele to make trades for them on a discretionary basis.

43.   Based on the discretion the Plaintiffs gave Steele to make trades on their behalf, he owed them fiduciary duties.

44.    Steele repeatedly breached the fiduciary duties he owed the Plaintiffs and his other investors by intentionally, knowingly, and willfully misleading them about the results of his trading and his misappropriation of the funds they entrusted to him.

45.    As Steele's partner, Shannon is responsible for Steele's misdeeds.

46.    Shannon also owed fiduciary duties to the Plaintiffs he solicited to give Steele discretion to make trades for them.

47.    Shannon breached the fiduciary duties he owed the Plaintiffs he solicited to invest in Steele's pool by making false representations and omissions of material fact without doing anything to determine whether the information he was giving them was true or false.

48.    As Steele's partner, the Fulkcos are also responsible for Steele's misdeeds.

49.    The Fulkcos also owed fiduciary duties to the Plaintiffs they solicited to give Steele discretion to make trades for them.

50.    The Fulkcos breached the fiduciary duties they owed these Plaintiffs by repeatedly and recklessly making false representations of material fact to them without doing anything to determine whether the information they were giving them was true or false.

51.    The circumstances surrounding the investments the Plaintiffs made in Steele's pool are as follows:

(1)    On April 16, 2004, Plaintiff, Thomas Armstrong ("T. Armstrong") met with W. Fulkco at his father, Frank Armstrong's ("F. Armstrong") home in New Denver, B.C., to discuss an investment he could make in Steele's commodity pool. T. Armstrong and his father, F.

Armstrong, had known W. Fulkco for many years and they reposed great trust in him. W. Fulkco stated falsely that Steele was a very talented commodities trader, and that he was earning very high returns for his investors. W. Fulkco showed T. Armstrong some of the Phony Statements he received for his own account, which showed large monthly profits. T. Armstrong also met with D. Fulkco in June 2004 and in October 2004 in Victoria, B.C., when D. Fulkco assured T. Armstrong falsely that the investment program was doing very well. The Fulkcos failed to tell T. Armstrong that Steele was actually losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. T. Armstrong relied justifiably on these omissions and misrepresentations of material fact when he invested $34,227 CDN on April 26, 2004, $15,093 CDN June 9, 2004, $13,418 CDN on July 15, 2004, $25,000 USD on July 20, 2004, $20,173 CDN on August 12, 2004, $50,000 USD on August 20, 2004, $7,343 CDN on January 21, 2005, and $4,995 CDN on March 29, 2005 in Steele's commodity pool. T. Armstrong withdrew $40,000 USD from his account on May 13, 2005.

(2)    Plaintiff, David Ballard ("Ballard") met the Fulkcos about 20 years ago when he purchased a home in New Denver, B.C. that is adjacent to W. Fulkco's property. Ballard reposed great trust in his neighbor, W. Fulkco. On February 5, 2005, Ballard met W. Fulkco at the Eldorado Market in New Denver, B.C., when W. Fulkco invited him to his

home in New Denver, B.C., to discuss an investment he could make in Steele's commodity pool. On February 7, 2005, they met at W. Fulkco's home in New Denver, B.C., when W. Fulkco showed him some of his own Phony Statements, which showed returns of about 7% to 10% per month. W. Fulkco stated falsely that accountants and business lawyers were monitoring Steele's pool. W. Fulkco failed to tell Ballard that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Ballard relied justifiably on these omissions and misrepresentations of material fact, when he invested $25,000 CDN on February 25, 2005, $50,000 CDN on March 24, 2005, $5,000 CDN on March 18, 2005 and $10,000 CDN on April 18, 2005 in Steele's commodity pool.

(3)    In late August 2003, Plaintiff, Michael Blauhorn ("Blauhorn") met W. Fulkco at W. Fulkco's home in New Denver, B.C., when W. Fulkco told him about an investment he could make in Steele's pool that was earning large profits. Blauhorn and W. Fulkco lived in New Denver, B.C. and had been a life-long friend of W. Fulkco and trusted him very much. W. Fulkco showed Blauhorn his own Phony Statements, which showed monthly returns of about 8% per month. W. Fulkco stated falsely that they had accountants and bookkeepers monitoring Steele's pool. W. Fulkco failed to tell Blauhorn that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Blauhorn relied justifiably on

these omissions and misrepresentations of material fact, when he invested $40,000 CDN on October 18, 2004, and $50,000 CDN on November 16, 2004, in Steele's pool.

(4)    In February 2005, Plaintiffs, James and Dorothy Mellen (the "Mellens"), met with Plaintiffs, Roy and Carol Box ("R. Box") and ("C. Box") (the "Boxes"), at the Mellens' winter home in Lake Havasu, AZ, when the Mellens told them about a successful investment they made in Steele's commodity pool. On March 23, 2005, R. Box called D. Fulkco to discuss making an investment in Steele's pool. D. Fulkco stated falsely that Steele was achieving great results and that he was using stop loss methods to protect against large losses. D. Fulkco also stated that he had invested his own money in Steele's pool and that it had been a very profitable investment. D. Fulkco failed to tell R. Box that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. The Boxes relied justifiably on these omissions and misrepresentations of material fact, when they invested $70,000 USD in Steele's pool on April 22, 2005.

(5)    In February 2004, Plaintiffs, Shawn and Chelan Brayshaw (the "Brayshaws") met with D. Fulkco at D. Fulkco's home in Victoria, B.C., when D. Fulkco told them about an investment they could make in Steele's pool. The Brayshaws had known D. Fulkco for many years and trusted him greatly. D. Fulkco stated falsely that Steele was earning returns that were averaging about 8% to 12% per month. D. Fulkco also

stated falsely that Steele had a stop loss program that limited his investors' losses to no more than 5% per day. D. Fulkco stated falsely that all of the investors would be notified and given the opportunity to withdraw the money in their accounts if Steele should lose 10% of their money. D. Fulkco failed to tell the Brayshaws that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. The Brayshaws relied justifiably on these omissions and misrepresentations of material fact, when they invested $13,550 CDN on February 4, 2004 and $40,000 CDN on October 28, 2004 in Steele's pool.

(6)     During 2003-2005, Plaintiff, Cliff Caukell's ("Caukell") brother-in-law, Plaintiff, Timothy McCrory ("McCrory"), showed him some of the Phony Statements he received from W. Fulkco for an investment he made in Steele's commodity pool, which showed very large profits each month. On March 15, 2005, Caukell called D. Fulkco at his home in Victoria, B.C., to discuss the investment. D. Fulkco stated falsely that the investors in Steele's pool were earning profits like those shown on McCrory's Phony Statements. D. Fulkco failed to tell Caukell that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Caukell relied justifiably on these omissions and misrepresentations of material fact, when he invested $45,000 CDN in Steele's pool on March 16, 2005.

(7)    Plaintiff, Allan Ceccon ("Ceccon") met with W. Fulkco on March 17, 2005, at Tim Horton's Restaurant in Castlegar, B.C., to discuss making an investment in Steele's commodity pool. W. Fulkco stated falsely that they were earning large profits on a steady basis. W. Fulkco also stated falsely that if Steele incurred losses for more than three (3) consecutive days, he would stop trading, and ask the investors whether they wanted their money back. W. Fulkco failed to tell Ceccon that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Ceccon relied justifiably on these omissions and misrepresentations of material fact, when he invested $30,000 CDN in Steele's pool on April 4, 2005.

(8)    In January 2005, Plaintiff, Joseph Cheveldave's ("J. Cheveldave") brother-in-law, Plaintiff, Myron Bevans ("Bevans"), told him about an investment he made in Steele's commodity pool that was earning very high returns. J. Cheveldave called D. Fulkco at his home in Victoria, B.C. on April 28, 2005, to inquire about how he and his wife, Olga Cheveldave ("O. Cheveldave"), could make an investment in Steele's pool. D. Fulkco gave Cheveldave instructions to make his investment, but he failed to tell J. Cheveldave that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was mis-appropriating their money. J. Cheveldave and O. Cheveldave relied

jus-tifiably on these omissions and misrepresentations of material fact, when they invested $25,000 CDN in Steele's pool on May 5, 2005.

(9)     During the fall of 2004, Plaintiff, Howard Turner ("Turner"), told Plaintiff, Nicholas Cifarelli ("Cifarelli"), about a very successful investment he made in Steele's commodity pool.  Turner explained that he was a close friend of W. Fulkco whom he had known all of his life and that he trusted him completely.  Cifarelli met with W. Fulkco at the Post Office in New Denver, B.C., in September 2004, when W. Fulkco stated falsely that Steele was earning returns of 7% to 9% each month for his investors.  Cifarelli had several more meetings with W. Fulkco over the following 2 or 3 months at W. Fulkco's home to discuss the large returns that Steele was achieving, but W. Fulkco failed to tell Cifarelli that Steele was actually losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money.  Cifarelli relied justifiably on these omissions and misrepres-entations of material fact, when he mortgaged his home and other property to invest $25,000 CDN in Steele's commodity pool on November 4, 2004.

(10)    In or about January 2004, Plaintiff, Bevans, and Plaintiff, Cifarelli, told Plaintiffs, Giovanna Cunsolo ("Cunsolo") and her husband, Bradley Roberts ("B. Roberts"), about a successful investment they made in Steele's commodity pool.  In or about January 2005, B. Roberts called D. Fulkco twice at his home in Victoria, B.C. to discuss the investment when D. Fulkco stated falsely that Steele was earning very large profits

trading commodities for his investors, and that he was the best in his field. D. Fulkco failed to tell Cunsolo and B. Roberts that Steele was losing enormous sums of his investors' money trading futures contracts at Inter-active, and that he was misappropriating their money. Cunsolo and B. Roberts relied justifiably on these omissions and misrepresentations of material fact, when they invested $25,000 CDN in Steele's pool on January 17, 2005.

(11)    In November 2002, W. Fulkco approached Plaintiff, George Iverson ("Iverson") at the New Denver Christmas Market when he told him about Steele's investment pool. W. Fulkco stated that he and his son had invested in the pool. Iverson had known W. Fulkco and his family since early in 1980, when he moved to New Denver, and trusted him wholeheartedly. W. Fulkco showed Iverson Phony Statements and gave him his son, D. Fulkco's telephone number and told him to call D. Fulkco for more information. In November 2004, Iverson called D. Fulkco, when D. Fulkco stated falsely that Steele was earning 7.5% to 8% per month on his investment. D. Fulkco also stated falsely that if there were any losses on the investment they would contact all of their investors before Steele would continue trading, making it unlikely for investors to lose their investment. W. Fulkco and D. Fulkco failed to tell Iverson that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Iverson and his wife, Plaintiff, Susan Davies ("Davies"), relied justifiably

on these omiss-ions and misrepresentations of material fact, when they invested $25,000 CDN in Steele's pool on November 30, 2004.

(12)    In June 2004, Plaintiff, Lisa Farr ("Farr") told Plaintiff, David Ducharme ("Ducharme") and his wife, Christine Nichol ("Nichol"), about a successful investment she made in Steele's pool. About two (2) weeks thereafter, Nichol met with W. Fulkco at his home in New Denver, B.C., to discuss making an investment in Steele's pool. W. Fulkco stated to Nichol that Steele made all of the trading decisions for the commodity pool, and that he and his son, D. Fulkco, were handling the administrative side of the program. He also stated falsely that Steele was earning profits that were averaging about 6% to 8% per month. W. Fulkco showed Nichol some of the investors' Phony Statements, which showed very high returns. W. Fulkco failed to tell Nichol and Ducharme that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Nichol and Ducharme relied justifiably on these omissions and misrepresentations of material fact, when they invested $25,000 CDN in Steele's pool on June 14, 2004.

(13)    In October 2003, and April 2004, Plaintiff, Maria Elsmore ("Elsmore") met W. Fulkco at the Post Office in New Denver, B.C., where they both lived. W. Fulkco told her about an investment she might want to make in Steele's commodity pool, which was earning large profits. On March 30, 2005, Elsmore met with her friend, Plaintiff, Lana Wocknitz

("Wocknitz"), at her home in New Denver, B.C.  Wocknitz showed Elsmore the Phony Statements she received for the investment she made in Steele's pool.  Shortly after this meeting, Elsmore met with W. Fulkco at his home in New Denver, B.C., when W. Fulkco stated falsely that Steele was a gifted trader.  W. Fulkco showed Elsmore some of his own Phony Statements, which showed profits averaging about 8% per month.  W. Fulkco failed to tell Elsmore that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money.  Elsmore relied justifiably on these omissions and misrepresentations of material fact, when she invested $30,000 CDN on April 13, 2005, in Steele's pool.

(14)    After another investor in Steele's pool, Al Lynch ("Lynch"), showed Plaintiff, Hamish Fraser ("Fraser"), some of his Phony Statements, Fraser met with D. Fulkco at D. Fulkco's home in Victoria, B.C. on April 15, 2005, to discuss making an investment in Steele's pool.  Fraser had known D. Fulkco for many years, and trusted him very much.  D. Fulkco stated falsely that Steele was an extremely talented trader who used a stop loss program to protect the funds he was using to trade commodities, and that the investment was very safe.  D. Fulkco failed to tell Fraser that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money.  Fraser relied justifiably on these omissions and misrepresentations of

material fact, when he invested $30,000 CDN in Steele's pool on April 15, 2005.

(15)    In May 2004, Plaintiff, Kathleen Armstrong's ("K. Armstrong") father, F. Armstrong, told her and her partner, Leonard Freeth ("Freeth"), about Steele's pool.  F. Armstrong and T. Armstrong advised Freeth and K. Armstrong that D. Fulkco had known Steele from college.  Based on information they received from W. Fulkco, they told Freeth and K. Armstrong that Steele had been getting returns very high returns for his investors.  In late June 2004, Freeth and K. Armstrong met W. Fulkco at the Appletree Restaurant in New Denver, B.C., when he stated falsely that Steele was earning returns that were between 7% and 9% each month.  After this meeting with the W. Fulkco, K. Armstrong was convinced that the Fulkcos knew Steele very well and that they had every confidence in his trading abilities.  W. Fulkco acknowledged that there was some risk involved, but he stated falsely that the in the worst possible situation they would receive their initial investment back.  W. Fulkco failed to tell K. Armstrong that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money.  K. Armstrong relied justifiably on these omissions and misrepresentations of material fact, when she invested $25,000 CDN on June 30, 2004, $3,000 CDN on November 19, 2004, $15,000 CDN on December 10, 2004, $25,000 CDN on February 22, 2005, and $4,920 CDN on April 7, 2005 in Steele's pool.

(16)   In the fall of 2003, Plaintiff, Garth Hunter ("Hunter") told her friend, Plaintiff, Maryse Gallisant ("Gallisant") about Steele's pool. Gallisant lived in Silverton, B.C., which was only three (3) miles from New Denver, B.C., where W. Fulkco lived. In May 2004, Gallisant met with W. Fulkco at his home in New Denver, B.C., when W. Fulkco stated falsely that Steele had been earning about 10% per month for their investors. W. Fulkco showed her some of his own Phony Statements that reflected such returns, but he failed to tell her that Steele was actually losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Gallisant relied justifiably on these omissions and misrepresentations of material fact, when she invested $15,000 CDN on June 4, 2004, $5,000 CDN on December 31, 2004, and $5,000 CDN on January 21, 2005, in Steele's commodity pool. Gallisant withdrew $2,000 USD on March 30, 2005, and $1,500 USD on April 1, 2005 from her account.

(17)   Hans-Jochen Leyer ("Leyer") resides in Kassel, Germany. He had a summer home in New Denver, B.C. between 1991 and 1998, and knew W. Fulkco very well from the time he spent there. While Leyer and his friends, Plaintiffs, Elvira Lang ("Lang") and Ulrike Persch ("Persch"), were visiting New Denver, B.C. in June 2003, they met with W. Fulkco at his home in New Denver, B.C., when W. Fulkco showed them some of his Phony Statements, which reflected returns of approximately 8% per month. Lang and Persch do not speak English, so they relied on Leyer to

communicate with the Fulkcos and Steele about making an investment in Steele's pool. W. Fulkco told them that his son, D. Fulkco, had been a friend of Steele for 16 years and that they had met in college. W. Fulkco stated falsely that Steele was one of the best traders in the world. D. Fulkco showed them documents showing that he had mortgaged all of his properties to make investments in Steele's pool. Persch, Lang, and Leyer also met with Steele and D. Fulkco in Victoria, B.C. during the summer of 2003. At this meeting, Steele and D. Fulkco misrepresented that Steele was getting returns of about 8% per month from his trading program. W. Fulkco, D. Fulkco, and Steele failed to tell Persch, Lang, and Leyer that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money.

(18)    Plaintiff, Kurt Gasser ("Gasser") also resides in Kassel, Germany. He does not speak English, and, he too relied on Leyer to communicate with W. Fulkco. In November 2004, Leyer met with Gasser in Kassel, Germany and told him about the returns W. Fulkco said that investors in Steele's pool were getting. Lang and Persch do not speak English, so they relied on Leyer to communicate with the Fulkcos about making an investment in Steele's pool. Leyer relayed all of the other information to Gasser that W. Fulkco gave him, as alleged in sub-paragraph 51 (17), above, but when Gasser made his investment in Steele's pool, the Fulkcos and Steele failed to tell Leyer or Gasser that Steele was losing enormous sums of his investors' money trading futures contracts at

Interactive, and that he was misappropriating their money. Gasser relied justifiably on these omissions and misrepresentations of material fact, when he invested $30,273 EU on November 11, 2004, and $17,500 EU on August 9, 2004, in Steele's pool. Gasser's August 9, 2004, deposit was made into Plaintiff Ulrike Persch's account, but it was transferred to Gasser's account on February 1, 2005. The transfer from Persch's account at Interactive was to include accrued interest and was in the amount of $36,929 USD

(19)   Based on Leyer's longstanding relationship with W. Fulkco, Persch believed all of the false information she got from the Fulkcos through Leyer, as alleged in subparagraph 51 (17), above, but the Fulkcos had failed to tell Leyer or Persch that Steele was losing enormous sums of his investors' money trading futures contracts at Inter-active, and that he was misappropriating their money. Persch relied justif-iably on these omissions and misrepresentations of material fact, when she invested $51,842 EU on March 1, 2004 in Steele's pool, $10,819 EU on April 11, 2004 in Steele's pool, $14,925 EU on April 29, 2004 in Steele's pool $20,000 EU on July 12, 2004 in Steele's pool, $17,500 EU on August 9, 2004 in Steele's pool on behalf of Plaintiff Gasser, which was later transferred to Gasser's account in the amount of $36,929 USD, $38,940 EU on August 16, 2004, $7,494 EU on September 7, 2004 in Steele's pool, $27,847 EU on November 11, 2004 in Steele's pool on behalf of Plaintiff, Gasser, which was transferred to Gasser's account on February 1, 2005,

and $20,000 EU on December 7, 2004 in Steele's pool, on behalf of G. and M. Leyer.

(20)    Lang    relied    justifiably    on    these    omissions    and misrepresentations of material fact when she invested $8,580 EU on November 14, 2003, $15,855 EU on March 5, 2004, and $10,149 EU on February 9, 2005, in Steele's pool.

(21)    Guenter Leyer ("G. Leyer") and Marianne Leyer ("M. Leyer"), collectively (the "Leyers") are residents of Kassel, Germany and do not speak English well.  They are Leyer's parents.  Leyer relayed the information that W. Fulkco gave him in the summer of 2003 to his parents about Steele's pool as alleged in subparagraph 51 (17), above.  The Leyers were reluctant to invest because they had retired and on a fixed income, which they told W. Fulkco during a conversation they had with him and Leyer in fall of 2004 at W. Fulkco's home in New Denver, B.C.  During the same conversation, W. Fulkco told the Leyers and their son (Leyer) that he would personally repay their investment if they lost any money. W. Fulkco failed to tell the Leyers or their son that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money.  The Leyers relied justifiably on these omissions and misrepresentations of material fact when they invested $20,000 EU on November 23, 2004, through Plaintiff Persch's account as alleged in sub-paragraph 51 (17), above.

(22)    In February 2005, Plaintiff, Hans Schoneberger ("Schon-eberger") and his wife, Barbara Poensgen's ("Poensgen") close friend, Leyer, told them about Steele's pool. Schoneberger and Poensgen do not speak English. For this reason, they relied on Leyer to communicate with W. Fulkco about making an investment in Steele's pool. Leyer conveyed the same information to them that he received from W. Fulkco, as alleged in subparagraph 51 (17), above, but W. Fulkco failed to tell Leyer, Schon-eberger or Poensgen that Steele was losing enormous sums of his invest-ors' money trading futures contracts at Interactive, and that he was mis-appropriating their money. Schoneberger and Poensgen relied justifiably on these omissions and misrepresentations of material fact when they invested $19,490 EU on April 29, 2005, in Steele's pool.

(23)    In early 2005, Leyer told Plaintiffs, Samuel and Mathias Wiesmann (the "Wiesmanns"), about Steele's pool. Leyer stated that he was a friend of D. Fulkco and knew his family personally. Leyer told the Wiesmanns about Steele's pool and the large returns he was getting for his investors. Leyer relayed the same information to them that he received from W. Fulkco, as alleged in subparagraph 51 (17), above, but W. Fulkco failed to tell Leyer or the Wiesmanns that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. The Wiesmanns relied justif-iably on these omissions and misrepresentations of material fact when they invested $36,750 CHF on April 15, 2005 in Steele's pool.

(24)    In the spring of 2004, Leyer told his friend, Plaintiff, Andreas Huettig ("Huettig") about Steele's pool. Huettig does not speak English. For this reason, she, too, relied on Leyer to communicate with W. Fulkco about making an investment in Steele's pool. Leyer conveyed the same information to her that he received from W. Fulkco as alleged in subparagraph 51 (17), above, but W. Fulkco failed to tell Leyer or Huettig that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Huettig relied justifiably on these omissions and misrepresentations of material fact when she invested $19,585 EU on April 14, 2004 in Steele's pool.

(25)    On April 30, 2004, a friend of Diane Germain ("Germain"), Linda Fitchett ("L. Fitchett"), told her about an investment her husband, James Fitchett ("Fitchett") had made in Steele's pool that was earning very high returns. Germain is the trustee of Plaintiff, Germain-Geisler Family Trust. L. Fitchett showed some of her husband's Phony Statements to Germain, and told her that she should talk to W. Fulkco if she wanted to learn more about the investment. Germain met W. Fulkco at his home in New Denver, B.C., on May 4, 2004. During this meeting, W. Fulkco showed her his own Phony Statements for the past year, which showed that he had doubled the money he invested. W. Fulkco failed to tell her that Steele was actually losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating

their money.   Germain relied justifiably on these omissions and

misrepresentations of material fact, when she invested $13,264 CDN on

July 6, 2004, $26,470 CDN on July 15, 2004, $13,240 CDN on August 12,

2004, $8,737 CDN on October 8, 2004, and $4,876 CDN on December 29,

2004 in Steele's pool.

(26)    In April 2003, W. Fulkco came to Plaintiff, Wayne Gerow's

("Gerow") store, Eldorado Market, in New Denver, B.C., to tell him about

an investment he could make in Steele's pool.   Gerow had known W.

Fulkco in the New Denver-Silverton community for many years and

trusted him greatly.   Gerow's youngest daughter had attended school with

D. Fulkco in New Denver, B.C.   W. Fulkco said that he and his son, D.

Fulkco, were looking for more people to invest in Steele's pool.   W.

Fulkco showed Gerow some of his own Phony Statements, which

reflected returns of approximately 8% to 10% per month.   W. Fulkco told

Gerow that D. Fulkco had known Steele since college.   He stated falsely

that Steele was a very gifted trader, and that he trusted him very much.   He

also stated that all of the investors in the pool would be informed of any

major changes in how Steele intended to make trades for his investors so

they could decide whether or not to withdraw from the pool.   W. Fulkco,

however, failed to tell Gerow that Steele was losing enormous sums of his

investors' money trading futures contracts at Interactive, and that he was

misappropriating their money.   Gerow and his wife, Plaintiff, Theresa

Gerow, relied justifiably on these omissions and misrepresentations of

material fact, when they invested $64,976 CDN on March 9, 2005 and $40,000 CDN on March 15, 2005 in Steele's commodity pool.

(27)   In the spring of 2004, Plaintiff, T. Armstrong, told Plaintiff, Farr about an investment he made in Steele's commodity pool. He stated that W. Fulkco was a close friend of his father, F. Armstrong, and that he trusted him very much. He told Farr that Steele was earning profits that were averaging about 7% to 9% per month. Farr met with W. Fulkco at his home in New Denver, B.C., in July 2004, when W. Fulkco urged her to invest in Steele's pool quickly because the minimum investment was going to change from $25,000 to $100,000 in the spring of 2005. Farr had known W. Fulkco for many years and trusted him greatly. Farr also met with D. Fulkco in a coffee shop in Victoria, B.C. in October 2005, when D. Fulkco misrepresented that Steele's returns were ranging between 7% and 9% per month. Farr had also known D. Fulkco for many years and trusted him as well. The Fulkcos failed to tell Farr that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Farr relied justifiably on these omissions and misrepresentations of material fact, when she invested $25,000 CDN in Steele's pool on January 6, 2005.

(28)   In July 2004, Plaintiffs, David and Kerrie Glover (the "Glovers") met with W. Fulkco at his home in New Denver, B.C., while they were vacationing in New Denver, B.C. The Glovers were W. Fulkco's neighbors and trusted him very much. W. Fulkco told them that

he, his son, D. Fulkco, and his son's friend, Steele, had formed a company to trade futures contracts for investors, where Steele was doing the trading and the Fulkcos were handling all administrative matters. He stated that many other people in New Denver, B.C. had invested in Steele's pool, and he stated falsely that Steele was an excellent trader, who was earning profits of roughly 8% each month. He showed them his own monthly Phony Statements, which showed similar gains, but W. Fulkco failed to tell the Glovers that Steele was actually losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. The Glovers relied justifiably on these omissions and misrepresentations of material fact, when they invested $25,000 CDN in Steele's pool on March 15, 2005.

(29)    During the fall of 2004, Plaintiffs, Karen and Howard Turner, Anita Michiels, and Gallisant told Plaintiff, Joanne Gustafson ("Gustafson"), about an investment they made in Steele's commodity pool that was doing extremely well. Gustafson met with W. Fulkco at his home in New Denver, B.C. in November 2004, when he showed her some of his own Phony Statements, and stated falsely that Steele's returns were averaging 8% per month. Gustafson had known W. Fulkco for many years in the New Denver-Silverton, B.C. community and trusted him very much. W. Fulkco failed to tell Gustafson that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Gustafson relied justifiably on

these omissions and misrepresentations of material fact, when she invested $25,000 CDN on November 22, 2004, and $12,000 CDN on April 21, 2005, in Steele's pool.

(30)    Plaintiff, Beverly Hascarl ("Hascarl"), and W. Fulkco were born and raised in Nakusp, B.C.  Hascarl had known W. Fulkco for about 60 years and attended the same school with him.  W. Fulkco approached Hascarl about making an investment in Steele's pool shortly after her husband's death in 2003, while he was visiting her at her home.  He told her that if she made an investment in Steele's pool she could make enough money to hire the help she needed to run her farm.  W. Fulkco stated falsely that Steele was a genius.  In August 2003, they met again at W. Fulkco's home, when he showed her some of his Phony Statement.  He stated falsely that an investment in Steele's pool was earning about 8% per month.  Hascarl sold her calves to come up with the money she needed to make her initial investment.  W. Fulkco failed to tell Hascarl that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money.  Hascarl relied justifiably on these omissions and misrepresentations of material fact, when she invested $13,125 CDN on December 31, 2003, $2,000 CDN on October 28, 2004, $24,990 CDN on January 25, 2005, and $24,990 CDN on January 25, 2005, in Steele's pool.

(31)    In December 2003, Plaintiff, McCrory told Plaintiff, Lee Heichert ("L. Heichert"), about an investment he made in Steele's pool.

McCrory showed L. Heichert some of his Phony Statements, which showed returns that were averaging about 8% per month. L. Heichert called D. Fulkco in Victoria, B.C., on April 23, 2005, to learn more about the investment. L. Heichert and the Fulkcos had lived in New Denver, B.C. for many years, and he had also known D. Fulkco for many years and trusted him as well. D. Fulkco also stated falsely that Steele was an outstanding trader, who was averaging returns of about 8% per month. D. Fulkco also stated falsely that if Steele incurred a loss of 9% of his investors' money all trading would cease so their investors could decide whether they would like their money back. D. Fulkco failed to tell L. Heichert that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. L. Heichert and his wife, Julie Heichert relied justifiably on these omissions and misrepresentations of material fact, when they invested $30,000 CDN in Steele's pool on April 28, 2005.

(32)    W. Fulkco is Plaintiff, Debra Hicks ("D. Hicks") father, and D. Fulkco's sister. D. Hicks had a very close relationship with her father and her brother, D. Fulkco, and trusted them fully. D. Hicks visited W. Fulkco's home in New Denver, B.C., frequently in 2003 and 2004, when he showed her numerous Phony Statements, which reflected false profits that were averaging about 10% per month from the investments he made in Steele's commodity pool., but he failed to tell her that Steele was losing enormous sums of his investors' money trading futures contracts at

Interactive, and that he was misappropriating their money. D. Hicks relied justifiably on these omissions and misrepresentations of material fact, when she invested $14,000 CDN on May 11, 2004, $7,000 CDN on August 19, 2004, $5,000 CDN on September 30, 2004, $50,000 CDN on October 28, 2004, $5,000 CDN on February 16, 2005, $8,700 CDN on February 16, 2005, and $10,000 CDN on March 5, 2005, in Steele's pool.

(33)    Plaintiffs, Darrin and Chad Hicks ("Chad" and "Darrin", respectively), are brothers. Their mother is D. Hicks, their grandfather is W. Fulkco, and their uncle is D. Fulkco. Darrin and Chad were 14 and 16 years old when D. Hicks invested $10,000 CDN for Darrin in Steele's pool on August 19, 2004 and $10,000 CDN for Chad on the same date in Steele's pool. D. Hicks relied justifiably on the same omissions and misrepresentations of material fact that she relied upon when she made investments for herself in Steele's pool, as alleged in subparagraph 53 (32), above.

(34)    Plaintiff, Peter Hiebert ("Hiebert") had been a friend of Shannon, Steele, and D. Fulkco for many years. While Hiebert and Steele were golfing in the late summer of 2002 in Victoria, B.C., Steele told him that he was "day trading", and he stated falsely that he was earning returns that were averaging about 10% each month. He showed Hiebert false statements he created on Interactive letterhead, which reflected very large gains. Steele also failed to tell Hiebert that he was losing money trading futures contracts at Interactive. Hiebert relied justifiably on these

omissions and misrepresentations of material fact, when he invested $30,000 CDN on Feb-ruary 24, 2003, $14,800 CDN on March 19, 2003, and $50,000 CDN on December 20, 2004, in Steele's pool.

(35)    In March 2004, Plaintiff, Diane Howard's ("Howard") sister, Plaintiff, Lynette Ryrie ("L. Ryrie"), told her about an investment she made in Steele's pool that was doing very well. Howard met with D. Fulkco at her home in Victoria, B.C. in April 2005, when D. Fulkco told her that Steele was one of his best friends, and that he trusted him completely. D. Fulkco told her that his own mother had invested all of the money she could in Steele's pool. D. Fulkco also stated falsely that Steele had devised a trading strategy where he would stop trading as soon as he suffered losses. D. Fulkco failed to tell Howard that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Howard relied justifiably on these omissions and misrepresentations of material fact, when she invested $15,000 CDN in Steele's pool on April 26, 2005.

(36)    In October 2004, Plaintiff, Bruno Huber ("Huber") called D. Fulkco to discuss an investment that his friend, Plaintiff, McCrory had made in Steele's pool. McCrory told Huber that he had known the Fulkcos for many years and trusted him very much. D. Fulkco told Huber falsely that Steele's program was getting great returns and that if Steele decided to quit trading, all of their investors would be paid the money in their accounts. Huber had a telephone conversation with D. Fulkco in October

2004, when D. Fulkco stated that the investment was making excellent returns and gave Huber instructions on how to make an investment in Steele's pool. D. Fulkco failed to tell Huber that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Huber relied justifiably on these omissions and misrepresentations of material fact, when he invested $25,000 CDN in Steele's pool on October 26, 2004.

(37)    W. Fulkco met with Plaintiff, Garth Hunter ("Hunter") at W. Fulkco's home in New Denver, B.C. in September 2003, when W. Fulkco told him about an investment he could make in Steele's pool that was earning about 10% per month. Hunter and W. Fulkco had lived in New Denver, B.C. for many years and Hunter trusted him very much. W. Fulkco showed Hunter his own Phony Statements, which showed large monthly returns, but W. Fulkco failed to tell him that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Hunter relied justifiably on these omissions and misrepresentations of material fact, when he invested $23,997 CDN on December 31, 2004, and $5,000 CDN on January 25, 2005, in Steele's pool. Hunter withdrew 4,000 USD on May 7, 2005, and $2,000 USD on March 30, 2005.

(38)    Plaintiff, Joanne Jordan ("Jordan") met with W. Fulkco at his home in New Denver, B.C. on April 12, 2005, when he stated falsely that Steele was the best trader in Canada, and that he had made millions of

dollars trading commodities for his investors in a commodity pool. Jordan had lived in New Denver, B.C. since 1981 or 1982, while W. Fulkco was also living there. Jordan placed substantial trust in W. Fulkco. W. Fulkco stated falsely that Steele was earning returns of about 8% per month. W. Fulkco showed Jordan a large stack of Phony Statements, which showed how his investments were growing very rapidly. He told her that Steele made trades very quickly, and that he never left his trades open overnight, and, for this reason, Steele could not lose large sums of money, which was false. W. Fulkco also said that all of the investors would be notified if Steele incurred losses on three (3) consecutive days to give them the opportunity to withdraw the funds in their accounts, which was also false. W. Fulkco failed to tell Jordan that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Jordan relied justifiably on these omissions and misrepresentations of material fact, when she invested $25,000 CDN on April 13, 2005, in Steele's pool.

(39)    W. Fulkco met with Plaintiff, Shirley Kosiancic ("Kosiancic") at the New Denver Post Office in March 2004, when he told her about Steele's pool. Kosiancic and her partner, Hillary Bitten ("Bitten") had lived in New Denver, B.C. for many years while W. Fulkco also lived there. They reposed great trust in him. Shortly thereafter, Kosiancic went to W. Fulkco's home, where he showed her his Phony Statements and stated falsely that Steele had been earning about 7% to 11% each month.

W. Fulkco also stated falsely that she could not lose a large portion of her money. W. Fulkco called her several times in March 2004, when he encouraged her to make an investment in Steele's pool, but he failed to tell Kosiancic or Bitten that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Kosiancic and Bitten relied justifiably on these omissions and misrepresentations of material fact, when they invested $25,000 CDN on April 8, 2004, $8,000 CDN on September 21, 2004, and $12,636 CDN on April 18, 2005, in Steele's pool. Kosiancic withdrew $1,000 USD on August 31, 2004, from her account.

(40)    After Plaintiff, Beth Trotter ("Trotter") told Plaintiff, Barbara Kovar ("Kovar") about an investment she made in Steele's pool. She called D. Fulkco at his home in Victoria, B.C., in January or February 2005, to get more information about the investment. Kovar met D. Fulkco on March 2, 2005, at a Starbuck's coffee shop in Victoria, B.C., where he told her that Steele's pool was a private hedge fund, which would have no more than 150 investors and no more than $15 million in assets. He misrepresented that, in 2004, Steele's average monthly returns was 8.5%, and that his lowest monthly return was 7.65% and that his highest was 12.5%. D. Fulkco also stated that Steele visited the trading site three (3) to five (5) times a day and used a stop loss technique to minimize losses. He also stated falsely that in 2004 Steele decided that he would stop trading if he had incurred losses of 1.5% in a single day, and that if his

monthly returns dropped below 6%, they would notify her so she could decide whether she wanted to withdraw the money she had in her account. W. Fulkco failed to tell Kovar that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Kovar relied justifiably on these omissions and misrepres-entations of material fact, when she invested $20,000 CDN in Steele's pool on May 12, 2005.

(41)    In early spring 2003, Plaintiff, Ursula Kreiger ("Kreiger"), met with W. Fulkco at her home in New Denver, B.C. W. Fulkco had been her neighbor since 2001 and a long time friend, and trusted him very much. W. Fulkco told Kreiger that Steele was trading commodities in a pool for their investors. He stated falsely that the investment program was running very successfully, and that Steele had not yet lost any money. He also stated falsely that if Steele incurred losses on three (3) consecutive days, he would stop trading and give his investors the opportunity to close their accounts. W. Fulkco showed Kreiger Phony Statements he prepared, which showed impressive gains. W. Fulkco failed to tell Kreiger that Steele was losing money trading futures contracts at Interactive, and that he was misappropriating his investors' money. Kreiger relied justifiably on these omissions and misrepresentations of material fact, when she invested $27,357 CDN on April 22, 2004, $10,000 CDN on August 19, 2004, $10,000 CDN on August 27, 2004, and $10,000 USD November 18, 2004, in Steele's pool.

(42)    Plaintiff, Hunter, told Plaintiff, Phillip Larstone ("Larstone") about Steele's pool in the fall of 2004, and stated that he had borrowed $25,000 to make an investment in the pool because Steele had been earning returns of about 8% each month. Hunter told Larstone that the Fulkcos had held several meetings in New Denver, B.C. to let people know about the investment. Hunter provided Larstone with information that W. Fulkco gave him about Steele's pool, including representations that: (a) over 100 people had invested in the pool; (b) the pool would be closed to additional investors after May 2005; (c) Steele was a brilliant trader, who used a stop loss technique to limit potential losses; (d) he traded for short periods of time to decrease the risk of loss; (e) Steele traded large amounts of currencies, bonds, and stocks to generate small amounts of money on each trade; (e) Steele had not incurred any losses during the past year; (f) Steele only used 10% of the assets in his pool for trading at any time, and that he kept the remaining funds kept in a secure bank account; and (g) investors could withdraw their funds at any time, which a number of investors had already done. W. Fulkco failed to tell Larstone when she made her investment in Steele's pool that Steele was actually losing his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Kreiger relied justifiably on these omiss-ions and misrepresentations of material fact, when she invested relied on these omissions and misrepresentations of material fact when he invested $25,000 CDN on April 22, 2005.

(43)    Plaintiffs, Antonio and Guissepina Lioce (the "Lioces") met W. Fulkco at his home in New Denver, B.C., in June 2004, when he told them that he had made an investment in Steele's pool that was earning returns of about 10% a month. W. Fulkco showed them some of his own Phony Statements to corroborate what he said. The Lioce family had been friends of W. Fulkco for many years and trusted him very much. W. Fulkco failed to tell the Lioces that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. The Lioces relied justifiably on these omissions and misrepresentations of material fact when they invested $79,750 CDN on August 6, 2004, $40,245 CDN on August 12, 2004, and $6,188 CDN on November 1, 2004, in Steele's pool. On March 31, 2005, the Lioces withdrew $5,000 USD from their account.

(44)    Plaintiff, Jeffrey Lioce ("Lioce") is the Lioces son. Guissepina Lioce provided Lioce with the same information she received from W. Fulkco as alleged in subparagraph 53 (43), above. Lioce relied justifiably on these omissions and misrepresentations of material fact when he invested $19,165 CDN on October 16, 2004 in Steele's pool.

(45)    Plaintiffs, Norbert and Gerdi Maucher (the "Mauchers"), met W. Fulkco at W. Fulkco's home in New Denver, B.C. in September 2004, when W. Fulkco stated falsely that Steele was earning returns for the investors in his pool that were much higher than they could earn from a bank. The Mauchers had known W. Fulkco since 1995 and trusted him

as a well-respected member of the New Denver-Silverton, B.C. community where the Mauchers and W. Fulkco lived. W. Fulkco stated he and his son, D. Fulkco, were handling the administrative side of Steele's pool. W. Fulkco also showed the Mauchers his own Phony Statements, which showed very large returns. W. Fulkco represented that they only had space for 20 more investors, and that there would only be a total of 120 investors. W. Fulkco failed to tell the Mauchers that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. The Mauchers relied justifiably on these omissions and misrepresentations of material fact when they invested $15,000 CDN on October 29, 2004, and $12,000 CDN on March 11, 2005, in Steele's pool.

(46)    In early March, 2005, Plaintiff, Norman Sanderson ("Sanderson") told Plaintiffs, Bippy McMaster ("McMaster") and Leonard Kaplan ("Kaplan"), husband and wife, about a very successful investment they made in Steele's pool. Sanderson showed Kaplan and McMaster some of his Phony Statements and told them to contact D. Fulkco if they wanted to learn more about Steele's pool. Kaplan met D. Fulkco on March 10, 2005, at the Scandinavian Church in Victoria, B.C., where D. Fulkco stated falsely that Steele was a broker at Interactive whose trades were very profitable. Kaplan also met W. Fulkco at the same church after this meeting with D. Fulkco. McMaster and Kaplan had known the Fulkcos for many years, and trusted them very much. The Fulkcos failed to tell

Kaplan and McMaster that Steele was losing enormous sums of his invest-
ors' money trading futures contracts at Interactive, and that he was mis-
appropriating their money.  Kaplan and McMaster relied justifiably on
these omissions and misrepresentations of material fact, when they
invested $35,000 CDN in Steele's pool on March 15, 2005.

(47)   W. Fulkco met with Dorothy and James Mellen ("the
Mellens"), in June 2003, at the Valhalla Inn in New Denver, B.C., when
he told them about Steele's commodity pool.  The Mellens had lived in the
New Denver-Silverton, B.C. community while W. Fulkco was living there
for many years, and trusted him very much.  W. Fulkco stated falsely that
Steele had been earning profits of about 8% to 10% per month for their
investors.  W. Fulkco showed them copies of some of his Phony
Statements, which showed returns of about 8% to 10% per month.  W.
Fulkco failed to tell the Mellens that Steele was losing enormous sums of
his investors' money trading futures contracts at Interactive, and that he
was misappropriating their money.  The Mellens relied justifiably on these
omissions and mis-representations of material fact, when they invested
$70,000 CDN on October 22, 2004, and $20,000 USD on March 18, 2005,
in Steele's pool.

(48)   W. Fulkco told Plaintiffs, George and Mary Mellen ("G.
Mellen" and "M. Mellen") in December 2003, that Steele was earning
great returns for people who made investments in Steele's pool after a
Christmas service at the Roman Catholic Church in New Denver, B.C.  G.

Mellen" and "M. Mellen also spoke with G. Mellen's brother and sister in-law, (the Mellens), who, as alleged in subparagraph 51 (17), above, had already invested in Steele's pool. The Mellens showed G. and M. Mellen some of their Phony Statements, which showed large returns. G. Mellen also discussed the program with his friend, L. Heichert, who expressed confidence in their mutual friend, W. Fulkco, who they had known for about 30 years as members of the New Denver-Silverton, B.C. community. In the spring of 2005, W. Fulkco met with G. Mellen at W. Fulkco's home in New Denver, B.C. when he stated, once again, that Steele was earning large returns for their investors, and that his own grandchildren had invested in Steele's pool, but W. Fulkco failed to tell G. Mellen and M. Mellen that Steele was losing enormous sums of his invest-ors' money trading futures contracts at Interactive, and that he was mis-appropriating their money. G. Mellen and M. Mellen relied justifiably on these omissions and misrepresentations of material fact, when they invested $10,000 CDN on April 27, 2005, and $15,000 CDN on the following day in Steele's pool.

(49)    In June 2004, Plaintiff, Werner Mengler ("W. Mengler"), met W. Fulkco at W. Fulkco's home in New Denver, B.C., where W. Fulkco told him falsely that Steele was earning profits of about 8% per month trading commodities in a pool for his investors. W. Mengler had known W. Fulkco for many years in the New Denver-Silverton, B.C. community and trusted him very much. During another meeting at W.

Fulkco's home in June 2004, W. Fulkco showed W. Mengler his own Phony Statements, and stated falsely that Steele was a broker at a brokerage firm in the United States. W. Fulkco, however, failed to tell W. Mengler that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. W. Mengler and his wife, Marilyn Mengler ("M. Mengler"), relied justifiably on these omissions and misrepresentations of material fact, when they invested $14,000 CDN on May 4, 2004, $25,000 CDN on July 9, 2004, $27,000 CDN on August 22, 2004, $5,000 CDN on September 22, 2004, $50,000 CDN on August 25, 2004, and $8,000 CDN on March 3, 2005, in Steele's pool.

(50)   Plaintiff, Tyler Mengler ("T. Mengler") is W. Mengler and M. Mengler's son. During the period of June 2004 through early 2005, W. Mengler and M. Mengler were receiving Phony Statements from Abriel Asset Management that showed substantial monthly returns from their investments in Steele's pool. From time-to-time, during this period, they told T. Mengler about the returns they were supposedly getting from their investments in the pool, and what W. Fulkco had told them about it, as alleged in subparagraph 53 (49), above. T. Mengler had known W. Fulkco for many years before his parents told him unwittingly about W. Fulkco's false representations and omissions of material fact. Like his parents, T. Mengler had trusted W. Fulkco very much. T. Mengler relied justifiably on W. Fulkco's omissions and misrepresentations of material fact, when he

invested $18,000 CDN and $8,809 CDN on March 4, 2005, in Steele's pool.

(51)    In November 2004, Plaintiff, McCrory, told Plaintiffs, Anita and Gerald Michiels (the "Michiels"), about an investment he made in Steele's pool that was making a lot of money. The Michiels met with W. Fulkco later that month at their home in New Denver, B.C. The Michiels and W. Fulkco lived near W. Fulkco in New Denver, B.C. and trusted him very much. W. Fulkco told them that one had to make an investment of at least $25,000 to invest in Steele's pool. W. Fulkco stated falsely that if Steele incurred losses on three (3) consecutive days, they would advise their investors about the losses and give them the opportunity to withdraw the money they had in their accounts. W. Fulkco failed to tell the Michiels that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. The Michiels relied justifiably on these omissions and misrepresentations of material fact, when they invested $21,000 CDN on November 24, 2004, and $4,000 CDN on February 16, 2005, in Steele's pool.

(52)    On October 1, 2003, Plaintiff, McCrory told Plaintiff, David Morey ("Morey"), about a successful investment he made in Steele's pool. On October 16, 2003, Morey called D. Fulkco in Victoria, B.C., to discuss making an investment in the pool. D. Fulkco stated falsely that Steele was making a lot of money trading commodities for his

investors. D. Fulkco also stated falsely that if Steele were to incur losses on three (3) consecutive days, he would stop trading, notify the investors, and ask them whether they wanted their money back. D. Fulkco stated falsely that there was a guarantee that he would not lose more than 9% of the funds he invested. D. Fulkco, however, failed to tell Morey that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Morey relied justifiably on these omissions and misrepresentations of material fact, when he invested $40,000 CDN on October 28, 2003, in Steele's pool.

(53)    In September 2004, W. Fulkco visited the Plaintiffs, James and Shirley Morris (the "Morrises"), several times at their pharmacy in New Denver, B.C., when he showed them some of the Phony Statements he had for Steele's pool, which showed substantial returns. W. Fulkco told them that he had invested his own money in Steele's pool, and that Steele was one of the best futures traders in the country. The Morrises called D. Fulkco in Victoria, B.C., in September 2004, to ask him for further information about Steele's pool. D. Fulkco stated falsely that Steele was an excellent trader who was earning very large returns for his investors every month. The Morrises had known the Fulkcos for many years and trusted them very much. D. Fulkco and W. Fulkco failed to tell the Morrises that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating

their money.  The Morrises relied justifiably on these omissions and misrepresentations of material fact, when they invested $20,000 CDN on October 28, 2003, $25,000 CDN on February 4, 2004, $50,000 CDN on September 29, 2004, $61,085 CDN on December 31, 2004, $63,130 CDN on October 22, 2004, and $61,085 CDN on January 11, 2005, in Steele's pool.

(54)    In the spring of 2004, Kathy Provan ("Provan") told Plaintiff, Belinda Nunn ("Nunn"), about an investment she made in Steele's pool that was earning much higher returns than she could get from a bank.  Provan also told Nunn that several employees of the local credit union in Silverton, B.C. had invested in Steele's pool, and that if she wanted more information about the investment she should contact W. Fulkco.  Nunn had known the Fulkcos for many years, having attended the same school as D. Fulkco, and having lived in the New Denver, B.C. community with the Fulkcos for many years.  In May 2004, Nunn met W. Fulkco at his home in New Denver, B.C., where he showed her copies of some of his Phony Statements, which showed very high returns.  W. Fulkco misrepresented that only 50 investors were allowed to join the pool and that there were only eight (8) spots remaining at the time.  In November 2004, W. Fulkco approached Nunn at the New Valhalla Restaurant in New Denver, B.C., when he misrepresented, once again, the large returns that Steele was earning for his investors.  W. Fulkco encouraged Nunn to borrow money by mortgaging her home so she could

make an investment in Steele's pool. W. Fulkco failed to tell Nunn that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Nunn relied justifiably on these omissions and misrepresentations of material fact, when she and her husband, Plaintiff, Arthur Nunn, invested $15,000 CDN on November 22, 2004 in Steele's pool.

(55)   In June 2004, D. Fulkco had dinner with Plaintiffs, Dianne and Brian Nursey (the "Nurseys"), at D. Fulkco's home in Victoria, B.C., where he told them about Steele's pool. He stated falsely that Steele was earning returns that were averaging about 8% per month for their investors, but that if Steele lost more than three 3% of their investors' money, they would send them the money they had in their accounts. The Nurseys had known D. Fulkco for many years and trusted him very much. D. Fulkco failed to tell the Nurseys that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. The Nurseys relied justifiably on these omissions and misrepresentations of material fact, when they invested $23,000 CDN on August 25, 2004, and $40,000 CDN on March 29, 2005, in Steele's pool.

(56)   The owner of Plaintiff, Omegadent Services, Bevans, met W. Fulkco in December 2004, at Helen Baynes's home in Castlegar, B.C., when W. Fulkco told Bevans that he and his son, D. Fulkco, were managing an investment fund for Steele who was doing the trading for the

fund. W. Fulkco stated falsely that Steele was highly trained and skilled, and that he was earning returns that were averaging about 8% per month. During late December 2004, Bevans and W. Fulkco spoke several times by telephone when W. Fulkco stated falsely, once again, that Steele was earning returns that were was averaging about 8% per month, and that KPMG was acting as the accountants for their trading firm, Abriel Asset Management. W. Fulkco failed to tell Bevans that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Bevans relied justifiably on these omiss-ions and misrepresentations of material fact, when he invested $25,000 CDN on January 4, 2005, in his own name, and $25,000 CDN on March 7, 2005, for Omegadent Services in Steele's pool.

(57)    In the late fall of 2003, W. Fulkco came to Plaintiffs, Carolyn Parker ("C. Parker") and Eugene Parker's ("E. Parker") (the "Parkers"), home in New Denver, B.C., where he stated falsely that Steele was getting excellent returns for their investors. Shortly thereafter, the Parkers met W. Fulkco on the street near their home, when he stated falsely, once again, that Steele was earning very large returns for their investors. The Parkers had known W. Fulkco for many years in New Denver, B.C. where they lived and trusted him very much. E. Parker had known W. Fulkco since his early teens. C. Parker had also known W. Fulkco since childhood and also trusted him. W. Fulkco said that Steele was a close friend of his son, D. Fulkco. W. Fulkco showed them some of

his own Phony Statements, which showed that he had doubled his money in about seven (7) months. W. Fulkco failed to tell the Parkers that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. The Parkers relied justifiably on these omissions and misrepresentations of material fact, when they invested $10,000 CDN on November 20, 2003, $13,000 CDN on January 20, 2004, and $60,000 CDN in Steele's pool on October 18, 2004.

(58)    The Brayshaws told the Plaintiffs, Michelle and Yves Pelletier (the "Pelletiers") in September of 2004 about an investment they made Steele's pool that was doing quite well, and that they should ask D. Fulkco for more information about it. The Pelletiers met D. Fulkco at the Bear Mountain Club House in Victoria, B.C., several times in October and November 2004, when D. Fulkco stated falsely that their money would be safe because Steele used a stop loss technique for all of his trades. D. Fulkco also told them that all of his friends and family had invested in the pool. The Pelletiers had known D. Fulkco for many years and trusted him very much. D. Fulkco failed to tell the Pelletiers that Steele was losing enormous sums of his investors' money trading futures contracts at Inter-active, and that he was misappropriating their money. The Pelletiers relied justifiably on these omissions and misrepresentations of material fact, when they invested $40,000 CDN on November 10, 2004, $15,599

CDN on January 14, 2005, and $217,302 CDN on March 31, 2005, in Steele's pool.

(59)   In mid-July, 2004, Plaintiff, Mark Perry's ("Perry") friend, Russ Collins ("Collins"), told him about a successful investment he made in Steele's pool. In late July or August 2004, Perry met with W. Fulkco at W. Fulkco's home in New Denver, B.C., when W. Fulkco stated falsely that Steele was getting returns of about 10% per month for their investors for over one (1) year. He showed Perry some of his Phony Statements, which reflected very large profits. Perry met with W. Fulkco again in late April 2005, when W. Fulkco stated falsely that Steele was continuing to earn great returns for his investors. Perry and W. Fulkco had lived in the New Denver-Silverton, B.C. community for many years, and Perry trusted him very much. W. Fulkco failed to tell Perry that Steele was actually losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Perry relied justifiably on these omissions and misrepresentations of material fact, when he invested $67,267 CDN on January 20, 2005 and $9,744 CDN on February 18, 2005 in Steele's pool.

(60)   Plaintiff, Perry, is Plaintiffs' Ave Perry, Bryn Perry and Caitlin Perry's father. Each of them received a $10,000 inheritance from their grandfather in 2004, which Perry invested for them in Steele's pool based on the representations and omissions of material fact that W. Fulkco made in the summer of 2004, as alleged in subparagraph 53 (59), above.

Perry invested $10,000 CDN in the name of Ave Perry name on January 20, 2005, $10,000 CDN in the name of Bryn Perry on January 20, 2005, and $10,000 CDN in the name of Caitlin Perry on January 20, 2005.

(61)    Plaintiff, Jeffrey Popham ("Popham") owns Plaintiff, Paradigm Properties. In about February 2004, Popham met with Collins at his office in Victoria, B.C., where Collins told Popham about Steele's pool. Collins had designed homes for both Popham and D. Fulkco whom he trusted very much. Collins met with D. Fulkco at Collins' office in September or October 2004. D. Fulkco stated falsely that Steele was getting returns that were averaging about 6% to 8% per month. He also stated that Steele made trades based on price trends, which was what big traders were doing at the time. D. Fulkco told him that if conditions were not satisfactory, Steele would not make a trade. D. Fulkco stated falsely that if Steele incurred losses on three (3) consecutive days, he would stop trading and reassess whether he should continue trading for the fund. In September 2004, Popham met with D. Fulkco and Steele in Victoria, B.C., where Steele and D. Fulkco stated falsely that Steele was continuing to earn very high returns for his investors. D. Fulkco and Steele, however, failed to tell Popham that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive account, and that he was misappropriating their money. Popham relied justifiably on these omissions and misrepresentations of material fact when he invested $25,000 CDN on November 3, 2004, in his own name, and $50,000 CDN

on January 15, 2005, and $41,000 CDN for Paradigm Properties on March 23, 2005, in Steele's pool.

(62)    In June 2003, D. Fulkco met with Plaintiff, Sybille Prochaska ("Prochaska"), at the Child and Family Counselling Association, where they both worked in Victoria, B.C., when he told her about Steele's pool. D. Fulkco and Prochaska had known and worked with each other since October 2001, and Prochaska trusted him a great deal. D. Fulkco stated falsely that Steele developed a trading strategy where investors could earn a substantial amount of money, but where they could lose only a small amount of their investments because of a stop loss program that Steele had developed. D. Fulkco also stated falsely that if losses occurred, Steele would stop trading immediately. D. Fulkco showed Prochaska his own Phony Statements, which showed very large returns. About one (1) week later, Prochaska met with D. Fulkco and Steele at a Starbuck's coffee shop in Victoria, B.C., where D. Fulkco reiterated the false statements he made one (1) week earlier. Prochaska expressed an interest in the program, but she told D. Fulkco that she could not lose a lot of money because she was a single parent. D. Fulkco reassured her by saying that he would give her a promissory note for the amount she invested. D. Fulkco, however, failed to tell Prochaska that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Prochaska relied justifiably on these omissions and misrepresentations of

material fact when she invested $4,000 CDN on July 2, 2004, $25,000 CDN on September 30, 2004, and $20,000 CDN on December 18, 2004 in Steele's pool. D. Fulkco provided Prochaska with a promissory note in the amount of $20,000 for her December 18, 2004 deposit, which has never been repaid.

(63)    A friend of Plaintiffs, Ronald and Kathy Provan (the "Provans"), Plaintiff, McCrory, told them about Steele's pool in the fall of 2003. McCrory told them that he had been earning impressive returns from his investment in Steele's pool, and that other people in New Denver, B.C. had made investments in it as well. McCrory showed them his own Phony Statements, which corroborated what he said. He recommended that they speak with W. Fulkco to discuss the investment if they wanted more information about it. The Provans had known W. Fulkco for many years in the New Denver-Silverton, B.C. community and trusted him very much. They met W. Fulkco at his home in New Denver, B.C., in November 2003, when he stated falsely that there were about 30 to 40 investors who were earning very large returns from their investments. He also stated falsely that Steele was extremely talented, whom he described as the "Golden Boy" of investments. W. Fulkco showed them two (2) or three (3) Phony Statements of other investors whose names were crossed out, which showed very high returns. W. Fulkco stated that he and several members of his family and friends had also invested in Steele's pool. He also stated that there were foreign investors who had invested large sums

of money in Steele's pool. W. Fulkco failed to tell the Provans that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. The Provans relied justifiably on these omissions and mis-representations of material fact when they invested $20,000 CDN on February 2, 2004, $20,000 CDN on April 30, 2004, $10,000 CDN on September 16, 2004, and $20,000 CDN on January 28, 2005, in Steele's pool. On May 12, 2005, the Provans withdrew $8,500 USD from their account.

(64)    In September 2004, another investor in Steele's pool, Plaintiff, Dennis Rogers ("Rogers"), introduced Plaintiff, Daniel Robbins ("Robbins"), to D. Fulkco at a work site at 906 Pemberton Road in Victoria, B.C., when D. Fulkco briefly described Steele's pool. Later that day, they met at the Hillside Mall, in Victoria, B.C., when D. Fulkco stated falsely that Steele was in the top one percent (1%) of all traders in North America. He also told Robbins falsely that Steele used a trading method where he could never lose more than a small proportion of his investors' money, and that he would stop trading as soon as he sustained the smallest loss, minimizing risk. D. Fulkco also showed Robbins copies of various Phony Statements, which showed very large profits. D. Fulkco failed to tell Robbins that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Robbins relied justifiably on these omiss-ions and misrepresentations of material fact when he invested $25,000

CDN on October 31, 2004, $110,000 CDN on December 31, 2004, $100,000 CDN on March 6, 2005, and $500,000 CDN on March 31, 2005, in Steele's pool. Robbins withdrew $100,000 CDN from Steele's pool on April 1, 2005.

(65)    In the fall of 2004, D. Fulkco met with Plaintiff, Rogers at D. Fulkco's home in Victoria, B.C., to discuss making an investment in Steele's pool, when D. Fulkco showed him copies of some of the Phony Statements he had sent to investors, which showed very large profits. D. Fulkco failed to tell Rogers that Steele was losing enormous sums of money trading futures contracts in his Interactive account, and that he was misappropriating his investors' money. Rogers relied justifiably on these omissions and misrepresentations of material fact when he invested $25,000.00 CDN on October 11, 2004 and $75,000.00 CDN on April 5, 2005 in Steele's pool.

(66)    In April 2003, Plaintiff, Ernest James Fitchett ("Fitchett") met his long-time friend, W. Fulkco, on the streets of New Denver, B.C., when W. Fulkco told him about an investment he made in Steele's pool that was very successful. W. Fulkco told Fitchett falsely that Steele was a very talented trader who was earning about 8% month per month for his investors. W. Fulkco, however, failed to tell Fitchett that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Fitchett relied justifiably on these omissions and misrepresentations of material fact

when he invested $25,000 CDN on April 22, 2004, $4,000 CDN on October 21, 2004, $25,000 CDN on December 3, 2004, $25,000 CDN on January 19, 2005, and $28,500 CDN on February 17, 2005 in Steele's pool.

(67)    In February 2005, Plaintiff, Fitchett, told Plaintiffs, Audrey Kanyo, and her son, Kelman Kanyo (the "Kanyos"), about an investment he made in Steele's pool that was realizing very high returns.  Fitchett told the Kanyos that his close friend, W. Fulkco, was administering Steele's pool.  Fitchett repeated the information that W. Fulkco had given him as alleged in subparagraph 53 (66), above.  The Kanyos placed a great deal of trust in W. Fulkco because he was a close friend of Audrey Kanyo's brother.  The Kanyos borrowed $10,000 CDN $35,030 CDN in April 2005 to invest in Steele's pool.

(68)    In late 2003 or early 2004, Plaintiff Fitchett told Plaintiff Sanderson about an investment he made in Steele's pool while they were clearing cedar on Sanderson's property in New Denver, B.C.  Fitchett told Sanderson that he was receiving returns that were averaging about 8% per month.  Fitchett told Sanderson that if he wanted to know more about making an investment in Steele's pool he should contact W. Fulkco.  In March 2004, Plaintiff, Sanderson and his wife, L. Ryrie, met with W. Fulkco at his home in New Denver, B.C., where W. Fulkco showed them his Phony Statements.  Sanderson and L. Ryrie had known W. Fulkco for many years when they had this meeting, and trusted him very much.  W.

Fulkco also stated falsely that Steele was in the top percentile of Canadian traders, and had many American and European connections. W. Fulkco also stated falsely that Steele had developed a trading system, which generated positive returns 80% of the time, and that he was getting returns of about 8% per month for his investors. W. Fulkco also misrepresented that Steele had been turning down offers to work for various trading firms because he was so committed to his pool. W. Fulkco failed to tell Sanderson and L. Ryrie that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. L. Ryrie and Sanderson relied justifiably on these omissions and misrepresentations of material fact when they invested $40,450 CDN on May 20, 2004, and $27,200 CDN on January 21, 2005, in Steele's pool.

(69)    During the summer of 2004, Plaintiff, L. Ryrie told her father, Plaintiff, Bruce Ryrie ("B. Ryrie"), about Steele's pool. In September, 2004, while visiting her father at his home in Innisfail, Alberta, B.C., she showed him some of the Phony Statements she and her husband, Sanderson, received from the Fulkcos, which showed that they were earning returns that were averaging about 8% per month. She also provided him with the same false information that W. Fulkco represented when she and her husband met with him in March 2004, as alleged in subparagraph 53 (69), above. W. Fulkco failed to tell L. Ryrie, Sanderson, or B. Ryrie that Steele was losing enormous sums of his investors' money

trading futures contracts at Interactive, and that he was misappropriating their money.  B. Ryrie relied justifiably on these omissions and misrepresentations of material fact when he invested $25,000 CDN on February 16, 2005, in Steele's pool.

(70)    Plaintiff, Barry Ryrie is L. Ryrie's brother.  In July 2004, L. Ryrie told him about Steele's pool.  In January 2005, Barry Ryrie called D. Fulkco in Victoria, B.C., to learn more about it.  D. Fulkco stated falsely that Steele was a gifted trader.  He also told Barry Ryrie that Steele was one of his closest friends.  D. Fulkco stated falsely that there was space for only 100 additional investors.  D. Fulkco also stated falsely that the minimum investment was $20,000 CDN, and that Steele's returns were averaging about 8% per month.  D. Fulkco also told Barry Ryrie that Steele only traded for about 15 minutes a day when he seized opportunities he saw in the marketplace, and that the remaining funds were kept in the pool's account.  D. Fulkco failed to tell Barry Ryrie that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money.  Barry Ryrie relied justifiably on these omissions and misrepresentations of material fact when he invested $20,000 CDN on February 11, 2005, in Steele's pool.

(71)    Plaintiff, Alan Walker, ("A. Walker"), told Plaintiff, Richard Schultz ("Schultz"), told Schulz about the Steele's pool from in the spring of 2002.  A. Walker showed him his Phony Statements and told

him about large returns he was getting on his investment. When Schulz made his investments in Steele's pool through Abriel Asset Management, the Fulkcos failed to tell him that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Barry Ryrie relied justifiably on these omissions and misrepresentations of material fact when he invested $20,000 CDN on February 11, 2005, and $30,000 CDN on May 13, 2005 in Steele's pool.

(72)    In or about January 2005, Plaintiff, Trotter told Plaintiff, Joan Schwartzenberger ("Schwartzenberger"), about investments she and other residents in New Denver, B.C., made in Steele's pool, which were earning very strong returns. Trotter told Schwartzenberger that she contact D. Fulkco if she wanted more information about the investment. Later that month, Schwartzenberger called D. Fulkco in Victoria, B.C., and arranged to meet him at a Starbuck's coffee shop in Victoria, B.C., where he stated falsely that Steele was a very skilled trader who used a stop loss strategy to limit the amount of losses he might sustain. D. Fulkco also stated falsely that if Steele lost more than 9% of his investors' money, he would stop trading and ask the investors whether they wanted their money back. D. Fulkco failed to tell Schwartzenberger that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Schwartzenberger relied justifiably on these omissions and

misrepresentations of material fact when she invested $20,000 CDN on February 10, 2005, in Steele's pool.

(73)   In November 2004, Plaintiff, Michael Seaton ("Seaton"), met with W. Fulkco at the home of Seaton's brother, Doug Seaton ("D. Seaton"), in Nakusp, B.C., where W. Fulkco stated falsely that Steele was a gifted trader who was earning substantial profits for their investors. W. Fulkco had been a long-time friend of D. Seaton who made an investment in Steele's pool in December 2004. On February 7, 2005, Seaton called W. Fulkco and asked him how much he would need to invest. W. Fulkco told him there was a $25,000 CDN initial minimum investment and gave him instructions to make the investment, but W. Fulkco failed to tell Seaton that Steele was losing enormous sums of money trading futures contracts at Interactive, and that he was misappropriating their money. Seaton relied justifiably on these omissions and misrepresentations of material fact when he invested $25,000 CDN in Steele's pool on February 7, 2005.

(74)   In the summer of 2004, Plaintiffs, Hunter and Gallisant, told Plaintiff, Nelson Slaboda ("Slaboda"), about investments they had made in Steele's pool that were doing very well. On January 22, 2005, Hunter and Gallisant sent Slaboda some of their Phony Statements. Slaboda called D. Fulkco on February 22, 2005, at his home in Victoria, B.C., when D. Fulkco stated falsely that Steele was an exceptionally talented trader, and that he had known Steele for many years and trusted

him completely.  Plaintiffs Hunter and Gallisant had known D. Fulkco for many years, and trusted him very much.  D. Fulkco failed to tell Slaboda when he made his investment in Steele's pool that he was losing enormous sums of money trading futures contracts in his Interactive account, and that he was misappropriating his investors' money.  Slaboda relied justifiably on these omissions and misrepresentations of material fact when he invested $26,000 CDN on February 7, 2005, and $14,000 CDN on May 12, 2005, in Steele's pool.

(75)    In February 2004, Plaintiff, Craig Sowinski ("Sowinski") met with Marc Storms ("Storms") and D. Fulkco at Raymond's Restaurant in Victoria, B.C., where Storms and D. Fulkco told him about Steele's pool.  D. Fulkco stated falsely that Steele was an extremely talented trader who was earning impressive returns for their investors, and that he had a 92% success rate.  D. Fulkco also stated falsely that Steele was earning returns of between 7% to 13% per month, but, if he experienced a losing streak, he would stop trading, and they would inform the investors about the losses.  D. Fulkco failed to tell Sowinski that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money.  Sowinski relied justifiably on these omissions and misrepresentations of material fact when he invested $13,400 CDN in Steele's pool on March 31, 2004.

(76)    W. Fulkco met with Plaintiff, Sean Tobin ("Tobin") at W. Fulkco's home in New Denver, B.C., in January 2004, when W. Fulkco

stated falsely that Steele was a very gifted trader who had been earning returns of 8% to 10% per month for their investors. W. Fulkco also stated falsely that Steele used a tight stop loss program, which reduced the risk of loss. He also said that the program was similar to a hedge fund that would have no more than 50 investors. The Fulkcos' family had been very close with Tobin's mother and Tobin considered them family friends for decades. Tobin's father worked with W. Fulkco at the Department of Highways in New Denver, B.C., for many years, and trusted him very much. Tobin called D. Fulkco on February 9, 2004, at his home in Victoria, B.C., and told him that he and his wife, Asami Sudo ("Sudo"), were thinking about making investments in Steele's pool, when D. Fulkco repeated the false statements that W. Fulkco made during their January 2004 meeting. The Fulkcos failed to tell Tobin that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Tobin relied justifiably on these omissions and misrepresentations of material fact when he invested $10,000 CDN on February 5, 2004, in Steele's pool.

(77)    Plaintiff, Tobin, also told his wife, Plaintiff, Sudo, everything that the Fulkcos had told him in January and February 2004 (as alleged in subparagraph 53 (76), above). The Fulkcos failed to tell Sudo when she made her investment in Steele's pool that he was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Sudo relied

justifiably on these omiss-ions and misrepresentations of material fact when she invested $26,216 CDN on June 11, 2004, $16,995 CDN on September 27, 2004, $10,000 CDN on November 15, 2004, and $30,000 CDN on December 31, 2004, in Steele's pool.

(78)    Trotter's friend, Plaintiff, K. Armstrong told her in December 2004, that she was earning returns of 7% to 8% per month from an investment she made in Steele's pool, and that she could withdraw her funds whenever she wanted.  K. Armstrong told Trotter to talk to D. Fulkco if she wanted more information about the investment.  Trotter met D. Fulkco at her home in Victoria, B.C. on January 3, 2005, when he stated falsely that Steele's pool was a private hedge fund, which had no more than 100 investors.  D. Fulkco also stated falsely that Steele was earning profits that were averaging about 7% to 8% each month.  He also stated falsely that Steele used stop loss methods for his trades, where he could not lose more than 1% to 2% on any trade, but, if he incurred a loss of 9% of his investors' funds, they would notify the investors of these losses so they could decide what they wanted to do.  D. Fulkco failed to tell Trotter that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money.    Trotter relied justifiably on these omissions and misrepresentations of material fact when she invested $50,000 CDN on January 4, 2005, $10,000 CDN on January 27, 2005, $10,000 CDN on

stated falsely that Steele was a very gifted trader who had been earning returns of 8% to 10% per month for their investors. W. Fulkco also stated falsely that Steele used a tight stop loss program, which reduced the risk of loss. He also said that the program was similar to a hedge fund that would have no more than 50 investors. The Fulkcos' family had been very close with Tobin's mother and Tobin considered them family friends for decades. Tobin's father worked with W. Fulkco at the Department of Highways in New Denver, B.C., for many years, and trusted him very much. Tobin called D. Fulkco on February 9, 2004, at his home in Victoria, B.C., and told him that he and his wife, Asami Sudo ("Sudo"), were thinking about making investments in Steele's pool, when D. Fulkco repeated the false statements that W. Fulkco made during their January 2004 meeting. The Fulkcos failed to tell Tobin that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Tobin relied justifiably on these omissions and misrepresentations of material fact when he invested $10,000 CDN on February 5, 2004, in Steele's pool.

(77)    Plaintiff, Tobin, also told his wife, Plaintiff, Sudo, everything that the Fulkcos had told him in January and February 2004 (as alleged in subparagraph 53 (76), above). The Fulkcos failed to tell Sudo when she made her investment in Steele's pool that he was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Sudo relied

February 14, 2005, $14,000 CDN on April 11, 2005, $8,000 CDN on February 28, 2005, and $4,200 CDN on April 13, 2005, in Steele's pool.

(79)    Sean Twamley ("Twamley") owns Plaintiff, Twamley Holdings. During January 2005, Plaintiff, Robbins, told Twamley that Steele was trading commodities for investors in a group portfolio at Interactive. He also told Twamley that Steele used, among other tools, a farm report to predict how the market would react. Robbins showed Twamley a copy of his own Phony Statements, which showed very large profits. Shortly thereafter, Twamley called D. Fulkco to learn more about the investment. D. Fulkco stated that Steele had been trading the group portfolio for three (3) years and that time there were only about 60 to 70 investors in the program, which was false. He also misrepresented that Steele used a stop loss program and that, if he incurred losses on three (3) consecutive, days he would stop trading and they would ask the investors whether they wanted their money back. D. Fulkco failed to tell Twamley that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Twamley relied justifiably on these omissions and misrepresentations of material fact when he invested $50,000 CDN on February 2, 2005 in her own name, and $70,000 CDN on March 14, 2005, in Twamley Holdings, Ltd's name in Steele's pool.

(80)    Plaintiff, Fitchett, told Plaintiffs, Michael and Patricia Van Deusen (the "Van Deusens") about the investment he made in Steele's

pool while they were at the Fitchetts' summer home in Hills, B.C., on April 1, 2003.  They also spoke with Plaintiff, Tim McCrory, about Steele's pool the following day at Fitchett's summer home.  The Van Deusens then met with W. Fulkco at his home in New Denver, B.C., on April 12, 2004, to discuss the investment.  The Van Deusens had known W. Fulkco for many years and trusted him very much.  W. Fulkco misrepresented that Steele was an extremely talented trader, and had received awards for his trading. He stated falsely that they could not lose more than 10% of their investment because, if Steele were to lose money on three (3) consecutive days, he would stop trading.  W. Fulkco told the Van Deusens that Steele had given him a written guarantee that that he would not lose more than 10% of his investment and that he borrowed money giving his lender liens against some of his assets because he firmly believed in the success of the investment.  W. Fulkco showed the Van Deusens some of his Phony State-ments, which showed very large profits, but W. Fulkco failed to tell the Van Deusens that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappro-priating their money.  The Van Deusens relied justifiably on these omiss-ions and misrepresentations of material fact when they invested $50,000 USD on April 19, 2004, $50,000 USD on April 21, 2004, and $23,000 USD on October 22, 2004, in Steele's pool.

(81)    Plaintiff, Ursula Krieger ("Krieger") told Plaintiff, John Vanden Heuvel ("Vanden Heuvel") about Steele's pool in August 2004. Krieger introduced Vanden Heuvel to W. Fulkco in November 2004 at W. Fulkco's home in New Denver, B.C., where W. Fulkco stated falsely that Steele was getting amazing returns for his investors.  W. Fulkco showed him some of his Phony Statements, which showed profits that averaged about 7% to 8% per month.  W. Fulkco also told Vanden Heuvel that Steele was a good friend of his son, D. Fulkco, whom he had known since college.  He also stated falsely that Steele's program should earn profits ranging from 1%-8% per month.  In September 2004, Vanden Heuvel met with the Fulkcos at a coffee shop in Nelson, B.C., where they convinced him to invest more money in Steele's pool by stating falsely that his investment was doing very well.  Vanden Heuvel had several telephone conversations and meetings with W. Fulkco at W. Fulkco's home in New Denver, B.C. during the following three (3) or (4) months.  W. Fulkco even told him that Steele had "hit a home run" one day.  W. Fulkco and D. Fulkco failed to tell Vanden Heuvel that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money.  Vanden Heuvel relied justifiably on these omissions and misrepresentations of material fact when he invested $25,000 CDN on September 24, 2004, $24,120 CDN on Novem-ber 12, 2004, and $11,169 CDN on March 17, 2005, in Steele's pool.

(82)    In January 2003, W. Fulkco met with Plaintiffs, A. Walker and his wife, Theresa Walker ("T. Walker") (the "Walkers") outside of W. Fulkco's home in New Denver, B.C., when W. Fulkco told them about Steele's pool. He stated that Steele was a friend of his son, D. Fulkco, from college. W. Fulkco stated falsely that Steele was earning considerable gains trading commodities for his investors. W. Fulkco showed the Walkers some of his Phony Statements, which reflected gains of about 10% to 12% per month. W. Fulkco failed to tell the Walkers that Steele was losing enormous sums of his investors' money trading futures contracts at Inter-active, and that he was misappropriating their money. A. Walker relied justifiably on these omissions and misrepresentations of material fact when he invested $60,000 CDN on March 5, 2004, in Steele's pool.    T. Walker relied justifiably on these omissions and misrepresentations of material fact when she invested $80,000 CDN on September 12, 2004, $20,000 CDN on March 11, 2005, and $25,000 CDN on April 26, 2005, in Steele's Pool.

(83)    In November 2004, Plaintiff, T. Armstrong told his close friend, Plaintiff, Frederick Wedgewood ("Wedgewood"), about a successful investment he made in Steele's pool. T. Armstrong told Wedgewood that he was earning returns of 8% to 10% per each month for a period of one (1) year. When Wedgewood made his investment in Steele's pool, W. Fulkco failed to tell him that Steele was losing enormous sums of their investors' money trading futures contracts at Interactive, and that he was

misappropriating their money.  Wedgewood relied justifiably on these omissions and misrepresentations of material fact when he invested $25,000 CDN on November 12, 2004, in Steele's pool.

(84)   In December 2003, Plaintiff, Shelly Welch ("Welch"), met W. Fulkco several times at the Kootenay Credit Union where Welch works.  W. Fulkco told her that she and her husband, Plaintiff, David Welch ("D. Welch"), were earning returns of about 8% each month from investments they made in Steele's pool.  W. Fulkco showed her his own Phony Statements, which showed profits of about 8% per month.  W. Fulkco failed to tell Welch that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive account, and that he was misappropriating their money.  Welch and her husband, D. Welsh, relied justifiably on these omissions and misrepres-entations of material fact, when they invested $25,000 CDN on July 8, 2004, $25,000 CDN on April 13, 2005, and $15,000 CDN on October 21, 2004, in Steele's pool.

(85)   In December 2003, Plaintiff, Hascarl, told her friend, Plain-tiff, Michelle Whitcomb ("M. Whitcomb") about a successful investment she made in Steele's pool.  She showed M. Whitcomb her Phony State-ments, which showed impressive gains.  M. Whitcomb met with the Fulkcos at W. Fulkco's home in New Denver, B.C., on May 10, 2004. The Fulkcos stated falsely that Steele was earning very large returns for his investors.  D. Fulkco stated that he had known Steele for many years, but the Fulkcos failed to tell M. Whitcomb that Steele was losing

enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. M. Whitcomb relied justifiably on these omissions and misrepresentations of material fact, when she invested $20,000 CDN on May 17, 2004, and $60,000 CDN on January 24, 2005, in Steele's pool.

(86)    Plaintiff, M. Whitcomb, and her husband, Darryl Whitcomb, are Plaintiff, Sandra Whitcomb's ("S. Whitcomb") son and daughter in-law. In January 2005 M. Whitcomb and Darryl Whitcomb told S. Whitcomb about Steele's pool, when they showed her their Phony Statements. They conveyed the same false statements to S. Whitcomb that the Fulkcos told them in January 2005, as alleged in subparagraph 53 (85). The Fulkcos failed to tell S. Whitcomb when she made her investment in Steele's pool that he was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. S. Whitcomb relied justifiably on these omissions and mis-representations of material fact, when she invested $14,642 CDN March 18, 2005 in Steele's pool.

(87)    In the fall of 2004, Plaintiff, McCrory told Plaintiff, Lana Wocknitz ("Wocknitz"), about an investment he made in Steele's pool that was earning substantial profits. He referred her to W. Fulkco to learn more about it. Wocknitz met W. Fulkco at his home in New Denver, B.C. on November 4, 2004, when he stated falsely that Steele was an extremely gifted trader who was earning impressive gains for his investors.

Wocknitz had known W. Fulkco very well as members of the New
Denver, B.C. community.   When Wocknitz made her investment in
Steele's pool, W. Fulkco failed to tell her that Steele was losing enormous
sums of his investors' money trading futures contracts at Interactive, and
that he was misappropriating their money.  Wocknitz relied justifiably on
these omissions and misrepresentations of material fact, when she invested
$25,000 CDN on Novem-ber 11, 2004, in Steele's pool.

(88)    In February 2003, Plaintiff McCrory, told his long-time
friend Plaintiff, James York ("York"), about Steele's pool while visiting
him at his home in Castlegar, B.C.  On October 1, 2004, McCrory showed
York copies of his Phony Statements.  McCrory indicated that D. Fulkco
told him that if Steele incurred losses on three (3) consecutive days he
would stop trading and give the investors the opportunity to withdraw the
money in their accounts.  On November 22, 2004, York called D. Fulkco
in Victoria, B.C.  D. Fulkco returned York's call on November 24, 2004.
D. Fulkco told York that he and his father, W. Fulkco, made investments
in Steele's pool, and that they trusted him implicitly.  York spoke with D.
Fulkco again on November 27, 2004, when D. Fulkco stated falsely that
his own investment was doing very well.  Shortly thereafter, York met the
Fulkcos at a coffee shop in Castlegar, B.C., when he told them that he
wanted to make an investment in Steele's pool, but D. Fulkco and W.
Fulkco failed to tell York that Steele was losing enormous sums of his
investors' money trading futures contracts at Interactive, and that he was

misappropriating their money. York relied justifiably on these omissions and misrepresentations of material fact, when he invested $12,016 CDN on November 30, 2004, $18,823 CDN on March 3, 2005, and $17,000 CDN on April 21, 2005, in Steele's pool.

(89)    On February 14, 2005, Plaintiffs, Thomas and Henriette Zarp (the "Zarps"), called D. Fulkco in Victoria, B.C. from the Mellens' winter home in Lake Havasu City, AZ, after the Mellens showed them the Phony Statements they received for their investment in Steele's pool, which reflected returns of about 8% to 10% per month. D. Fulkco stated falsely that Steele was a very talented commodities trader who had been earning returns of about 8% to 10% per month. D. Fulkco, however, failed to tell the Zarps that Steele was losing enormous sums of his investors' money trading futures contracts at Inter-active, and that he was misappropriating their money. The Zarps relied justifiably on these omissions and misrepresentations of material fact when he invested $60,082 USD in Steele's pool at the end of their telephone conversation with D. Fulkco.

(90)    While Plaintiff, McCrory was doing electrical work in February 2003, at W. Fulkco's home in New Denver, B.C., W. Fulkco told him about an investment in Steele's pool that was earning substantial profits for their investors. From time-to-time throughout 2003, while McCrory was at W. Fulkco's home in New Denver, B.C., W. Fulkco showed him copies of his own Phony Statements to illustrate the returns

he was getting from his own investments in Steele's pool. McCrory had known W. Fulkco for many years while they were living in the New Denver-Silverton, B.C. community, and placed great trust in him. W. Fulkco, however, failed to tell McCrory that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. McCrory relied justifiably on these omissions and misrepresentations of material fact when he invested $11,000 CDN on December 24, 2003, $11,815 CDN on January 20, 2004, $6,500 CDN on March 2, 2004, $7,000 CDN on May 20, 2004, $10,000 CDN on December 3, 2004, $9,000 CDN on January 31, 2005, and $7,000 CDN on March 12, 2005. On September 1, 2004, McCrory withdrew $15,000 CDN from his investment in Steele's pool.

(91)    In January 2005, another investor in Steele's pool, John M. Anderson, told Plaintiff, Elizabeth Berger ("E. Berger"), and her husband, Albert Berger ("A. Berger") ("the Bergers"), that he was earning substantial gains from an investment he made in Steele's pool through the Fulkcos. The Bergers knew that Anderson had known the Fulkco family for many years and considered them honest and trustworthy people. The Fulkcos, however, failed to tell the Bergers when they made their investment in Steele's pool that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. The Bergers relied justifiably on these

omissions and misrepresentations of material fact when they invested $25,000 CDN on March 21, 2005.

(92)    In September 2004, Plaintiff, Kreiger, told her sister, Plaintiff, Ingrid Struebbe ("Struebbe"), about a successful investment she made in Steele's pool while visiting her at her home in Hohenpeissenberg, Germany. Kreiger conveyed all of the information to Struebbe that she received from W. Fulkco in the early spring of 2003, as alleged in subparagraph 53 (91), above. Kreiger showed Struebbe some of the Phony Statements she received for her investment in Steele's pool, which showed very large monthly returns. On or about April 1, 2005, Kreiger called W. Fulkco to make arrangements for an investment for her sister, Struebbe, in Steele's pool. W. Fulkco instructed Kreiger to have Struebbe wire transfer her money to Interactive, but he failed to tell her that Steele was losing enormous sums of his investors' money trading futures contracts at Interactive, and that he was misappropriating their money. Struebbe relied justifiably on these omissions and misrepresentations of material fact when she invested $15,610 CDN on April 1, 2005, in Steele's pool.

(93)    In April or May 2004, Plaintiff, Elaine Woods ("Woods"), met with W. Fulkco at W. Fulkco's home in New Denver, B.C., where he stated falsely that Steele was a very talented trader. He stated that he and his son, D. Fulkco, were managing the administrative side of Steele's investment pool. W. Fulkco showed her one of his Phony Statements,

which reflected a profit of about 8% for the month, which was false.  W.
Fulkco failed to tell Woods that Steele was losing enormous sums of his
investor's money trading futures contracts at Interactive, and that he was
misappropriating their money.  Woods relied justifiably on these omiss-
ions and misrepresentations of material fact when she invested $20,000
CDN on July 7, 2004, $26,500 CDN on September 21, 2004, $15,920
CDN on November 3, 2004, and $12,305 CDN on March 23, 2005, in
Steele's pool.

(94)    In the summer of 2003, Shannon met with Plaintiff, Troy
Saladana ("Saladana"), at Shannon's home in Victoria, B.C., where Shann-
on told Saladana about Steele's trading program.  Shannon stated falsely
that Steele was earning great returns trading commodities for his investors.
Shannon went on several fishing trips with Saladana during the summer of
2003, when Shannon told him again about how well Steele's program was
doing.  Still later in the summer of 2003, Saladana met Steele at Steele's
home in Victoria, B.C., when Steele stated falsely that he was earning
returns of about 8% per month using a trading program he developed.
Saladana had grown up with Steele, Shannon and D. Fulkco in New
Denver, B.C., and they had remained friends over the years.  Based on
their long-time friendship, Shannon trusted Steele and D. Fulkco.  Steele
and Shannon failed to tell Saladana that Steele was losing enormous sums
of his investors' money trading futures contracts at Interactive, and that he
was misappropriating their money.  Saladana relied justifiably on these

omissions and misrepresentations of material fact when he invested $68,990 CDN on June 16, 2004, and $89,005 CDN on September 30, 2004, in Steele's pool.

    b.    Steele Opened A Commodity Futures Trading Account At Interactive Stating That He Had A Liquid Net Worth Of Only $175,000, That He Was Self-Employed As A Commodity Futures Trader, That All Of The Money That Would Be Deposited Into His Account Would Belong To Him, And That He Would Be Trading Only For Himself

52.    Steele opened an individual trading account at Interactive (No. U82666) on or about December 16, 2002. (Steele opened two additional accounts at Interactive (Nos. U99311 and U10127), but all, or almost all, of the activities that are the subject of this case were conducted through Account No. U82666. Account U10127 was never funded.) (All references made herein to "Steele's account" shall include all three accounts.)

53.    Steele submitted account opening forms to Interactive on or about December 16, 2002, which stated, among other things, that he had a "liquid net worth" of only $175,000 (U.S.), and that he was self-employed as a trader.

54.    Steele also told Interactive that that the money that would be deposited in his account would be his and his alone, and that he would be trading futures contracts for himself only, but, beginning in February 2003, or about two months later, when Steele began perpetrating his fraudulent scheme, until May 2005, when it finally collapsed, Interactive: (a) accepted wire transfers and checks from third parties totaling more than $7,700,000, which it credited to Steele's account knowing that the funds did not belong to him; (b) issued checks made payable to him personally and wire transferred funds to his personal bank account at Bank of America totaling more than $3,100,000, knowing that

the funds did not belong to him; and (c) entered orders for the purchase and sale of highly speculative commodity futures contracts worth many millions of dollars with funds that it knew did not belong to him, which resulted in losses totaling more than $4,300,000.

> c.    Interactive Accepted Wire Transfers From Third Parties Totaling $7.7 Million Dollars That It Credited To Steele's Account

55.    In certain instances, Steele or the Fulkcos told the Plaintiffs or other investors to issue checks to Abriel Asset Management or wire transfer their funds to Abriel Asset Management, which they did. Abriel Asset Management then wire transferred their money to Interactive.

56.    In other instances, Steele, Shannon, or the Fulkcos told the Plaintiffs or other investors to wire transfer their funds directly to Interactive to be credited to Steele's account, which they did. In fact, four (4) of the Plaintiffs made 14 wire transfers directly to Interactive in their own names.

57.    In various instances, Steele, Shannon, or the Fulkcos told the Plaintiffs or other investors to issue checks to Custom House Currency Exchange ("CHCE") and give them to Steele, which they did.

58.    Steele, Shannon, or the Fulkcos then brought the checks to CHCE, and asked CHCE to wire transfer the funds to Interactive, which it did.

59.    Upon information and belief, none of the money that Interactive credited to Steele's Interactive account belonged to him. If any of the money that Interactive credited to Steele's account belonged to Steele, it would have represented a tiny fraction of the money that Interactive credited to his account.

60.    Most, if not all, of the wire transfers that Interactive received were made to Interactive in the name of someone other than Steele.

61.    During the period of February 2003 through May 2005, Interactive received at least 135 wire transfers from third parties totaling about $7,700,000 (U.S.), which Interactive credited to Steele's account.

62.    Eighty (80) of the 135 wire transfers came from Abriel Asset Management, 12 came from CHCE, and 43 came from 18 individual investors in foreign countries, including, at least, Canada, Germany, and Switzerland as well as the United States.

63.    On various days, Interactive received multiple deposits from third parties that it credited to Steele's account.

> d.    Interactive Issued Checks Made Payable To Steele Personally or Wire Transferred Approximately $3.1 Million To His Personal Bank Account

64.    During February 2003 through May 2005, a period of approximately 26 months, Interactive processed approximately 200 withdrawals from Steele's account by issuing checks made payable to him personally or by wire transferring funds to his personal bank account at Bank of America, which totaled approximately $3,100,000 (U.S.).

65.    One-half of Steele's withdrawals were for sums less than $30,000, while others were for hundreds of thousands of dollars.

66.    Some of Steele's withdrawals were made on the same day deposits were made into his account.

> e.    Interactive Executed Speculative Futures Trades For Steele That Were Worth Many Millions Of Dollars, Which Resulted In Losses Of About $4.3 Million

67.    During the period of February 2003 through May 2005, Interactive executed numerous speculative futures trades for Steele worth many millions of dollars,

which resulted in losses totaling more than $4,300,000 (U.S.), including commissions totaling $649,308 (U.S.) that Interactive deducted from Steele's account.

> f.  Interactive Knew That The Money In Steele's Account Did Not Belong To Him

68.    During the first 13 months that Steele was perpetrating his fraudulent scheme (February 2003–March 2004), Interactive received deposits from third parties totaling about $580,000 (U.S.), which Interactive credited to Steele's account.

69.    During the same period, Steele incurred losses of approximately $240,000 (U.S.) from trades Interactive executed for him, and Interactive issued checks made payable to him personally or wire transferred money to his personal bank account totaling about $150,000 (U.S.).

70.    Interactive knew that the amount of these deposits, withdrawals, and trading losses were out of line for a full-time trader who had a liquid net worth of only $175,000 (U.S.).

71.    Interactive asked Steele where he was getting the money he was using to trade futures contracts.

72.    Steele told Interactive that he was a full-time trader, who was merely trying to earn a living trading futures contracts, and that he was only withdrawing money "to pay for his living expenses".

73.    Steele's response failed to answer Interactive's question about where he was getting the money he was using to trade futures contracts at Interactive.

74.    Interactive consciously disregarded Steele's non-responsive answer, without even asking him why third parties had deposited so much money into his account or

why he had not issued checks personally or wire transferred any funds to Interactive in his own name.

75.    Despite Steele's failure to explain where he was getting the money that was deposited into his account, over the next 13 months (April 2004-May 2005), Interactive: (a) accepted wire transfers from third parties totaling more than $7,400,000 (U.S.), which Interactive credited to Steele's account knowing that the funds did not belong to him; (b) processed numerous wire transfers to his personal bank account at Bank of America and issued checks that it made payable to him personally, which totaled about $3,000,000 (U.S.) knowing that the funds did not belong to him; and (c) executed numerous speculative futures trades for him that were worth many millions of dollars, which resulted in steady losses totaling more than $4,000,000 (U.S.), including more than $600,000 in commissions that Interactive deducted from his account, knowing that the funds did not belong to him.

76.    At no time while Steele's account was opened at Interactive, did Interactive even ask Steele whether he had liquidated any non-liquid assets to make deposits into his account at Interactive.

77.    Interactive knew that the money Steele was withdrawing from his account was far greater than anything he needed to "pay for his living expenses", but Interactive knowingly, intentionally, and consciously ignored Steele's obvious lies.

78.    Interactive did not want to know any of the details about Steele's fraudulent scheme, because if it made any reasonable inquiries about what he was doing, his criminal activities it would have been laid bare for the rest of the world to see, and Inter-

active would have lost any opportunity to claim, albeit falsely, that it knew nothing about Steele's fraudulent scheme.

79.    Moreover, Interactive would have lost the opportunity to continue paying itself hundreds of thousands of dollars in commissions from Steele's account.

80.    Despite the obvious, glaring "red flags" surrounding Steele's account, Interactive continued giving Steele substantial assistance to carry out his fraudulent scheme.

81.    In September 2004, Interactive asked Steele disingenuously about where he was getting money to trade futures contracts -- knowing full well that the funds in his account did not belong to him.

82.    Steele responded by stating, once again, that he was a "full-time day trader", and that he was merely withdrawing money from his account "to pay for his living expenses".

83.    Interactive knew that Steele's representations could not be true, but it, nonetheless, intentionally, knowingly, and consciously ignored his lies and continued to give him substantial assistance to carry out his fraudulent scheme.

84.    Clearly, the magnitude and patterns of the deposits, withdrawals, and trading losses in Steele's account, and the patently false explanations he gave Interactive, made clear to Interactive that the funds in his account did not belong to him.

85.    At about the same time that Steele told Interactive in September 2004 that he was a "full-time day trader", and that he was merely withdrawing money from his account "to pay for his living expenses", he sent Interactive an email, which stated that

the money in his account came from "revenue property and real estate he had in various countries", and that "his liquid net worth had increased from $175,000 to $300,000".

86.    This email said nothing about "trying to earn a living" as a "full-time day trader."

87.    Interactive knew that the inconsistencies in Steele's explanations did not add-up.

88.    Interactive knew that Steele could not have been engaging in a new, robust real estate business in foreign countries while working as a "full-time day trader" over this 13-month period.

89.    Interactive also knew that Steele could not have been depositing millions of dollars into his account to trade risky futures trades with a liquid net worth of only $300,000 -- unless he was using money that did not belong to him.

90.    Interactive did not even ask Steele why he had said that he only had a liquid net worth of $300,000, when he claimed that he had so much "income" flowing freely into and out of his account from foreign real estate transactions.

91.    Interactive did not even ask Steele why Abriel Asset Management, CHCE, and 18 individuals and other entities had wire transferred so much money to Interactive on so many occasions, or why none (or possibly, almost none) of the deposits made into his account had been made in his own name.

92.    Interactive also knew that companies with names ending in "Asset Management", like Abriel Asset Management, typically invest money for clients, but Interactive failed to even ask Steele why so much money was coming from Abriel Asset Management, or what his relationship to Abriel Asset Management was; nor did Inter-

active do anything else to determine what the nature of Abriel Asset Management's business was.

93.    At no time did Interactive even try to contact any of the 18 individuals, CHCE, or Abriel Asset Management to inquire: (a) whether Steele was managing investments for them or other third parties; (b) whether the millions of dollars they were wire transferring to Interactive belonged to them; (c) whether their deposits related in any way to legitimate real estate transactions in foreign countries; (d) whether they knew that Steele had directed Interactive to issue checks made payable to him personally and wire transfer funds totaling many millions of dollars to his personal bank account at Bank of America; or (e) whether they knew he was losing many millions of dollars trading futures contracts in his account at Interactive.

94.    Interactive's employees did not even ask Steele whether he would mind if they called any of the 18 individuals, CHCE, or Abriel Asset Management to inquire about these matters.

95.    At no time did Interactive contact Bank of America to ask whether the bank had any information, along with its own, that would indicate whether the enormous sums that Interactive received from third parties in at least three foreign countries and the United States, which Interactive had wire transferred to the Bank of America later, belonged to the third parties -- as opposed to Steele.

96.    Indeed, Interactive did not want another financial institution to do an investigation that could expose Steele's criminal activities and deprive it of the opportunity to continue deducting more and more commissions from Steele's account and

interfere with its ability to claim later, albeit falsely, that it had no idea that Steele was defrauding so many people around the world.

97.    Interactive also knew that Steele's representations made about receiving income from so many real estate transactions were patently false because he would have to report his profits and losses from futures trading separately from the income he said he was receiving from foreign real estate transactions on his tax returns, and that commingling his profits and losses from both businesses would create substantial and unnecessary difficulties when preparing his tax returns.

98.    Interactive's employees are very sophisticated about financial matters; to be sure, their sole business involves financial matters.

99.    Once again, Interactive knew that numerous third parties had deposited money into Steele's account that did not belong to him, and that he was acting as an illegal commodity pool operator so he could misappropriate millions of dollars from numerous persons around the world.

100.    In short, Interactive knowingly, intentionally, and consciously ignored the obvious, glaring "red flags" surrounding Steele's account so it could continue deducting hundreds of thousands of dollars in commissions from his account on a steady basis.

> g.    Interactive Urged Steele To Limit The Number Of Deposits Made In His Account Because His Regular Activity For Making Deposits Was Raising Flags, Particularly When Withdrawals Were Made On The Same Day

101.    Interactive had a conversation with Steele in April 2005, which plainly shows that Interactive knew that Steele was defrauding third parties.

102.    Interactive told Steele that he had to "consolidate [the] deposits and withdrawals because…the regular activity is what is drawing flags … especially when the withdrawals are coupled with deposits on the same day…it raises the question…"

103.    Interactive told Steele that it "would prefer to see a withdrawal once a month for $250,000."

104.    Interactive wanted Steele to make only one $250,000 withdrawal each month to conceal the fraud he was perpetrating on third parties.

105.    Clearly, Interactive knew that a trader who had a liquid net worth of only $175,000 or even $300,000 could not withdraw $250,000 each month from his account -- unless the money belong to third parties.

106.    Interactive also knew that Steele did not need $250,000 per month to pay for his living expenses, but it continued to give him substantial assistance so he could continue perpetrating his fraudulent scheme.

> h.    Interactive Recklessly Allowed Steele To Make Enormous Trades
> That Resulted In Losses Of About $2,000,000 Over A Period Of
> Only Two Days

107.    In May 2005 Interactive recklessly allowed Steele to make trades in his account that resulted in approximately $2,000,000 in losses over a period of only two (2) days, knowing full well that he was using money to trade futures contracts that did not belong to him

> i.    Interactive Was Finally Forced To Report Steele's Illegal
> Activities To The Authorities in May, 2005

108.    On or about May 15, 2005, one of Steele's investors, Alan De Chezet ("De Chezet"), called Interactive to ask a question about his account.

109.    Interactive did not have an account for De Chezet on its books and records.

110.    On May 23, 2005, or <u>eight days</u> after it received De Chezet's telephone call, Interactive finally reported Steele's criminal conduct to the CFTC.

111.    If Interactive had failed to report what happened to the authorities, at this point, it would have only made matters worse for itself, and it would have deprived itself of any opportunity to deny, albeit falsely, that it did not have any knowledge about what Steele was doing.

112.    At no time before May 23, 2005 did any of the Plaintiffs know that Interactive was giving substantial assistance to Steele to carry out his fraudulent scheme.

j.    The CFTC Filed An Injunctive Action Against Steele

113.    On May 26, 2005, the CFTC filed an action against Steele in the U.S. District Court for the Northern District of Illinois seeking a temporary restraining order, a preliminary and permanent injunction, an order freezing the funds in his Interactive and Bank of America accounts, a civil monetary penalty, and an order directing him to make restitution to the Plaintiffs and his other investors.

114.    On the same day, May 26, 2005, the District Court entered a temporary restraining order and froze approximately <u>$242,000</u> (U.S.), in Steele's Interactive and Bank of America accounts.

115.    On June 13, 2005, the District Court entered a preliminary injunction against Steele.

116.    When the Royal Canadian Mounted Police ("RCMP") arrested Steele in June 2005, he turned approximately <u>$75,000</u> over to it, and the RCMP, in turn, entrusted

this money to the Provincial Court to be distributed to the Plaintiffs and Steele's other investors.

117.    On November 22, 2005, the District Court entered a permanent injunction against Steele that enjoined him from committing any further violations of the Commodity Exchange Act, as amended, directing Interactive and Bank of America to turn the $242,000 (U.S.) over to the Provincial Court to be distributed to Steele's investors, a civil monetary penalty in the amount of $6,200,000 (U.S.), and an order directing Steele to pay the Plaintiffs and his other investors $7,409,194.75 (U.S.) as restitution for their losses.

k.    The Plaintiffs' Out-Of-Pocket Losses And Other Damages

118.    The Provincial Court distributed portions of said $242,000 (U.S.) in Steele's accounts at Interactive and Bank of America and the $75,000 (U.S.) that Steele turned-over to the RCMP to the Plaintiffs and Steele's other investors.

119.    Faced with Interactive's serious violations of its rules, the NFA's Business Conduct Committee brought a disciplinary action against Interactive alleging, *inter alia*, that it failed to exercise due diligence in connection with Steele's account, which Interactive settled by agreeing to pay a fine in the amount of $125,000 (U.S.) and $325,000 (U.S.) into a restitution fund for investors who would be willing to release Interactive from any claims they might have against it.

120.    The Plaintiffs will not receive any portion of this $325,000 (U.S.) because they have not, and will not release Interactive from the claims they have made herein for such paltry sums.

121.    The CFTC also instituted an administrative action against Interactive where Interactive agreed to pay another $175,000 (U.S.) into a restitution fund for all of Steele's investors.

122.    The CFTC's order does not require an investor to sign a release to receive a distribution from the $175,000 restitution fund.

123.    The Provincial Court also agreed to distribute the $175,000 to Steele's investors, which it has done.

124.    The portions of the $242,000 (U.S.) and $75,000 (U.S.) and the portions of the $175,000 (U.S.) the Plaintiffs received from the Provincial Court represent a tiny fraction of their losses.

125.    All of the Plaintiffs, except five, were residents of Canada, Germany, and Switzerland (the "Foreign Plaintiffs") when they made their investments in Steele's commodity pool.

126.    The remaining Plaintiffs resided in the United States when they made their investments.

127.    During 2003-2005, the Foreign Plaintiffs used Canadian Dollars, Euros, or Swiss Francs to make their investments in Steele's commodity pool.

128.    If the Court decides to enter a judgment against Interactive in favor of the Foreign Plaintiffs in U.S. Dollars, the amount of their judgments must account for the differences in the exchange rates that were in effect when they made their investments and the exchange rates that will be in effect when the Court enters its judgments.

129.    Without regard to the differences in exchange rates, all of the Plaintiffs have suffered out-of-pocket losses totaling approximately $4,000,000 (U.S.).

130.    The Foreign Plaintiffs would not be made whole if the Court's judgment did not account for such differences in the exchange rates in effect at these times if the U.S. dollar remains weaker than it was when the Foreign Plaintiffs made their investments.

131.    In addition, Interactive must pay all of the Plaintiffs interest at a rate the Court deems just and equitable to compensate them for the opportunities they lost to make alternative investments.

132.    The Plaintiffs would not be made whole without an award of interest or other measure of their opportunity losses to compensate them for the damages they sustained as a result of Interactive's tortious conduct.

133.    After appropriate adjustments are made for the differences in exchange rates for the Foreign Plaintiffs and interest is added to all of the Plaintiffs' out-of-pocket losses, the Plaintiffs' damages, as of today's date, are approximately $6,400,000.

134.    The CFTC's administrative order characterizes the $175,000 that Interactive must pay into a restitution fund as "commissions", which Interactive withdrew from Steele's account.

135.    Interactive is still wrongfully retaining at least $474,308 in commissions it paid itself from Steele's account.

VI.    Plaintiffs' Causes of Action

COUNT ONE

Intentionally And Knowingly Aiding And Abetting<br>Steele's Fraudulent Scheme And Breaches Of Fiduciary Duties

1-135. The Plaintiffs re-allege paragraphs 1-135, above, and incorporate same herein by reference.

136.    Steele was at all times relevant hereto acting as the Plaintiffs' agent, which gave rise to fiduciary duties that he owed them of loyalty, candor, honesty, and to use their assets solely for their benefit.

137.    In addition, the Plaintiffs reposed trust and confidence in Steele by giving him discretion to invest their assets.

138.    By accepting that trust and confidence, Steele placed himself in a position that was superior to Plaintiffs', which gave rise to the same fiduciary duties he owed them as their agent.

139.    By defrauding the Plaintiffs, Steele knowingly, willfully, and intentionally breached the fiduciary duties he owed them.

140.    Interactive was regularly aware of its role in Steele's tortious conduct.

141.    Interactive intentionally and knowingly aided and abetted Steele's fraudulent scheme and his breaches of the fiduciary duties he owed the Plaintiffs.

142.    Interactive's acts and omissions were willful and wanton and were committed with utter indifference to and in conscious and reckless disregard for the Plaintiffs' welfare.

143.    Interactive's willful and wanton misconduct was the proximate cause of the Plaintiffs' damages.

144.    Interactive's acts and omissions were the proximate cause of the Plaintiffs' damages.

145.    Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of its employees alleged herein.

## COUNT TWO

### Aiding And Abetting Steele's Fraudulent Scheme And Breaches Of Fiduciary Duties By Intentionally, Knowingly, And Consciously Ignoring Obvious, Glaring "Red Flags" Relating To Steele's Criminal Conduct

1-145.  The Plaintiffs re-allege paragraphs 1-145 of Count One, above, and incorporate same herein by reference.

146.    Interactive aided and abetted Steele's fraudulent scheme and breaches of fiduciary duties by intentionally, knowingly, and consciously ignoring the obvious, glaring "red flags" surrounding Steele's account.

147.    Interactive's acts and omissions were willful and wanton and were committed with utter indifference to and in conscious and reckless disregard for the Plaintiffs' welfare.

148.    Interactive's acts and omissions were the proximate cause of the Plaintiffs' damages.

149.    Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of its employees alleged herein.

## COUNT THREE

### Intentionally and Knowingly Aiding and Abetting Steele's Conversion of Plaintiffs' Assets

1-149.  The Plaintiffs re-allege paragraphs 1-149 of Count Two, above, and incorporate same herein by reference.

150.    The Plaintiffs have a right to the assets they entrusted to Steele, Shannon, and the Fulkcos to trade futures contracts at Interactive.

151.    The Plaintiffs have and immediate and unconditional right to possess the assets they entrusted to Steele, Shannon, and the Fulkcos.

152.    Steele wrongfully assumed control and ownership of the Plaintiffs' assets.

153.    The U.S. District Court for the Northern District of Illinois ordered Steele to make restitution to the Plaintiffs and his other investors, which Steele has failed to do.

154.    The Plaintiffs either deposited their funds directly into Steele's Interactive account or they entrusted them to the Fulkcos or Steele, and the Fulkcos or Steele then deposited them directly into Steele's Interactive account. For this reason, the Plaintiffs' funds can be traced directly to Interactive.

155.    Interactive knowingly and intentionally provided substantial assistance to Steele so he could carry out the fraudulent scheme and convert the Plaintiffs assets. Interactive received and benefited from the assets Steele converted from the Plaintiffs.

156.    Interactive's acts and omissions were willful and wanton and were committed with utter indifference to and in conscious and reckless disregard for the Plaintiffs' welfare.

157.    Interactive's acts and omissions were the proximate cause of the Plaintiffs' damages.

158.    Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of its employees alleged herein.

COUNT FOUR

Aiding and Abetting Steele's Conversion of Plaintiffs' Assets<br>By Intentionally, Knowingly, and Consciously Ignoring Obvious, Glaring "Red Flags"

1-158. The Plaintiffs re-allege paragraphs 1-158 of Count Three, above, and incorporate same herein by reference.

159.    Interactive provided Steele with substantial assistance in converting the Plaintiffs' assets by intentionally, knowingly, and consciously ignoring obvious, glaring "red flags" surrounding Steele's account.

160.    Interactive's acts and omissions were willful and wanton and were committed with utter indifference to and in conscious and reckless disregard for the Plaintiffs' welfare.

161.    Interactive's acts and omissions were the proximate cause of the Plaintiffs' damages.

162.    Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of its employees.

### COUNT FIVE

Unjust Enrichment Warranting The Imposition Of A Constructive
Trust On The Commissions Interactive Deducted From Steele's Account

1-162.    The Plaintiffs re-allege paragraphs 1-162 of Count Four, above, and incorporate same herein by reference.

163.    Interactive systematically paid itself commissions from Steele's account totaling $649,308 for the trades it executed for him with the Plaintiffs' and other investors' money.

164.    The CFTC ordered Interactive to pay $175,000 of the commissions it deducted from Steele's account to the Plaintiffs and his other investors, leaving, at least, $474,308 in commissions, it is retaining wrongfully.

165.    Interactive is not permitted to benefit from its wrongful conduct by retaining the commissions it paid itself from Steele's account to the detriment of the Plaintiffs.

166. Interactive's retention of these commissions would violate fundamental principles of justice, equity, and good conscience.

167. The Plaintiffs have a greater right to these commissions than any right Interactive might have.

168. Interactive would be unjustly enriched if it were allowed to retain these commissions.

169. The Court should impose a constructive trust upon said commissions for the benefit of the Plaintiffs.

170. Upon information and belief, Interactive's officers and managers knowingly authorized and ratified the acts and omissions of its employees alleged herein.

VII.    Prayer for Relief

WHEREFORE, the Plaintiffs hereby request that the Court enter: (a) money judgments against Interactive in the amounts of their losses (with adjustments for the differences in the exchange rates where necessary); (b) with interest at a rate the Court deems just and equitable; (c) the imposition of a constructive trust on, at least, $474,308 in commissions Interactive deducted from Steele's account; (d) punitive damages in an amount to be determined at trial; (e) reasonable attorney's fees and expenses; (f) the costs of this action; and (g) any other relief the Court deems just and equitable.

Respectfully submitted,
Plaintiffs,

By: _____
                Their attorney

Peter J. Berman
Peter J. Berman, Ltd.
332 S. Michigan Avenue, Suite 1000

Chicago, IL 60604-4398
312.408.1114
No. 0190535
Attorney for Plaintiffs

103